UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE YAMEEN,

        Plaintiff,

v.

EATON VANCE DISTRIBUTORS, INC.,

        Defendant, and

EATON VANCE TAX-MANAGED
GROWTH FUND1.1.,

        Nominal Defendant.

Civil Action No. 03-12437-RCL

## MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT EATON VANCE DISTRIBUTORS, INC. TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant Eaton Vance Distributors, Inc. ("Distributors") respectfully submits this Memorandum in support of its Motion to dismiss the complaint ("Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment pursuant to Rule 56.

### INTRODUCTION

This action challenges the payment by the Eaton Vance Tax-Managed Growth Fund 1.1 (the "Fund")[1] of distribution fees to defendant Distributors. The Fund was "closed" to new investors on March 1, 2001, in that it stopped selling shares to persons who were not already shareholders. It continues to offer and sell its shares to current shareholders. The Complaint alleges that the Fund's continued payment of "12b-1 distribution fees" is improper because the Fund is not incurring current distribution expenses and the Securities and Exchange Commission

---

[1] The Fund is named as a nominal defendant and has not been served.

("SEC") rule permitting the payment of distribution fees, Rule 12b-1 under the Investment Company Act of 1940 (the "ICA" or "Investment Company Act") allows payment only to cover distribution expenses incurred in current sales of Fund shares. Complaint ¶ 35. Plaintiff contends that the fees paid to Distributors are therefore "excessive" and may be recovered in an action under Section § 36(b) of the ICA. Complaint ¶ 50.

Plaintiff is simply wrong as a matter of law. Both the SEC, which promulgated Rule 12b-1, and the National Association of Securities Dealers ("NASD"), which has statutory authority to regulate distribution fees and other sales-related charges for mutual funds, have recognized that funds closed to new investors in fact may pay distribution fees for *past* distribution expenses. The Complaint should therefore be dismissed or, in the alternative, summary judgment should be granted to Distributors.

## BACKGROUND

### A.    The Regulatory Framework

The payments at issue in this action are payments by an investment company, or mutual fund, to the principal underwriter, or distributor, of its shares to pay the distributor for its efforts and expenses in distributing the fund's shares. Payment of these fees, commonly known as "Rule 12b-1 fees" or "distribution fees," is authorized and regulated by a comprehensive set of rules approved by the SEC and NASD, beginning in 1980 with the SEC's adoption of Rule 12b-1, 17 C.F.R. 270.12b-1. *See* Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414, 45 Fed. Reg. 73898 (November 7, 1980) ("12b-1 Adopting Release") (adopting Rule 12b-1 under the ICA, which allows mutual funds to use their assets to finance sales related expenses).

Prior to the adoption of these rules, the primary method used by mutual funds to pay sales related expenses (principally commissions to brokers through which investor purchase their fund

2

shares) was to deduct a front-end sales load from the offering price of mutual fund shares. *See* SEC Order Approving Proposed NASD Rule Change Relating to Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, SEC Release No. 34-30897, 57 Fed. Reg. 30985, 30985-86 (July 13, 1992) ("NASD Rule Release"). As an alternative to shares on which a front-end sales load is assessed, usually called Class A shares, the mutual fund industry developed shares, usually called Class B and Class C shares, that carry no "up-front" sales charges, but instead are assessed an "asset-based sales charge" or distribution fee that is paid to the distributor of fund shares. *Id.*[2] Such a distribution fee is expressly authorized by Rule 12b-1 to cover expenses of distribution, including but not limited to "advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature." *See* Complaint ¶ 24. There is nothing in Rule 12b-1, and Plaintiff has cited no authority, for the theory that distribution fees cannot be applied to pay for past expenses.

In Section 22(b) of the ICA, Congress granted the NASD the power to regulate all sales charges, including the distribution fees at issue in this case. *See* Proposed Rule Change by NASD Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, SEC Release No. 29070, 56 Fed. Reg. 16137, 16139 (April 19, 1991). NASD Rule 2830 (previously known as Section 26 of the NASD Rules of Fair Practice), entitled "Investment Company Securities", sets the permissible sales charges for distribution of investment company shares.[3] Rule 2830 (a copy of which is included in the Appendix of Additional Legal Materials submitted in support of this Motion) defines "sales charge" as "all charges or fees that are paid to

---

[2] Shareholders who do not pay a front-end sales load and who sell, or redeem, these shares within a few years of purchasing generally also must pay a "contingent deferred sales charge" upon redemption. *See* NASD Rule Release at 30986.

[3] The SEC approved this Rule. *See* NASD Rule Release 57 Fed. Reg. at 30989-90.

finance sales or sales promotion expenses . . . ." Rule 2830(b)(8). Rule 2830 defines "asset-based sales charge" as "a sales charge that is deducted from the net assets of an investment company and does not include a service fee." Rule 2830(b)(8)(A). Under Rule 2830, an investment company may pay both an "asset-based sales charge" and a "service fee."[4] The asset-based sales charge may not exceed .75 of 1 percent per annum of the average annual net assets of the investment company plus interest. Rule 2830(d)(2)(E). The fees at issue here are asset-based sales charges, generally referred to as distribution fees.

SEC Rule 17d-3 completes the regulatory framework governing distribution fees. Promulgated at the same time as Rule 12b-1, Rule 17d-3 allows funds to enter into written agreements with their affiliates who serve as the principal underwriter of fund shares to permit the funds to make payments to the affiliates in connection with the distribution of those shares. 17 C.F.R. § 270.17d-3; see SEC 12b-1 Adopting Release, 45 Fed. Reg. at 73898, 73904-06.

### B. The Fund's Distribution Arrangements

Defendant Distributors acts as the Fund's principal underwriter and distributes the Fund's shares to and through selling brokers under an Amended and Restated Distribution Agreement ("Distribution Agreement"). Statement of Material Facts Not In Dispute (hereinafter the "Statement") ¶¶ 2-3. The Distribution Agreement covers the distribution of all Fund shares, including Class A, Class B and Class C shares. Statement ¶ 3. The Fund also has a Class B Distribution Plan and a Class C Distribution Plan, both of which were approved by the Fund's

---

[4] See Questions #23 and #24 of NASD Notice to Members 93-12 (a copy of which is included in the Appendix of Additional Legal Materials submitted in support of this Motion). Service fees, which are not at issue in this case, may not exceed .25 of 1% of average net assets per annum. Rule 2830(d)(2)(E) and (5). Rule 2830 defines "service fees" as "payments by an investment company for personal service and/or the maintenance of shareholder accounts." Rule 2830(b)(9).

4

Board of Trustees. Statement ¶ 4.[5] These Plans are regularly reviewed by the Board, in accordance with Rule 12b-1. *See* Complaint ¶¶ 24-25; 27-28.

Pursuant to the Distribution Agreement, the Fund agrees to pay a commission to Distributors at the time of each sale. Purchasers of Class A shares have a percentage of the purchase price, a "front end load," deducted and used to pay the brokerage commissions and other distribution expenses. Statement ¶ 5. Purchasers of Class B and C shares, on the other hand, do not pay front-end loads, so that all of their investment is used to buy Fund shares. Statement ¶ 6. The distribution expenses, including commissions to the selling brokers, are paid by defendant Distributors. Statement ¶ 6. In essence, purchasers of Class B and C shares finance the commissions and other distribution expenses relating to their shares, rather than paying for the expenses up front as do the Class A shareholders. The Fund's Distribution Agreement and Distribution Plans provide that a commission will be paid to the Distributor on each sale of Class B and Class C shares and that the amounts due to the Distributors in respect of Class B and Class C share sales are to be accrued as "uncovered distribution charges" and paid as a fee (calculated daily and paid monthly) equal to up to an annual rate of .75% of the net asset value of the Fund's Class B and C shares. Complaint ¶ 29; Statement ¶¶ 7-10. The Fund may

---

[5] The Distribution Agreement and the Fund's Class B Distribution Plan and Class C Distribution Plan ("12b-1 Plan") are referenced in the Complaint and are public documents filed with the SEC. *See, e.g.,* Complaint ¶ 27-34 (describing Fund's 12b-1 plan and distribution agreement). These materials can properly be considered by this Court on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 32 (1st Cir. 2000); *Blackstone Realty LLC v. Federal Deposit Ins. Corp.,* 244 F.3d 193, 195 n.2 (1st Cir. 2001); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 n.34 (1st Cir. 1996); *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir. 1988) (quoting 5 Wright & Miller, Federal Practice and Procedure § 1327 at 489 (1969) ("when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading")). For the Court's convenience, copies of these documents are attached to the Declaration of James L. O'Connor, filed herewith.

make such payments to Distributors only after and as a result of the sale of Fund shares (*i.e.*, as sales commissions imposed on the actual sales of Fund shares). Statement ¶ 8.

The "uncovered distribution charges" are tracked by share class on a daily basis by the Fund administrator. Statement ¶ 9. Uncovered distribution charges are reduced by payments of distribution fees. When the amount of uncovered distribution charges for a Class of shares reaches zero, the Fund ceases to accrue or pay the 75 bases point distribution fee. Statement ¶ 10. As of December 31, 2002, the Fund's uncovered distribution charges were $86,884,581 for Class B shares and $86,489,100 for Class C shares. Statement ¶ 11.

## ARGUMENT[6]

Plaintiff's Complaint fails to state a claim for two reasons: *First*, Section 36(b) provides no remedy here. Courts have consistently held that a claim under Section 36(b) must involve a claim of excessive ***investment advisory fees*** paid by an investment company. Section 36(b) expressly excludes from its reach "compensation or payments made in connection with transactions subject to section 17 of this title (the ICA) or the rules, regulations or orders thereunder." Section 36(b)(4). Distribution fees under Rule 12b-1 are subject to Section 17 and the rules thereunder -- indeed, the SEC's Section 17 rules were amended to regulate them. Since

---

[6] "In ruling on a motion to dismiss, a court must 'accept all well-pleaded facts of the complaint as true and draw all reasonable inferences in favor of the plaintiff.'" Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 506 (1st Cir. 2002) (citing Aybar v. Crispin-Reyes, 118 F.3d 10, 13 (1st Cir. 1997)). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Yenush v. Pioneer Group, Inc., No. 02-11379-DPW, 2004 WL 187385, at *3 (D. Mass. Jan. 22, 2004). The party seeking summary judgment "must make a preliminary showing that no genuine issue of material fact exists." Yenush, 2004 WL 187385, at *3 (citing National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Circ. 1995)). Once such a showing has been made, the nonmoving party must "point to specific facts demonstrating that there is, indeed, a trialworthy issue." Yenush, 2004 WL 187385, at *3 (citing National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Circ. 1995)).

Plaintiff's entire claim is based on "Rule 12b-1 distribution fees" (*see, e.g.,* Complaint, Introduction), Distributors' receipt of fees is not subject to attack under Section 36(b).

*Second,* even if Section 36(b) could be applied to distribution fees, Plaintiff cannot establish the essential element of a Section 36(b) claim: that the fees are excessive. Plaintiff does not contend that the amount of the fees or the rate at which they are charged exceed NASD limits. Plaintiff's claim is based entirely on the fact that distribution fees were paid after the Fund had been closed to new investors. The SEC has stated expressly that distribution fees may be paid for *past* distribution expenses, even after a fund is closed, as long as payments do not exceed NASD limitations. And in interpreting its own Rule 2830, the NASD has expressly recognized that distribution fees may be paid after a mutual fund closes to new investors.[7]

In the alternative, defendant Distributors is entitled to summary judgment. As the undisputed facts set forth in the Statement establish (and as Plaintiff well knows), the distribution fees are being used for an entirely legitimate purpose. As of December 31, 2002 the Fund had over $170 million in "uncovered distribution charges" representing amounts due defendant Distributors for past sales of Class B and C shares. These expenses primarily were to pay brokerage commission to the brokers through which Class B and C shareholders bought their shares. Had Distributors not paid these expenses, the Fund would have had to do so directly, or no sales of Class B or Class C shares would have been made. The Fund and its shareholders have thus derived the benefit from the past distribution expenses incurred by Distributors. It is also undisputed that, under the Distribution Agreement, once uncovered distribution charges are paid, the Fund will pay no more distribution fees. Since there has been no receipt by Distributors

---

[7] *See* NASD Notice to Members 93-12, Question 6.

of "excessive" distribution fees and no possibility of such receipt in the future, defendant Distributors is entitled to judgment as a matter of law.

## I. THE EXPRESS RIGHT OF ACTION UNDER SECTION 36(b) DOES NOT ENCOMPASS DISTRIBUTION FEES

Section 36(b) of the ICA creates only a limited cause of action aimed at excessive advisory fees. Indeed, "the case law is unanimous that ... a section 36(b) claim must either involve a challenge to excessive advisory fees per se or to conduct that results in excessive advisory fees." *Rohrbaugh v. Investment Co. Inst.*, Fed. Sec. L. Rep. ¶ 91,961, 2002 WL 31100821, at *9 (D.D.C. July 2, 2002).

Federal courts have repeatedly recognized that a complaint that does not allege excessive advisory fees fails to state a claim under Section 36(b) and therefore must be dismissed. *See, e.g., In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 343 (S.D.N.Y. 1996) (a complaint alleging that the distributor was paid "at an annual rate of 0.75% of the average daily net assets of the Fund for specific expenses incurred in promoting the sale and distribution of the Fund's shares" but not alleging receipt of compensation for advisory services failed to state Section 36(b) claim.); *Rohrbaugh*, 2002 WL 31100821, at *9 (dismissing complaint alleging that the payment of certain trade group membership dues was wasteful and therefore trade group's receipt of such fees violated Section 36(b); "given that Plaintiffs have failed to assert any facts alleging a breach of fiduciary duty related to advisory fees, the Court concludes that Plaintiffs do not have a cognizable section 36(b) claim."); *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 491-92 (N.D. Ill. 1999) (service payments received by corporate parent of fund's investment adviser could not be the basis for a section 36(b) violation; it is outside the language and intent of 36(b) to hold liable "affiliated persons" where the complaint does not allege that those "affiliated persons" received compensation for advisory

services); *In re Nuveen Fund Litig.*, 1996 WL 328006, at *15 (N.D. Ill. June 11, 1996) (complaint alleging that advisor devised rights offering to generate fees regardless of consequences to fund does not state a claim under section 36(b) because it "does not challenge the fee arrangement between the Advisor and the Funds");[8] *see also Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 329 (4th Cir. 2001) ("[g]eneral breach of fiduciary duty claims which involve merely an incidental or speculative effect on advisory fees are not properly within the scope of Section 36(b)").

These authorities are entirely consistent with the text of Section 36(b), which specifically excludes from its reach the Rule 12b-1 fees that Plaintiff seeks to attack. Section 36(b)(4) expressly provides that Section 36(b) "shall not apply to compensation or payments made in connection with transactions subject to Section 17 of this title [the ICA], or the rules, regulations or orders thereunder, or to sales loads for the acquisition of any security issued by a registered investment company."

Plaintiff simply ignores the limit on the reach of Section 36(b) set by the cases and the statute itself. The Complaint does not so much as mention the advisory fees paid by the Fund, let alone allege that these fees are excessive. Instead, as noted above, it focuses exclusively on the Fund's Rule 12b-1 distribution fees. Payments of these fees are unquestionably "payments made

---

[8] Two decisions indicate that Rule 12b-1 fees may be taken into account in determining whether advisory fees are excessive under Section 36(b). *See Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76, 83 (2d Cir. 1985) ("[a] claim that payments made under rule 12b-1 are excessive when combined with advisory fees, where both payments are made to 'affiliated persons' of an investment adviser, is cognizable under section 36(b)"); *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990) (if 12b-1 fees could not be considered in determining whether section 36(b) has been violated "investment advisers might be able to extract additional compensation for advisory services by excessive distributions" under Section 36(b)). Here, there is no allegation that advisory fees are excessive, the distribution fees are "compensation" or that Distributors benefits from them in any way, other than to recoup its advances to the Fund.

9

in connection with transactions subject to Section 17 [of the ICA], or the rules ... thereunder." The payments under contracts with fund distributors are specifically addressed and (subject to the constraints of Rule 12b-1) authorized by ICA Rule 17d-3.[9] *See* Rule 12b-1 Adopting Release, 45 Fed. Reg. 73898 at 73898 ("[t]he Commission also is adopting [Rule 17d-3] to exempt from the requirement of prior Commission approval, to the extent necessary, certain agreements between open-end management investment companies and their affiliated persons whereby investment company assets are used for distribution, if such agreements are entered into in compliance with the rule permitting such companies to bear their distribution expenses"); *id.* at 73901 ("[t]he Commission is exercising its authority under section 17(d) to permit arrangements for use of fund assets for distribution which involve covered joint transactions only if such arrangements comply with rule 12b-1").[10]

In short, Section 36(b) does not reach the Rule 12b-1 fees under the circumstances alleged here, and accordingly, the Complaint should be dismissed as a matter of law.

---

[9] Absent Rule 17d-3, a 12b-1 plan would be a "joint transaction" forbidden by Section 17(d) and Rule 17d-1 thereunder because:

> If a fund finances distribution, it becomes so actively and intimately involved in the distribution process that, even if it contracts with an underwriter, it cannot fairly be said to be distributing through that underwriter. Such a fund should more properly be viewed as acting as a distributor along with the underwriter.

12b-1 Adopting Release, 45 Fed. Reg. at 73902.

[10] Plaintiff's allegations that the Fund's Rule 12b-1 Plan did not comply with Rule 12b-1, *see, e.g.,* Complaint ¶¶ 41-42, are irrelevant in determining whether the Rule 12b-1 distribution payments are "subject to" Section 17 and the rules thereunder for purposes of Section 36(b)(4). In this context, "subject to" is synonymous with "governed by." *See, e.g., United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 547 (D.C. Cir. 2002) ("an entity is 'subject to' a particular legal regime when it is regulated by, or made answerable under, that regime"); *Texaco, Inc. v. Duhe*, 274 F.3d 911, 918-19 (5th Cir. 2001) (natural gas became "subject to an existing contract" within the meaning of the Natural Gas Policy Act when it was "governed by" the terms of that contract).

## II. THE DISTRIBUTION PAYMENTS IDENTIFIED IN THE COMPLAINTS ARE EXPRESSLY AUTHORIZED BY SECTION 22(b) OF THE INVESTMENT COMPANY ACT AND THE RULES THEREUNDER AND ARE THEREFORE NOT EXCESSIVE

Even assuming *arguendo* that Section 36(b) could be used to reach distribution fees standing alone, it cannot be used to attack the payments by the Fund. The permissible amount of these fees is comprehensively regulated by the NASD, and the ability of Distributors to continue receiving them after the closing of the Fund is specifically recognized by the SEC and the NASD, which have the statutory authority under Section 22(b) to regulate the fees. Because the payments at issue unquestionably comport with the NASD Rules, which are designed to avoid "excessive" sales charges while still "allow[ing] reasonable compensation for ... underwriters," *see* ICA Section 22(b)(1), they cannot possibly be deemed excessive as required to state a claim under Section 36(b).

### A. Rule 12b-1 Fees and Other Mutual Fund Sales Charges are Comprehensively Regulated by Section 22(b) and the NASD Rules Thereunder

Current Section 22(b) was enacted as part of the same 1970 Amendments to the Investment Company Act that also added Section 36(b). *See* Investment Company Amendments Act of 1970, Pub. L. No. 91-547, 84 Stat. 1413, 1413-36 (1970). Whereas Section 36(b) created a private right of action as a means of addressing excessive advisory fees, Section 22(b) reflects a Congressional intent to prevent excessive sales charges by delegating to the NASD[11], subject to SEC oversight, responsibility for regulating these charges as they apply to mutual fund shares. As the Senate Committee Report expressed it:

---

[11] All broker-dealers selling investment company shares must be members of a securities association registered with the SEC. *See* 15 U.S.C.A. § 78o-(a)(1) (West 1997). Distributors is a broker-dealer and a member of the NASD (a registered securities association). The NASD regulates for its members the permissible charges for distributing shares of an investment company. *See* NASD Rule 2830. That is why the NASD Rules control this case.

11

> Your committee believes that sales loads should be regulated through the existing industry-government framework of self regulation. Therefore, [Section 22(b)] provides that a registered securities association may by rule prohibit its members from offering redeemable securities at a price which includes an 'excessive' sales load and that the Commission may by its rules alter or supplement the rules of such association. . . . This bill would, therefore, amend section 22 of the Investment Company Act of 1940 to permit associations of securities dealers registered with the Commission under the Securities Exchange Act to adopt rules prohibiting excessive mutual fund sales charges. The NASD is the only such association now registered."[12]

S. Rep. No. 91-184, at 17-18 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4904-05, 4912.

Interpreting Section 22(b), the SEC has found that the NASD possessed the authority to "regulate comprehensively" and "ensure overall reasonableness" of Rule 12b-1 fees and other mutual fund sales charges:

> The ability of the NASD, through its rules, to regulate comprehensively mutual fund fees received by members is fully consistent with the statutory mandate of section 22(b) of the 1940 Act that gives the NASD authority to prohibit excessive sales loads, and with protection of investors and the promotion of just and equitable principles of trade pursuant to section 15A(b)(6) of the Act.... Given the specific mandate of section 22(b) of the 1940 Act and the requirement of just and equitable principles of trade embodied in section 15A(b)(6) of the Act, the Commission is of the view that the NASD has authority to adopt rules that ensure overall reasonableness of sales fees received by members.

NASD Rule Release, 57 Fed. Reg. at 30989.

---

[12] The text of Section 22(b) itself makes clear that Congress intended the NASD to strike a balance between prohibiting "excessive" sales charges and "allow[ing] reasonable compensation for ... underwriters" and certain other participants in the mutual fund distribution process, a balance that could not be maintained were courts exercising jurisdiction under Section 36(b) to intrude with their own judgments about what constitutes excessive sales charges. The statute provides in pertinent part that the NASD shall adopt rules that "prohibit its members from purchasing, in connection with a primary distribution of redeemable securities of which any registered investment company is the issuer, any such security from the issuer or from any principal underwriter except at a price equal to the price at which such security is then offered to the public less a commission, discount, or spread which is computed in conformity with a method or methods, and within such limitations as to the relation thereof to said public offering prices, as such rules may prescribe in order that the price at which such security is offered or sold to the public shall not include an excessive sales load but shall allow for reasonable compensation for sales personnel, broker-dealers, and underwriters, and for reasonable sales loads to investors." 15 U.S.C. § 80a-22(b).

12

As described above, the NASD has issued, and the SEC has approved, NASD Rule 2830, which sets the maximum asset-based sales charges that may be imposed on the sale of fund shares. The charges provided for in the Distribution Agreement fully comply with the limits of Rule 2830, and Plaintiff does not allege otherwise.

### B. Both the SEC and the NASD Rules Recognize that "Closed" Funds May Pay Distribution Fees for Past Distribution Expenses

Plaintiff's sole claim is that it was allegedly improper for Distributors to receive distribution fees while the Fund was closed to new investors because it is improper to make payments of such fees to cover past, as opposed to ongoing, distribution charges. Complaint ¶ 35. This contention is unsupported by any authority cited by Plaintiff and is unfounded and incorrect. The SEC, in responding to a Congressional inquiry on this precise issue, expressly rejected Plaintiffs interpretation of Rule 12b-1:

> Rule 12b-1 permits a fund to spread its distribution expenses over several years and allows payment of fees for past distribution services. ***Therefore, even if a fund closes to new investors, it may continue to pay rule 12b-1 fees in order to compensate the distributor for its past distribution efforts.***

See Letter dated August 19, 1993 to Congressman John D. Dingell from Acting Chairman Arthur Levitt enclosing Memorandum dated August 16, 1993 of Barbara J. Green, Deputy Director, Division of Investment Management (emphasis added).[13]

The interpretation in the letter to Chairman Dingell is consistent with prior SEC consideration of this issue. In 1988, the SEC proposed for comment an amendment to Rule 12b-1 that would have placed limits on the payment of fees to cover past distribution charges. See Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 53 Fed. Reg. 23258, 1988 WL

---

[13] A copy of the SEC Letter is included in the Appendix of Additional Legal Materials submitted in support of this Motion.

1000015, at *44 (June 13, 1988) (discussing proposed Rule 12b-1(c)). The SEC never took any further action on these proposals. The 1988 proposed amendments thus reinforce the conclusion that the 12b-1 payments at issue comport with Rule 12b-1 as in effect. *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1035 (4th Cir. 1997) (rejecting imposition of a disclosure requirement when the SEC had previously considered, but declined to, amend Rule 10b-10 to specifically impose this requirement: "[i]t is puzzling why, if Rule 10b-5 always imposed this requirement to disclosure on dealers, the SEC considered amending Rule 10b-10 to impose a preexisting requirement").

In 1993, the NASD also addressed this precise issue, interpreting its own Rule 2830.[14] In its Notice to Members 93-12, the NASD posed the following question and gave the following answer:

> Question #6: If a fund generates no sales or discontinues selling its shares, must it stop paying any asset-based sales charges?
> Answer: No. The Rule provides only that the fund stop paying sales charges (either asset-based or deferred) when its remaining amount is depleted [under the aggregate cap]. A fund may fail to generate sales or stop selling its shares before its remaining amount is exhausted.

*See* Notice to Members 93-12.

The reason NASD rules permit principal underwriters, such as Distributors, and others to continue to receive distribution fees from a mutual fund even after that fund closes is straightforward. Such fees compensate the distributor for *past* distribution expenses. Distribution fees make possible Class B and C shares as alternatives to Class A shares, which

---

[14] The fact that this proposition was made clear in an NASD Notice to Members interpreting the rule, rather than in the text of the rule itself, is of no consequence. *See United States v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 733 (1975) ("we see no meaningful distinction between the [NASD's] rules and the manner in which it construes and implements them. Each is equally a subject of SEC oversight").

carry a front-end sales load. Selecting Class B or C shares essentially allows purchasers to defer payment of sales charges, effectively financing the sales load over time. *See* Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 53 Fed. Reg. 23258, 23275 (June 21, 1988) ("Adopting or continuing a 12b-1 plan as an alternative to a front-end sales load may benefit those shareholders whose payment for distribution is thereby postponed. A number of funds have justified the implementation or continuation of a 12b-1 plan on the basis of this benefit.").

Because the Fund's Rule 12b-1 distribution fee payments to Distributors are fully consistent with Rule 12b-1 and NASD Rule 2830, Plaintiff fails to state a claim for excessive fees under Section 36(b).

### III. THE DISTRIBUTION FEES ARE PROPERLY USED TO REDUCE "UNCOVERED DISTRIBUTION CHARGES" AND ARE NOT EXCESSIVE

For the reasons set forth in Parts I and II, the Complaint is defective on its face and should be dismissed for failure to state a claim. If any doubt remains about the propriety of the Fund's payment of distribution fees, review of a few undisputed facts (mostly available on the public record and well known to Plaintiff) establishes that, in the alternative, defendant is entitled to summary judgment.

*First*, it cannot be disputed that the distribution fees are contractually due payments made pursuant to the terms of a validly adopted Distribution Agreement to pay down the uncovered distribution charges incurred by defendant Distributors in connection with past sales of the Fund's Class B and Class C shares. *See* Distribution Agreement (Exhibit A to the Declaration filed herewith) ¶ 5(c), (d). As the SEC and NASD pronouncements cited above clearly state, this is entirely proper and within the contemplation of Rule 12b-1 and NASD Rule 2830. The combined amount of uncovered distribution charges for these classes totaled over $170 million

as of December 31, 2002. Statement ¶ 11. The amount of these charges and payments against these amounts are calculated on a daily basis by the Fund's administrator. Statement ¶ 9. Pursuant to the Fund's Distribution Agreement, once the uncovered distribution charges for a class have been paid, all payments of distribution fees for that class will end. Statement ¶ 10.

"Section 36(b) is limited to cases where there was excessive compensation." *Migdal*, 248 F.3d at 329. To violate Section 36(b), "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.* at 326 (quoting *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982)). There is no allegation that the uncovered distribution charges result from anything other than legitimate sales of Class B and Class C shares at a contractually agreed rate. The distribution fees are within the legal limits set by NASD rules and are not, and cannot by contract become, "excessive" in any respect. Accordingly, based on the undisputed facts, Distributors is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim under Section 36(b) and should therefore be dismissed with prejudice. In the alternative, summary judgment should be granted for Defendant Eaton Vance Distributors, Inc.

Respectfully submitted,

Wm. Shaw McDermott (BBO #330860)
Aimée E. Bierman (BBO #640385)
KIRKPATRICK & LOCKHART LLP
75 State Street
Boston, MA 02109-1808
(617) 261-3100

Jeffrey B. Maletta, Esq.
Nicholas G. Terris, Esq.
KIRKPATRICK & LOCKHART LLP
1800 Massachusetts Avenue, N.W.
Washington, D.C. 20036
(202) 778-9000

*Attorneys for Defendant
Eaton Vance Distributors, Inc.*

Date: February 24, 2004

## CERTIFICATE OF SERVICE

I, Aimée E. Bierman, hereby certify that on February 24, 2004, a true and correct copy of the foregoing Memorandum in Support of Motion of Defendant Eaton Vance Distributors, Inc. to Dismiss or, in the Alternative, for Summary Judgment was served by hand on the following:

Edward F. Haber, Esq.
SHAPIRO HABER & URMY LLP
75 State Street
Boston, MA 02109

Aimée E. Bierman