UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MICHELLE YAMEEN,**<br><br>  Plaintiff,<br><br>VS.<br><br>**EATON VANCE DISTRIBUTORS, INC.,**<br><br>  Defendant, and<br><br>**EATON VANCE TAX-MANAGED GROWTH FUND 1.1,**<br><br>  Nominal Defendant. | Civil Action No. 03-12437- RCL |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
MOTION OF EATON VANCE DISTRIBUTORS, INC.
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**INTRODUCTION**

   This is an action brought by the Plaintiff, Michelle Yameen, pursuant to Section 36(b) of the Investment Company Act of 1940 (the "1940 Act"), derivatively on behalf of the Eaton Vance Tax Growth Fund 1.1 (the "Fund"), in which the Plaintiff is a shareholder. The Fund is a mutual fund which is an open-end management company, registered under the 1940 Act. The action is brought against the defendant, Eaton Vance Distributors, Inc. ("Distributors" or the "Defendant"), the Principal Underwriter of the Fund's shares, for breach of fiduciary duty in violation of Section 36(b) to recover excessive distribution fees collected by the Defendant from the Fund.

   The Defendant has moved, pursuant to Rule 56 F.R. Civ. P., for dismissal of the Plaintiff's complaint, or alternatively, that the Court grant the Defendant summary judgment (the "Motion"). The Plaintiff submits this memorandum of law in opposition to the Motion. Plaintiff's opposition

to the Motion is also supported by the Declaration of Edward F. Haber Pursuant to Rule 56(f), F.R. Civ. P., and by the Plaintiff's Response to the Defendant's Statement of Material Facts Not in Dispute in Support of the Motion.

The Defendant seeks dismissal or summary judgment based upon several erroneous, technical, legal arguments which ignore the express terms of SEC Rule 12b-1, promulgated under the 1940 Act, which governs the Fund's payment of the distribution fees to the Defendant at issue in this case.[1]

## AN OVERVIEW OF RULE 12b-1

Prior to the promulgation of Rule 12b-1 in 1980, it was unlawful for an open-end management company registered under the 1940 Act to use its assets, directly or indirectly, to pay for or finance costs of selling or distributing shares in that investment company. However, since the promulgation of Rule 12b-1, registered open-end management investment companies, like the Fund, are permitted to use their assets to pay for activities which are:

> **primarily intended to result in the sale of shares issued by such company**, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature.

Rule 12b-1(a)(2) (emphasis added).

A mutual fund's assets may only be used for those purposes if the expenditures are made in conformance with the express, restrictive, provisions of Rule 12b-1. Those provisions require that any such expenditures must be pursuant a written plan "...describing all material aspects of the

---

[1] For the Court's convenience, a copy of Rule 12b-1 is attached hereto as Exhibit A.

proposed financing of distribution..." and that "...all agreements with any person relating to implementation of the plan [must be] in writing..." Rule 12b-1(b). Furthermore, and most significantly to the claim at bar, **those written plans and agreements may not commit the mutual fund to make any such payments, or to assume the liability for any such payments, for longer than 60 days.**

That fundamental requirement of Rule 12b-1 is codified in the following provisions:

- Rule 12b-1(b)(3)(iii) provides that the distribution plan required by Rule 12b-1(b) must provide that "...**it may be terminated at any time**..." by the fund's trustees (emphasis added);

- Rule 12b-1(b)(3)(iv)(A) provides that the written distribution agreement (between a mutual fund and an underwriter) required by Rule 12b-1(b) must provide that "...it may be terminated at any time, without the payment of any penalty, by a vote of a majority of the members of the board of directors [who are "disinterested"] ... **on not more than sixty days' written notice** to any other party to the agreement..." (emphasis added).

Furthermore, Rule 12b-1 also requires constant review by the mutual fund's trustees to determine whether the mutual fund's assets should continue to be used to pay for the costs of distributing the fund's shares to the public. Specifically:

- Rule 12b-1(b)(3)(i) prohibits a plan or agreement to continue in effect for more than one year unless "...such continuance is specifically approved at least annually in the manner described in paragraph (b)(2);[2]

- Rule 12b-1(d) provides that:

     In considering whether a [mutual fund] should ... continue a plan in reliance on paragraph (b) of this rule, the directors of such company shall have a duty to request and evaluate ... such information as may reasonably be necessary to an informed determination of whether such plan should be ... continued; in fulfilling their duties under this paragraph the directors should consider and give appropriate weight to all pertinent factors considered...

- Rule 12b-1(e) provides that a plan or agreement may not be continued unless:

     ...the directors who vote to approve such ... continuation conclude, in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and under sections 36(a) and (b) of the Act, **that there is a reasonable likelihood that [the continuation of] the plan will benefit the company and its shareholders...** (emphasis added)

### IN LIGHT OF THE TRUSTEES' DECISION TO CEASE SELLING SHARES OF THE FUND, THERE IS NO "...REASONABLE LIKELIHOOD THAT [THE CONTINUATION OF] THE PLAN WILL BENEFIT THE COMPANY AND ITS SHAREHOLDERS..."

It is undisputed that Trustees of the Fund caused the Fund, as of March 1, 2001, to cease offering and selling of shares of the Fund to the public. *See* Complaint, ¶21 and Declaration of James L. O'Connor ("O'Connor Decl."), ¶ 2. While discovery will provide the Plaintiff and the Court with the specifics of the Trustees' reasons for closing the Fund to new investors, it is apparent

---

[2] Rule 12b-1(b)(2) requires approval by a vote of the board of directors "...cast in person at a meeting called for the purpose of voting on such plan or agreements..."

4

that in making that decision the Trustees determined that the continued sales of shares of the Fund, and the resulting growth in the Fund's assets, would not benefit the Fund and its shareholders.[3]

The core of the claim in this case is that, in light of the fact that the trustees determined, as of March 1, 2001, that it was no longer in the best interests of the Fund and its shareholders for the Fund to sell additional shares of the Fund to the public, the trustees could not, "…in the exercise of their fiduciary duties under state law and under sections 36(a) and 36(b) of the [1940] Act…" have concluded "…that there is a reasonable likelihood that [the continuation of] the plan will benefit the [Fund] and its shareholders…" Rule 12b-1(e). Furthermore, the continuation of the Plan could not have been "... primarily intended to result in the sale of shares issued by [the Fund]." Rule 12b-1(a)(2).

Paradoxically, the Trustees of the Fund, in explaining their decision to continue the Plan, in a filing by the Fund with the SEC, said:

> **The Trustees of the Fund believe that each Plan will be a significant factor in the expected growth of the Fund's assets...**[4]

That explanation of the Trustees' decision to continue the Plans is non-sensical because, having ceased selling shares of the Fund to new investors, there would be no "expected growth of the Fund's assets" from sales of the Fund's shares.

By voting to continue the Fund's Plans and Agreements after the Fund ceased selling shares to the public, the Trustees of the Fund breached their fiduciary duties to the Fund and the Fund's shareholders, under state law and under Section 36(b) of the 1940 Act. Likewise, by continuing to

---

[3] No claim is asserted in this action with respect to the decision of the Trustees to close the fund to new investors.

[4] May 1, 2003 Statement of Additional Information ("SAI") at 17, portions of which are attached hereto as Exhibit B, emphasis added.

5

collect the distribution fees under the Plans and Agreements, after the Fund ceased selling shares to the public, the Defendant Distributors breached its fiduciary duties to the Fund and the Fund's shareholders, under state law and under Section 36(b) of the 1940 Act.[5]

### THE EXPRESS RIGHT OF ACTION UNDER SECTION 36(b) ENCOMPASSES DISTRIBUTION FEES

The Defendant advances two arguments in support of its contention that distribution fees do not fall within the scope of the express private right of action under Section 36(b). First, Defendant argues that the case law uniformly rejects any 36(b) action challenging excessive distribution fees – as opposed to advisory fees. In doing so, Defendant ignores or mischaracterizes authorities that unequivocally reject its position. Second, Defendant argues that Section 36(b)(4), by its own terms, renders distribution fees outside the reach of Section 36(b)'s express right of action, because they are "subject to" Rule 17d-3 of the 1940 Act. Defendant's second argument fails because the distribution fees are specifically <u>exempted</u> from Section 17 of the Act; they are not "subject to" it. *See* Rule 17d-3.

    **A.**    **The Unambiguous Language of Section 36(b) Demonstrates that Actions Can Be Brought Under Sec. 36(b) Against Principal Underwriters for Excessive Distribution Fees**

In interpreting a statute, the court must "...turn first to the language of the statute itself. If a statute is unambiguous, we use neither legislative history, . . . , nor administrative agency interpretation. *Bryson v. Shumway*, 308 F.3d 79, 85 (1st Cir.2002)(citations omitted). Section 36 unambiguously provides that an action can be brought pursuant to Section 36(b) against a principal underwriter of a mutual fund's shares, such as the Defendant at bar. Sec. 36(a)(2) specifically

---

[5] Section 36(b)(3) provides that the cause of action for breach of fiduciary duty under Section 36(b) can only be brought against the recipient of the compensation or payments at issue, in this case, the Defendant.

identifies the "principal underwriter" of a "registered...open-end" investment company, as an entity which can be subject to suit under Sec. 36(a). Section 36(b) first codifies that:

> An action may be brought under this subsection...against ... any ...person enumerated in subsection (a) [i.e., a "principal underwriter"] of this section ... for breach of fiduciary duty in respect of ... payments paid by such registered investment company ... to such person...."

Section 36(b)(3) then provides that an action under Sec. 36(b) can only be "...brought or maintained against ... the recipient of such compensation or payments...." The statute unambiguously provides that a principal underwriter can be sued under Sec. 36(b) for its improper receipt of any "compensation or payments" from the mutual fund. This obviously includes distribution fees, which are the primary payments which a principal underwriter would receive from a mutual fund. The Defendant's argument that a principal underwriter could only be sued under Sec. 36(b) in connection with its receipt of advisory fees is belied by the unambiguous terms of the statute.

### B. The Only Two Circuits to Address the Issue Have Held that Distribution Fees are Encompassed by the Express Right of Action Under 36(b)

The two circuit courts of appeals that have addressed the issue have determined that a principal underwriter can be sued under Sec. 36(b) for the receipt of excessive distribution fees. In *Meyer v. Oppenheimer Management Corp.*, 764 F.2d 76, 82 (2nd Cir. 1985) the Second Circuit expressly rejected the precise argument advanced by the Defendant here. As the Court said:

> Section 36(b), the [defendant's] argument runs, deals only with compensation for *advisory* services. But section 36(b) expressly applies to payments made to "any affiliated person" of the investment advisor, and the brokerage defendants are concededly affiliated persons. Moreover, in proposing what ultimately became section 36(b) the SEC made clear the broad scope of that provision:
>
> > **The statutory requirement . . . would apply to *all* forms of compensation paid by all investment companies to their** affiliated persons, **principal underwriters**, and affiliates of such persons. **This would include *all* forms of compensation paid to** officers, directors,

7

> advisory board members, trustees, sponsors, investment advisers, **principal underwriters**, and controlling persons of both externally and internally managed companies as well as persons or organizations with which such persons are affiliated. Although advisory fees are the principal form of managerial compensation in investment company industry, **externally managed companies frequently pay fees for various nonadvisory services to principal underwriters**, trustees, business managers, and sponsors **who**, like investment advisers, **are likely to have close and dominant relationships with such companies that preclude arm's-length bargaining.**

*Meyer*, 764 F.2d at 82 (quoting H.R.Rep. No. 2337 containing the SEC report) (the "SEC Report") (italics in original; bold emphasis added). *See also Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866-867 (2nd Cir. 1990) (reaffirming and clarifying earlier decision, *Meyer*, 764 F.2d at 82); and *Krantz v. Prudential Investments Fund Management LLC*, 305 F.3d 140, 142 (3rd Cir. 2002)("Section 36(b) also provides for a private cause of action by a shareholder against the . . . principal underwriter 'for breach of fiduciary duty in respect of ... compensation' paid by a fund.'").

Defendant incorrectly argues that the Second Circuit decisions in the *Meyer* cases stand only for the limited proposition that distribution fees can be taken into account in considering a challenge to excessive advisory fees. In fact, the Second Circuit explicitly stated that the two types of payments are unrelated and either one can be challenged as excessive under the terms of Section 36(b): "The two kinds of payments are for entirely different services, namely advice on the one hand and sales and distribution on the other. If the fee for each service viewed separately is not excessive in relation the service rendered, then the sum of the two is also permissible." *Meyer*, 895 F.2d at 866. Because the lower court had found – as a matter of fact – that "neither payment was excessive[,]" it affirmed the verdict at trial. *Id.* The Second Circuit's *Meyer* decisions establish both that excessive distribution fees can be challenged under Section 36(b), and that resolution of the excessiveness question is a factual issue and, accordingly, should not be decided on a motion to dismiss.

     **C.    The Decisions Cited By the Defendant Are Inapplicable to the Issue For Which They Are Cited, or They Were Erroneously Decided**

In addition to mischaracterizing the Second Circuit precedent discussed above (and ignoring entirely the Third Circuit's decision in *Krantz*), Defendant cites five cases (some of which are unpublished) which it argues support its assertion that only advisory fees can be the subject of a Section 36(b) action.[6] Two of these decisions simply did not concern excessive fees at all (let alone distribution fees); they challenged conduct outside the scope of Section 36(b). In *Migdal*, the plaintiffs challenged the independence of the directors who had negotiated the fee arrangements. However, they did not claim that the resulting fees were excessive. *Migdal,* 248 F.3d at 329. Similarly, in *In re Nuveen*, plaintiffs alleged that the investment adviser engaged in certain transactions which were designed solely to generate more fees for the adviser. But, they did not challenge any fees or compensation as excessive.

The three other decisions cited by the Defendant were erroneously decided. First, none of those courts appear to have been aware of the *Meyer* decisions, or the legislative history of Sec. 36(b) discussed therein. Indeed, in *Rohrbaugh* (which had nothing to do with distribution fees – it was a challenge to certain membership dues), the court explicitly stated that the plaintiffs had failed to cite to any cases under Section 36(b) which challenged anything other than excessive advisory fees, and "[n]or ha[d] the Court uncovered any such case." *Rohrbaugh*, 2002 WL 31100821 at *9. Likewise, the *In re TCW/DW* decision from the Southern District of New York does not acknowledge, and cannot be reconciled with, the Second Circuit's *Meyer* decisions, which were binding precedent on that court. Finally, each of those decisions relies on an incorrect interpretation of the legislative

---

      [6]    *See* Def. Memo. at 8-9 (citing *Rohrbaugh v. Investment Co. Inst.*, Civ. A. 00-1237, 2002 WL 3110821 (D.D.C. July 2, 2002); *In re TCW/DW North American Gov't Income Trust Securities Litig.*, 941 F.Supp. 326 (S.D.N.Y. 1996); *Green v. Nuveen Advisory Corp*., 186 F.R.D. 486 (N.D.Ill. 1999); *In re Nuveen Fund Litigation*, No. 94 C 360, 1996 WL 328006 (N.D. Ill. June 11, 1996); *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321 (4th Cir. 2001)).

history.

Each of these decisions rely upon a single sentence cropped from the legislative history of Sec. 36(b) by the court in *Halligan v. Standard & Poor's/Intercapital, Inc.*, 434 F.Supp. 1082, 1084 (E.D.N.Y. 1977). The *Halligan* decision focuses on the following sentence from Senate Report No. 91-184, which discusses the provision in Section 36(b) that renders affiliated persons of the investment adviser susceptible to suit under that section:

> This provision affords a remedy if the investment adviser should try to evade liability by arranging for payments to be made not to the adviser itself but to an affiliated person of the adviser.

*Halligan*, 434 F.Supp. at 1082 (citing Sen.Rep. No. 91-184, 91st Cong., 1st Sess. 16 (1969)); *see also Rohrbaugh* 2002 WL 31100821 at *9 (citing same Senate Report); *In re TCW/DW*, 941 F.Supp. at 343 (citing *Halligan* analysis of legislative intent); *Green*, 186 F.R.D. at 492 (citing *Halligan* analysis and Senate Report). Based on that single sentence in the Senate Report, each of those three decisions relied on by Defendant conclude that only excessive advisory fees can be challenged under Section 36(b). However, that sentence, when read in context, does not support that proposition.

The paragraph of the Senate Report from which that sentence comes reads in full as follows:

> An action for breach of fiduciary duty may be brought not only against the investment adviser but also against any officer, director, member of any advisory committee, depositor, or principal underwriter of the investment company who, under the circumstances, may also have a fiduciary duty in respect to the payments received. The fiduciary duty of the investment adviser is extended not only to compensation paid to the investment adviser but also to payments made by the investment company or its shareholders to an affiliated person of the investment adviser. This provision affords a [remedy] if the investment adviser should try to evade liability by arranging for payments to be made not to the adviser itself but to an affiliated person of the adviser.

Sen.Rep. 91-184, section entitled "Explanation and Analysis of the Bill, Part A: Costs of Mutual Fund Investment, Section 20, Adding New Section 36(b) to the Act – Breach of Fiduciary Duty Involving

Management Compensation and Other Payments." The paragraph, read as a whole, is saying that all of the persons and entities identified in the first sentence have a fiduciary duty with respect to payments they receive from a mutual fund, and they can be sued under Sec. 36(b) for recovery of those payments. The second sentence advises that, in addition to the investment advisor, all affiliates of the investment advisor have a fiduciary duty with respect to any payments they receive from a mutual fund, and they can be sued under Sec. 36(b) for recovery of those payments. The third sentence explains how chicanery by the investment advisor could be remedied by the section; it does not in any way suggest that the payments identified in the first sentence are limited to advisory fees.

The Congressional intent to provide the broad scope to Section 36(b) discussed by the Second Circuit in *Meyer* is also evidenced by other portions of the Senate Report relied upon in *Halligan*. The Senate Report, in the section entitled "Purpose of the Bill" describes Sec. 36(b) as providing an "effective method whereby the courts can determine whether there has been a breach of this duty by the adviser **or by certain other persons with respect to their compensation from the fund.**" Senate Report, 91-184, *Id.* (emphasis added). Moreover, the section of the Senate Report which discusses the lack of arm's-length negotiating in the mutual fund industry is entitled "**Advisory Fees and Other Compensation**." Sen.Rep. 91-184. In that section, the Senate Report unambiguously states, as does the statute itself, that not only does 36(b) provide an express right of action against the adviser and its affiliates for its "handling of the fund's assets and investments," but that "[o]ther persons enumerated in section 36(a) [which includes principal underwriters] who may have a similar fiduciary duty with respect to compensation or payments received by them from the fund or its shareholders may also be sued for a breach of such duty." *Id.*

In sum, the unambiguous statutory language; the equally unambiguous legislative history; and the decisions of the Second and Third Circuits fully support the conclusion that Section 36(b)

11

provides a remedy to shareholders suing on behalf of their mutual fund against the fiduciary recipient of excessive fees – without regard to whether such fees are for advisory or distribution services.

### D. Rule 12b-1 Distribution Fees Are Not "Subject To" Sec. 17 of the 1940 Act; They Are Exempt from Sec. 17

Finally, the Defendant argues that distribution fees paid to principal underwriters are "subject to Section 17 of this Act, or rules, regulations, or orders thereunder," (*see* Def. Memo. at 10, quoting Section 36(b)(4)) and hence are exempt from Sec. 36(b) pursuant to Section 36(b)(4). This argument is frivolous. Distribution fees paid in accordance with a 12b-1 plan are not "subject to Section 17 of this Act, or rules, regulations, or orders thereunder," because they are explicitly exempted from Section 17 of the Act by SEC Rule 17d-3 which provides that:

> An affiliated person of, or principal underwriter for, a registered open-end management investment company and an affiliated person of such a person or principal underwriter shall be **exempt** from section 17(d) of the Act. . .

17 C.F.R. §270.17d-3 (emphasis added).

It is axiomatic that Rule 12b-1 distribution fees cannot be both "subject to" and "exempt" from Section 17 of the 1940 Act (and its accompany regulatory framework).[7] Accordingly, Sec. 36(b)

---

[7] *See United States Postal Service v. Flamingo Industries (USA) Ltd.*, 124 S.Ct. 1321, 1329 (2004)(noting that the Postal Reorganization Act "refers in explicit terms to various federal statutes and specifies that the Postal Service is **exempt from some and subject to others**.")(emphasis added); *Northeast Federal Credit Union v. Neves*, 837 F.2d 531, 532, n.1 (1st Cir. 1988)(quoting Federal Credit Union Act which renders all property and income of federal credit unions "exempt from all taxation" except for any real property or tangible personal property which is "subject to Federal, State, Territorial, and local taxation to the same extent as other similar property is taxed."); *Maine Central Railroad Co. v. Brotherhood of Maintenance of Way Employees*, 813 F.2d 484, 491 (1st Cir. 1987)(explaining the rationale of the Supreme Court in finding a specific statute unconstitutional because of the "possibility that the American Express Company would continue to be exempt if its characteristics were to change, but competitors would continue to be subject to the statute even if their characteristics became identical to the American Express Company's."); *Massachusetts Furniture & Piano Movers Association, Inc. v. FTC*, 773 F.2d 391 (1st Cir. 1985)("Absent a statutory exemption, or state created immunity, . . ., the collective preparation or filing of intrastate motor carrier rates which affect interstate commerce is subject to federal regulation.").

claims challenging excessive distribution fees are not precluded by Sec. 36(b)(4).[8]

**NASD RULE 2830 DOES NOT PREDETERMINE THAT THE DISTRIBUTION FEES ARE NOT EXCESSIVE UNDER ALL OF THE CIRCUMSTANCES.**

The Rule 12b-1 distribution fees which the Fund pays the Defendant each year are .75% of the assets of the Fund. The defendant argues that Plaintiff's complaint should be dismissed because that percentage is equal to, and not greater than, the .75% maximum the annual percentage which an underwriter can collect from a mutual fund for Rule 12b-1 distribution fees, pursuant to NASD Rule 2830.

That argument is a "red herring." No claim is made in this case that the Defendant is violating NASD Rule 2830. That rule sets a ceiling (of .75% of the assets, per year) on the amount that can be charged for Rule 12b-1 distribution fees, <u>only if</u> all of the requirements and restrictions of Rule 12b-1 have been met. Compliance with NASD Rule 2830 does not, in any way, mean that a mutual fund, its trustees or its underwriter, have complied with Rule 12b-1. The fact that the Rule 12b-1 distribution fee paid to the Defendant here does not exceed the maximum allowed by NASD Rule 2830 does not speak at all to the question of whether – in light of the trustees' determination that as of March 1, 2001, it was no longer in the best interests of the Fund and its shareholders for the Fund to sell additional shares of the Fund to the public – the trustees could, "…in the exercise of their fiduciary duties under state law and under sections 36(a) and 36(b) of the [1940] Act…" have concluded "…that there is a reasonable likelihood that [the continuation of] the plan will benefit the

---

[8] Defendant's argument that the fees are "subject to" Section 17 of the Act because Rule 17d-3 states that they must comply with Rule 12b-1 to qualify for the exemption is nothing more than a nonsensical word game. Simply because Rule 17d-3 mentions Rule 12b-1 in defining the scope of the exemption does not mean that the fees are "subject to" 12b-1, and, thus, "subject to" Section 17 of the Act. The reference to Rule 12b-1 in Rule 17d-3 is to establish the scope of precisely what fees are not "subject to" Section 17 of the Act.

13

Brief

[Fund] and its shareholders…" Rule 12b-1(e).

If, as Plaintiff fully expects, this Court concluded "...under all the circumstances" (Sec. 36(b)(2)), based upon a full factual record, "…that there is [no] reasonable likelihood that [the continuation of] the plan will benefit the [Fund] and its shareholders…" (Rule 12b-1(e)), this Court could grant relief to Plaintiff pursuant to Sec. 36(b) – notwithstanding that the distribution fees complied with NASD Rule 2830's requirement not to exceed a certain percentage of the Fund's assets.

### WHETHER IT COULD EVER BE FOUND THAT A CLOSED FUND AND ITS SHAREHOLDERS COULD BENEFIT FROM THE CONTINUED PAYMENT OF RULE 12b-1 DISTRIBUTION FEES IS NOT RELEVANT TO THE SUFFICIENCY OF THE COMPLAINT AT BAR

The Defendant's final argument seeking dismissal of the complaint is that two unauthenticated, unofficial statements by staff of the SEC and the NASD express the "opinion" that there is no *per se* rule against a closed fund continuing to pay Rule 12b-1 fees. From that, the Defendant erroneously jumps to the conclusion that no legal claim could ever be made that the continued payment of Rule 12b-1 fees by a closed fund violates the fiduciary duty of the underwriter receiving those fees. As demonstrated below, the unauthenticated, unofficial statements upon which the Defendant relies cannot properly be considered on a motion to dismiss; are entitled to no deference by this Court; and by their own terms, they do not foreclose the type of claim set forth in the complaint at bar.

The Defendant points to a letter, dated August 19, 1993, from Arthur Levitt of the SEC to a member of Congress and a five page document entitled "Memorandum," dated August 16, 1993. The Defendant submits these documents as part of an unsworn submission entitled "Appendix Of Additional Legal Materials In Support of Motion of Eaton Vance Distributors, Inc. To Dismiss Or,

in the Alternative, for Summary Judgment." Nothing regarding the source of the documents, nor their authenticity is disclosed. These are not the kind of documents with respect to which a court could take judicial notice and consider on a motion to dismiss. *See* Locicero v. Leslie, 948 F.Supp. 10, 12 (1996)(court can only take judicial notice of "public records or indisputably authentic documents" at 12(b)(6) stage of proceedings). Defendant's failure to properly authenticate the documents and identify their source unfairly precludes Plaintiff from exploring the facts surrounding the creation and use of the documents, and thereby denies Plaintiff the opportunity to advance any and all appropriate rebuttal evidence and argument – an outcome not permitted by the evidentiary rules delineating the scope of judicial notice. *See* Fed.R.Evid.201, Note to Subdivision (b).

Even if this Court were to consider the documents, they would not be entitled to any deference by this Court. These documents are not rules or regulations promulgated by the SEC. On their face, they represent the view, or, at best, an advisory opinion of one member of the SEC's staff in 1993. It is settled law that advisory opinions of an administrative agency do not "command any particular deference under *Chevron* or comparable doctrines" *Association of Int'l Automobile Manufacturers, Inc. v. Commissioner, Massachusetts Dept. of Env. Protection*, 208 F.3d 1, 6 (1st Cir. 2000)(citing *Mid-America Care Foundation v. NLRB*, 148 F.3d 638, 642 (6th Cir. 1998).[9] Finally, on their face, they not only do not support the Defendant's effort to dismiss the complaint. Rather, they support Plaintiff's claim at bar that the decision whether to continue a Rule 12b-1 plan must be made by the mutual fund's trustees, pursuant to the commands of Rule 12b-1. Specifically, the August 16, 1993 Memorandum states:

---

[9] The memorandum and letter also make clear that they do not represent the type of "final agency action" that is afforded any deference by the courts, because they contemplate further investigation and monitoring of the practices at issue "to determine whether changes are necessary to prevent possible abuses arising from these practices." Levitt Letter of Aug. 19. When the opinions expressed contemplate such future action, they do not constitute "final agency action" and are afforded no deference. *Automobile Manufacturers*, 208 F.3d at 5-6.

15

### B. Requirements of Rule 12b-1

Fee practices such as those described in the *Forbes* article generally are governed by rule 12b-1 under the Investment Company Act, which permits the use of fund assets to promote distribution. Rule 12b-1 requires fund directors, including a majority of the independent directors, to determine that the use of fund assets to promote distribution is reasonably likely to benefit fund shareholders. The rule also contains provisions intended to ensure that the directors are not dominated or unduly influenced by management and that they are fully informed and exercise reasonable business judgment. Rule 12b-1, however, does not provide the board with a checklist of information it must review. Instead, rule 12b-1(d) requires the board to request such information as may be reasonably necessary to make an informed determination. Thus, the board's review under rule 12b-1 will depend on the specific facts and circumstances relating to each fund's 12b-1 plan.

In sum, this Memorandum simply expresses one staff member's view that there is no *per se* bar to the continuation of a Rule 12b-1 plan by a closed fund. However, even that staff member recognizes that before that could be done, the Trustees would have "...to determine that the use of fund assets...is reasonably likely to benefit fund shareholders" and that "...the board's review under rule 12b-1 will depend on the specific facts and circumstances relating to each fund's 12b-1 plan." The claim at bar is that under the "specific facts and circumstances" here, it was a breach of fiduciary duty for the Trustees to continue the Rule 12b-1 plans, and a breach of fiduciary duty for the Defendant to continue to receive payments from the Fund pursuant to those plans. That claim is fully consistent with the "Memorandum" contained in the Levitt letter, even if (which Plaintiff does not concede) there is no *per se* bar to the continuation of a Rule 12b-1 plan by a closed fund.[10] Thus, Plaintiff states a claim upon which relief can be granted.

---

[10] Defendant also argues that a NASD publication of "Questions and Answers" explicitly authorizes payment of the distribution fees under the circumstances presented by this case. However, the NASD's opinions are offered with respect to interpretations of NASD rules not at issue in this litigation. Even if the NASD offered an advisory opinion on the relevant SEC rules (though the NASD has no place giving advisory opinion regarding the SEC's rules), advisory opinions simply command "no particular deference" from the courts. *Automobile Manufacturers*, 208 F.3d at 6.

**THE DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE IT CREDITS THE RULE 12b-1 DISTRIBUTION FEES AGAINST WHAT IT CALLS "UNCOVERED DISTRIBUTION CHARGES"**

The Defendant argues it is entitled to summary judgment because the Rule 12b-1 Distribution Fees it receives relate to sales charges associated with sales of shares before the Fund "closed" itself to new investors and stopped selling its shares to the public on March 1, 2001. The Defendant calls those unpaid charges "uncovered distribution charges." O'Connor Decl., ¶¶ 10, 12 and 13.[11] Implicit in this argument is the erroneous assumption that the Fund is contractually or legally obligated to pay those charges to the Defendant.[12] As demonstrated below, the argument fails because:

1. As a matter of law – based upon the express provisions of Rule 12b-1 discussed above – any financial commitment which the Fund made to pay distribution fees would have to be terminable "...at any time, <u>without the payment of any penalty</u>, by a vote of a majority of the members of the board of directors [who are "disinterested"] ... on not more than sixty days' written notice to any other party to the agreement..." Rule 12b-1(b)(3)(iv)(A), emphasis added.

2. As a matter of fact – based upon the Fund's Plans and Distribution Agreements – the Fund can terminate those Plans and Distribution Agreements, with no continuing obligation to pay the distribution fees. The Distribution Plans of the Fund at issue here provide that they can be terminated

---

[11] The Defendant can profit from the Fund's payment of the "uncovered distribution charges" pursuant to the 12b-1 Plans and Distribution Agreements. "The Eaton Vance organization will profit by reason of the operation of the Class B and Class C Plans ... if at any point in time the aggregate amounts received by the principal underwriter [the Defendant] pursuant to the Plans ... have exceeded the total expenses incurred in distributing Class B and Class C shares." May 1, 2003 Statement of Additional Information at 17. (Exhibit B).

[12] In that regard, the Defendant's statement in its Memorandum in support of the Motion, that "...it cannot be disputed that the distribution fees are contractually due payments made pursuant to the terms of a validly adopted Distribution Agreement" *Id.* at 15, is not correct. Plaintiff expressly claims, for the reasons detailed herein and in the Complaint, that the Fund Trustees' approval of the continuation of the Distribution Agreements, after March 1, 2001, was not valid.

"…at any time by vote of a majority of the Rule 12b-1 [disinterested] Trustees…" *See* O'Connor Decl. ¶ 5; and ¶ 10 of Exhibits B and C thereto. Likewise, the Distribution Agreements between the Fund and the Defendant provide:

> ...this Agreement may be terminated with respect to a Class with a 12b-1 plan at any time by vote of a majority of the Rule 12b-1 [disinterested] Trustees … on not more than sixty (60) days notice to the Principal Underwriter [the Defendant]….

(¶ 9(b) of the Distribution Agreement dated March 1, 2001, attached as Exhibit A to the O'Connor Decl.)[13]

The fact that the Distribution Agreements do not obligate the Fund to continue to repay the "uncovered distribution charges" upon termination is also apparent from the terms of the Distribution Agreements. Paragraph 5(d) of the Distribution Agreements provides that the only manner in which the uncovered distribution charges will be paid is through the payments by the Fund, to the Defendant, of the Distribution Fees at the rate of .75% of the assets of the Fund, per year.[14] Furthermore, paragraph 9 of the Distribution Agreements, which addresses the termination of the Distribution Agreements, provides that, in the event of their termination, the only continuing

---

[13] The O'Connor Decl., at ¶ 3, states that the currently operative Distribution Agreement between the Defendant and the Fund is an "Amended and Restated Distribution Agreement effective as of June 16, 2003" and the O'Connor Decl., at ¶ 3, claims that the June 16, 2003 distribution agreement is attached to the Declaration as Exhibit A. In fact, Exhibit A to the Declaration is the March 1, 2001 Distribution Agreement.

[14] That provision conforms with Rule 12b-1. Payment of those charges by the Fund could not lawfully be made from any other source except the Rule 12b-1, .75% annual distribution fee.

financial obligation of the Fund is to pay over to the Defendant any "..contingent deferred sales charges[15] paid or payable ... with respect to any day subsequent to such termination." ¶ 9(b).[16]

Indeed, the Fund's financial statements reflect that the Fund and its auditor, Deloitte & Touche LLP, fully understand that the Fund is under no legal obligation to pay the Defendant the "uncovered distribution charges." As indicated in the O'Connor Declaration at ¶ 12, and on page 16 of the Fund's Annual Report for 2002 (which is Exhibit D to the O'Connor Decl.), the amount of the "uncovered distribution charges" for the Fund's Class B and Class C shares, as of December 31, 2002, was $86,884,581 and $86,489,100 respectively. If the Fund was obligated to pay that $173,373,681 of "uncovered distribution charges," that sum would have appeared on the Fund's financial statements as a liability. In fact, no such liability appears of the Fund's Statement of Assets and Liabilities, which appears on page 7 of the Fund's Annual Report for 2002. That page is also attached hereto as Exhibit C, for the Court's convenience.[17] Indeed, such a liability would have dwarfed the Fund's liabilities, which as of December 31, 2002 totaled only just over $16 million.[18]

Hence we see that the fact that the Distribution Fees relate to what the Defendant calls "uncovered distribution charges" that accrued before the Fund closed, does not support the Defendant's motion for summary judgment. The Fund could not have unconditionally committed

---

[15] Contingent deferred sales charges are paid by an individual investor who sells his shares of the Fund within a specified period of time after their purchase. Those charges are not paid by the Fund; are not governed by Rule 12b-1; and are not at issue in this action.

[16] Obviously, when the Defendant entered into the Distribution Agreements, and expended funds which became the "uncovered distribution charges," it did so with full knowledge that it was assuming the risk that it would not be repaid the "uncovered distribution charges" if the Fund exercised its right to terminate the Distribution Agreements, without cause and without penalty, on 60 days notice.

[17] There is a line item under Liabilities for "Payable to affiliate for distribution and services fees" in the amount of only $103,931. Presumably that represents Rule 12b-1 fees, accrued at the .75% annual rate, that had accrued but had not been paid as of December 31, 2002.

[18] The same analysis, with somewhat different numbers, applies to the Fund's unaudited financial statements as of June 30, 2003. See Exhibit E to the O'Connor Decl., at pages 4 and 13.

itself to repay all of those "uncovered distribution charges," because Rule 12b-1(3)(iv)(A) mandates that the distribution agreements be terminable by the fund on sixty days notice without penalty. Accordingly, the core issue in this action remains: in light of the fact that the trustees determined, as of March 1, 2001, that it was no longer in the best interests of the Fund and the shareholders of the Fund, for additional shares of the Fund to be sold to the public, the trustees could, "…in the exercise of their fiduciary duties under state law and under sections 36(a) and 36(b) of the [1940] Act…" have concluded "…that there is a reasonable likelihood that [the continuation of] the plan will benefit the [Fund] and its shareholders…" Rule 12b-1(e). And that issue must be decided by this Court based upon "... all of the circumstances" (Sec. 36(b)(2) of the 1940 Act), which cannot be done prior to the development and presentation of a full factual record after discovery. Accordingly, the Defendant's motion for summary judgment must be denied.

Dated: March 25, 2004

Respectfully submitted by the attorneys for the plaintiff,

**/s/Theodore M. Hess-Mahan**
Edward F. Haber (BBO No. 215620)
Theodore M. Hess-Mahan (BBO No. 557109)
Todd Heyman (BBO No. 643804)
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA 02109
(617) 439-3939

OF COUNSEL:
Richard J. Vita (BBO No. 510260)
77 Franklin Street, 3rd Fl.
Boston, MA 02110
(617) 426-6566