# Exhibit A – Part 2

advisor a menu of "pay as you go" services that includes marketing, distribution and sales-related services.

While defendants repeatedly mention in their brief that the 12b-1 fees charged to the Fund <u>could have</u> been used to pay broker-dealers for previously incurred distribution expenses, (*see* Def. Mot. to Dis., at 3 and 20), defendants do not, and cannot, claim that the 12b-1 fees charged to the Fund were actually used to pay for trail commissions as the case may be for commission-based funds that have closed to new investors (e.g. Dreyfus). Defendants would be hard pressed to make this claim because no-load funds typically do not incur trail commission expenses as described above, so the Fund's 12b-1 fees could not have been used to pay for past sales and distribution expenses.

3.   **The 12b-1 Fees Charged To The Fund For The Year Ended March 30, 2004 Increased As A Result Of Appreciation Of The Fund's Assets Rather Than In Relation To The Services Rendered**

For the year ended March 31, 2004 when the Fund was mostly closed to new investors, the 12b-1 fees charged to the Fund doubled as compared to the prior year because defendants charged 12b-1 fees as a percentage of the Fund's significantly appreciated asset base rather than in proportion to the actual marketing and servicing needs of the Fund. Since inception on March 31, 1997, the Fund has generated a cumulative return of 456.86%; for the year 2003, the Fund returned 66.86%. It is therefore unreasonable for defendants to continue charging 12b-1 fees based on a percentage of assets because the 12b-1 fees no longer reasonably relate to the services rendered on behalf of the Fund. For example, for the year ended March 31, 2004, the Fund was charged 12b-1 fees of $1,954,922 as compared to $836,845 in 12b-1 fees

charged to the Fund for the entire preceding year. (*See* Exhibits D and E). Thus, shareholders were charged more than double the 12b-1 fees than in the previous year even though the services rendered to the Fund did not increase in any discernable manner. Defendants had no reasonable basis under § 36(b) to double the 12b-1 fees merely because the stock market performed well and the Fund's assets appreciated significantly.

Moreover, considering the Fund's long-term history of asset appreciation, it was patently unreasonable for the defendants to charge the Fund's shareholders a percentage of assets for commodity type services that do not contribute to the increase in the Fund's assets. According to defendants, the Fund's shareholders were being charged a percentage of assets under the Fund's 12b-1 plan for services such as distributing Fund shares, maintaining customer accounts and records, arranging for bank wires and processing customer inquiries. (Def. Mot. to Dis., at 6-9). These are all commodity services that largely pertain to the back-office operations of the Fund. Unlike advisory services (i.e., investing fund assets) that directly impact the performance of the Fund and its asset base, these commodity services play little to no role in the appreciation of the Fund's asset base. It therefore is a violation of § 36(b) for defendants to continue charging the Fund's investors for commodity type services based on a percentage of assets where the assets have significantly appreciated over time. As a result of this unreasonable fee structure that defendants continue to allow, the 12b-1 fees that have been charged to the Fund are completely disproportionate to the actual services rendered to the Fund. This is a violation of § 36(b).

4.     **Plaintiff Has Properly Pled The *Gartenberg* Factors To The Extent They Apply To The Assessment Of 12b-1 Fees In This Action**

Contrary to defendants' assertions, in order to assert a claim under § 36(b) plaintiff is only required to plead facts, which if proven true, show that the fees charged are so disproportionately large that they bear no reasonable relationship to the services rendered. As the court in *Strougo* stated:

> "*Gartenberg* is a post-trial decision in which the evidence can be weighed against the six-factor test. The pleading standards under the federal rules…do not contemplate pleadings sufficiently detailed to enable a court to make a determination on a 12(b)(6) motion as to whether the six *Gartenberg* factors were met. Rather, the inquiry at this stage should be whether the … [plaintiff] alleges sufficient facts to make out a claim under the more general *Gartenberg* formulation that 'the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered.'" *See Strougo* 2000 WL 45714 at *7 (citations omitted).

Plaintiff has met his burden. The complaint alleges defendants continue to charge the Fund ongoing 12b-1 fees for marketing and distribution after the Fund effectively ceased its marketing efforts. The complaint further alleges that the 12b-1 fees charged to the Fund are unreasonable, excessive and disproportionate to the services rendered because they increased in proportion to the substantial appreciation in the Fund's asset base rather than correlate with the actual services provided to the Fund. Moreover, as described above, the 12b-1 fees charged to the Fund were apparently not used to pay for trailing commissions or for other past marketing and distribution expenses.

Defendants' argument that plaintiff is required to plead details about each of the six factors enumerated in *Gartenberg v. Merrill Lynch Asset Mgmt, Inc.*, 694 F.2d 923 (2d Cir. 1992) is incorrect. (Def. Mot. to Dis. at 26-29). First, as the Court in *Strougo*

12

explained, at the pleading stage plaintiff need only show that the 12b-1 fees charged to the Fund are disproportionate to the services rendered. Plaintiff has done so.

Second, most of the six *Gartenberg* factors do not apply in the context of this lawsuit because this action challenges expenses charged to the Fund -- *Gartenberg* was a case involving advisory fees. For example, defendants state that plaintiff failed to plead facts addressing the "nature and quality of the services" provided in exchange for the 12b-1 fees. (Def. Mot. to Dis. at 27). However, defendants fail to cite a single case that states that the "quality" factor is relevant to determine the reasonableness of expenses rather than advisory fees. While the "quality" factor may be prominent in the analysis involving advisory services because the quality of an advisor's services often correlates with the fund's return, "quality" is not much of an issue (assuming the task was performed competently) with respect to "commodity services" such as, for example, distributing prospectuses, maintaining customer accounts and records and processing customer inquiries. Once a prospectus was mailed, for example, it does not matter how well it was mailed provided the task is performed competently. This action, therefore, questions why the same commodity services that were performed by the same entities in the prior year cost the same shareholders almost double in the period that the Fund was mostly closed to new investors. Likewise, the *Gartenberg* factor relating to the "Fund's profitability to the advisor" has no meaning in the context of this lawsuit because 12b-1 fees are not supposed to be a profit center for the advisor. Thus, the *Gartenberg* factors, which were formulated as a standard to analyze advisory fees are not particularly relevant in this lawsuit challenging expenses.

While the specific *Gartenberg* factors do not necessarily apply in the 12b-1 fee context, the general *Gartenberg* requirement that the fees charged be reasonably related to the services rendered <u>does</u> apply. As described throughout this brief, the plaintiff has alleged that the ongoing 12b-1 fees simply were disproportionate to the services rendered to the Fund

### B.    THE ADMINISTRATIVE EXPENSES CHARGED ARE ALSO NOT REASONABLY RELATED TO THE SERVICES RENDERED

Similarly, plaintiff has more than adequately alleged that the administrative and various other expenses charged to the Fund were entirely disproportionate to the services rendered. (*See, e.g.*, Complaint ¶¶ 27-28). For the year ended March 31, 2004, defendants charged the Fund administrative fees of $811,738, more than double the $353,487 in administrative expenses charged for the entire prior year. (*See* Exhibits D & E). The administrative expenses more than doubled even though there was no apparent corresponding increase in administrative services rendered to the Fund. As appears to be the case with the 12b-1 fees, the administrative expenses defendants charged to the Fund's investors increased in proportion to the appreciation of the Fund's asset base rather than being reasonably related to the actual administrative services rendered. The complaint must be sustained on this basis alone – certainly defendants cannot claim that administrative expenses doubled simply because the stock market did well and the Fund's asset base appreciated significantly.

Moreover, the administration agreement between the Fund and Countrywide Fund Services, Inc. (the predecessor to Integrated Fund Services, hereinafter "IFS")

14

entered into on December 18, 1998 is now outdated and patently unreasonable because of the dramatic increase in the Fund's assets. When the agreement with IFS was signed, the Fund had approximately $7 million in assets, (*see* Exhibit F), and called for IFS to be paid a rate of 0.150% of the Fund's average daily net assets up to $25 million; 0.125% of such assets from $25 to $50 million; and 0.100% of such assets in excess of $50 million. While this asset-based fee structure for administrative expenses provided for a 50% decrease (0.150% to 0.100%) when assets rose by merely $25 million (from $25 million to $50 million), the Fund continues to be charged the same 0.100% (for assets over $50 million) for administrative services even though assets have swooned to more than $800 million today. (*See* Exhibit H). It is grossly unreasonable for the Fund shareholders to continue paying administrative expenses using a fee structure dating back to 1998 when the Fund's assets have increased by more than one-hundred fold since that time. The Fund's management is required to review such compensation arrangements on a regular basis (on a quarterly basis pursuant to Rule 12b-1 for 12b-1 plans) and terminate any arrangement that it finds no longer reasonable. Defendants have permitted this outdated fee structure to continue despite the fact that it obviously does not correspond to the services rendered in any reasonable manner. This would not be tolerated in any conventional corporate setting, and is clearly a violation of defendants' fiduciary duty under § 36(b).

In addition to the inflated administrative expenses, the Fund was also charged $162,197 in transfer agent fees during the year ended March 31, 2004 as compared to $96,500 for the same services for the entire preceding year. (*See* Exhibits D & E). As with the administrative fees, the transfer agent fees charged to the Fund are also based on

15

a percentage of assets and therefore have absolutely no reasonable correlation to the actual transfer agent services rendered on behalf of the Fund.[7] Such profligate spending of shareholders' money (assuming the money was actually spent for providing such services to the Fund) should not be permitted to continue unabated. As with the excessive 12b-1 fees charged to the Fund, the increase in administrative, transfer agent and other expenses charged to the Fund during the year ended March 31, 2004 appears to be strictly the result of defendants' assessment of asset based charges against the Fund's substantially appreciated asset base rather than the result of any proportionate increase in services provided to the Fund.

Accordingly, the complaint adequately alleges that defendants have violated their fiduciary duty under § 36(b) by charging to the Fund administrative and various other expenses that bear absolutely no reasonable relationship to the services rendered on behalf of the Fund.

### C.  THE NASD RULES DO NOT PERMIT DEFENDANTS TO CHARGE EXCESSIVE 12B-1 FEES IN VIOLATION OF THEIR FIDUCIARY DUTIES

Defendants' references to NASD Rule 2830 and NASD Notice to Members 93-12 are red herrings. Expenses charged to the Fund pursuant to Rule 12b-1 are always subject to the fiduciary duty obligations set forth in § 36(b) and under state laws. *See Meyer v. Oppenheimer Management Corp.*, 764 F.2d 76, 82 (2d Cir. 1990) (costs of 12b-1 plans are subject to review under § 36(b)). Therefore, if the 12b-1 fees charged to the

---

[7]       Similarly, other fees charged to the Fund have increased substantially and even doubled during the year ended March 31, 2004. For example, the "reports to shareholders" expense ballooned to $58,982 for the period ended March 31, 2004 from $25,999 for the entire previous year; registration fee expenses rose to $87,141 for the year ended March 31, 2004 from $51,843 for the entire previous year; and custodian fees increased to $136,439 compared to $53,998 for the entire previous year.

Fund are disproportionate to the services actually rendered on behalf of the Fund, § 36(b) imposes liability. As described below, NASD Rule 2830 cannot preempt the fiduciary duty obligations placed on the defendants by § 36(b).[8]

As an initial matter, however, NASD Rule 2830 was not intended to apply to "no-load" funds which do not generate trailing commissions to brokers that must be recovered over time. As described above, no-load funds are generally not marketed through traditional retail brokers and, as their name implies, therefore carry no up-front sales charge, or "load," payable to the broker at the time of sale. Therefore, there are no brokerage commissions that defendants have to recover in future periods.

NASD Rule 2830, among others things, was intended to regulate funds that carry sales load and also have other classes which do not charge a load at the time of sale. For these funds, rather, the advisor advances the brokerage commissions and recovers the expense over time through imposition of 12b-1 fees. NASD Rule 2830 therefore imposes certain caps on such ongoing asset-based sales charges to ensure that shareholders paying for distribution related expenses pursuant to Rule 12b-1 pay no more than the shareholders paying for distribution directly through front-end sales loads. *See* SEC Release No. 34-30897, 57 Fed. Reg. 30989 ("[Rule 2830(d)] carries out the NASD's congressional mandate to prevent excessive <u>sales charges</u> on mutual funds shares" and "appropriately balances the need to ensure that the NASD's rules allow broker-dealers. . . to receive reasonable compensation, against the need to ensure that investors are charged reasonable <u>sales loads</u>")(emphasis supplied); *see also id.* at 30986 (noting intent "to prevent circumvention of the existing maximum sales charge rule because it had become

---

[8]     In any event, NASD Rule 2830 and the related notices cited by the defendants in their brief have no application to the challenge involving administrative expenses (*supra*, Section B)

17

possible for funds to use 12b-1 plans. . . to charge investors more for distribution than could have been charged as an initial sales load under the existing maximum sales charge rule."). In this case, as described above, defendants cannot credibly claim that the 12b-1 fees are necessary to compensate broker-dealers for past distribution efforts because by definition, the Fund is "no load" and therefore does not generate any trailing commission obligation.

Moreover, even if NASD Rule 2830 were to apply in the context of a no-load fund, the rule does not, and cannot, provide defendants with a "free pass" to violate § 36(b)'s fiduciary duty to only charge expenses to the Fund reasonably related to the services actually rendered on behalf of the Fund.[9] In this case, the Fund stopped soliciting new investors on May 30, 2003, and therefore should not continue to incur "asset-based sales charges" at the same rate as when the Fund was open to new investors. At the very least, the 12b-1 fees charged to the Fund after it closed should have been reduced, if not altogether eliminated. Yet, the Fund is still being charged substantially more 12b-1 fees (more than double) while closed to new investors compared to the 12b-1 fees charged when the Fund was open to new investors. Moreover, as previously described (*supra,* Section A), charging 12b-1 fees in proportion to the Fund's significant appreciated asset base rather than in relation to the services actually rendered to the Fund was unreasonable under § 36 notwithstanding NASD Rule 2830.

Even the SEC memorandum discussing the implication of NASD Rule 2830 on funds closed to new investors states: "The NASD's maximum sales charge rule

---

[9]    For example, while NASD Rule 2830 places a 0.75% per annum cap on the asset-based sales charges a fund may impose, it would still be a violation of § 36(b) to charge 12b-1 fees below this cap if such fees are not reasonably related to services provided. In effect, the NASD rule caps fees and expenses that its members can charge, but certainly does not permit advisors to indiscriminately charge 12b-1 fees lacking a reasonable relationship with the needs of the fund.

ultimately would require a fund that made no new sales to reduce or eliminate its asset-based sales charge." Memorandum, "Chairman Dingell's Inquiry Concerning Rule 12b-1 Fees," Barbara J. Green, Deputy Director, Sec. Div. of Inv. Mgmt, Aug. 16, 1993, at 1 (Ex. H, Def. Mot. to Dis.). The memorandum also states that a fund closed to new investors may continue paying 12b-1 fees only "in order to compensate the distributor for its past distribution efforts." Id. at 3. As described above, because the Fund is no load, defendants are unlikely to have obligations to brokers for "past distribution efforts." Clearly, the memorandum addresses instances where a fund subject to a sales load closes to new investors and the advisor seeks to recover commissions advanced to broker-dealers through ongoing 12b-1 fees. However, even in 1993, ten years before the abuses taking place within the mutual fund industry came to light, the SEC recognized the potential of abuse in closed funds continuing to charge 12b-1 fees, stating:

> "The Division intends to re-examine rule 12b-1. . . In re-examining the rule, the Division will give careful considerations to the practices described in the article. The Division also will discuss these practices with the NASD" Id. at 1.
>
> * * *
>
> "The SEC believes that the NASD maximum sales charge rule [NASD Rule 2830] will deter excessive 12b-1 sales charges, but the Division intends to monitor closely the operation of the rule to see how it affects industry practices." Id. at 3

Even then, the SEC's memorandum was far from a ringing endorsement for charging 12b-1 fees to closed mutual funds. As previously discussed, recent studies conducted by SEC Office of Economic Analysis question the benefit of charging 12b-1 fees even for funds open to new investors. See *"The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns,"* supra at 3, (Ex. A).

In sum, NASD Rule 2830 notwithstanding, if the defendants are continuing to charge the Fund "asset-based sales charges" that lack a reasonable relationship to the needs of the Fund or the services rendered on behalf of the Fund, then defendants are liable under § 36(b).

**D.    DEFENDANTS HAVE APPARENTLY VIOLATED THE FUND'S 12B-1 PLAN**

In an attempt to justify the ongoing 12b-1 fees after the Fund closed to new investors, defendants have presented a laundry list of services they claim are reimbursed under the Fund's 12b-1 Plan. (Def. Mot. To Dis. at 7). However, it appears that most of these services are included in other expense categories charged to the Fund outside of the 12b-1 distribution expense category (which is capped at 0.25% of assets under the Fund's 12b-1 Plan). If the expenses listed in the other expenses categories are deemed 12b-1 expenses, as claimed by defendants in their brief, they must be added to the distribution expense which cause the 0.25% cap imposed by the Fund's 12b-1 Plan to be exceeded.

Defendants' list the following expenses purportedly reimbursed under the Fund's 12b-1 Plan: aiding in maintaining the investment of the respective customers in the Fund, establishing and maintaining customer accounts and records, monitoring dividend payments from the Trust on behalf of customers, arranging for bank wires, receiving and answering correspondence and assisting with purchase and redemption requests. *Id.* However, according to the Fund's Form N-CSRS filed on September 30 2003, the Fund pays transfer agent fees which includes the following services:

> "maintain[ing] the records of each shareholder's account, answer[ing] shareholder's inquiries concerning their accounts, process[ing] purchases and redemptions of ... [the] Fund's shares, act[ing] as dividend and distribution

20

disbursing agent and perform[ing] other shareholder service functions." (*See* Exhibit G)

Similarly, the administrative services provided to the Fund for which the Fund pays an administrative fee includes providing "reports to shareholders." (*See* Exhibit E attached to Def. Mot. To Dis.)  Moreover, the Fund is charged a separate fee (that was $58,982 for the year ended March 31, 2004) for providing "reports to shareholders." (*See* Exhibit D).  It appears, therefore, that all these services are being charged to the Fund in various categories apart from the category listed as distribution expenses subject to the 0.25% cap on assets for 12b-1 fees pursuant to the Fund's 12b-1 Plan.

If these other expenses are added to the Fund's distribution expense, then it appears, based on the limited financial disclosures available, that defendants have violated the terms of the Fund's 12b-1 Plan by exceeding the 0.25% cap on assets imposed for 12b-1 fees.  Furthermore, if discovery confirms that the total charges against the Fund's assets for sales related expenses and/or service fees is more than 0.25% of the Fund's average net assets per annum, then defendants have also violated NASD Rule 2830(d)(4) which imposes a 0.25% limit on such expenses for mutual funds that are promoted as "no-load."

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss should be denied in its entirety.

Dated: June 14, 2004

ZIMMERMAN, LEVI &
KORSINSKY, LLP

By: _____
Eduard Korsinsky (EK 8989)
Jean-Marc Zimmerman (JZ 7743)
39 Broadway, Suite 1440
New York, New York 10006
Tel: (212) 363-7500
Fax: (212) 363-7171

Attorneys for Plaintiff