# Exhibit A – Part 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
MILTON PFEIFFER,

    Plaintiff,

 -against-           03 CV 9741 (DLC)

BJURMAN, BARRY & ASSOCIATES
BJURMAN, BARRY MICRO CAP
GROWTH FUND,

    Defendants.
-------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

ZIMMERMAN, LEVI &
KORSINSKY, LLP
Eduard Korsinsky (EK 8989)
Jean Marc Zimmerman (JZ 7743)
39 Broadway, Suite 1440
New York, New York 10006
Tel: (212) 363-7500
Fax: (212) 363-7171

Attorneys for Plaintiff

# TABLE OF CONTENTS

Page

PRELIMINARY STATMENT ..................................................................................................3

ARGUMENT .............................................................................................................................5

    A. THE 12B-1 FEES ARE NOT REASONABLY
       RELATED TO THE SERVICES RENDERED ..........................................................5

       1. It Is Unreasonable For Defendants
          To Charge 12b-1 Fees For Marketing And
          Distribution After the Fund Closed To New
          Investors And Stopped Soliciting New Business...................................................6

       2. The 12b-1 Fees Charged Were Not Reasonably
          Related To Any Past Sales Or Distribution
          Expenses Advanced By Defendants........................................................................8

       3. The 12b-1 Fees Charged To The Fund
          For The Year Ended March 30, 2004 Increased
          As A Result Of Appreciation Of The Fund's
          Assets Rather Than In Relation To The Services Rendered..........................10

       4. Plaintiff Has Properly Pled The Gartenberg
          Factors To The Extent They Apply To The
          Assessment Of 12b-1 Fees In This Action............................................12

    B. THE ADMINISTRATIVE EXPENSES
       CHARGED ARE ALSO NOT REASONABLY
       RELATED TO THE SERVICES RENDERED..........................................14

    C. THE NASD RULES DO NOT PERMIT DEFENDANTS
       TO CHARGE EXCESSIVE 12B-1 FEES IN
       VIOLATION OF THEIR FIDUCIARY DUTIES.......................................16

    D. DEFENDANTS HAVE APPARENTLY
       VIOLATED THE FUND'S 12B-1 PLAN..................................................20

CONCLUSION................................................................................................21

i

# TABLE OF AUTHORITIES

**Cases**                                                                                             **Page(s)**

*King v. Simpson,*
   189 F.3d 284, 286 (2d Cir. 1999) ................................................................................5

*Koppel v. 4987 Corp.,*
   167 F.3d 125, 127 (2d Cir. 1999) ................................................................................5

*Villager Pond, Inc. v. Town of Darien,*
   56 F.3d 375, 378 (2d Cir. 1995)....................................................................................5

*Strougo v. Bea Assoc.,*
   2000 WL 45714 (S.D.N.Y.).....................................................................................5, 12

*Gartenberg v. Merrill Lynch Asset Mgmt, Inc.,*
   694 F.2d 923 (2d Cir. 1992) ................................................................................. 12-14

*Meyer v. Oppenheimer Management Corp.,*
   764 F.2d 76, 82 (2d Cir. 1990) ...................................................................................16


**Statues**

15 U.S.C. § 80a-35(b)(2000) ................................................................................... *passim*


**Rules and Regulations**

17 C.F.R. § 270.12b-1 (SEC Rule 12b-1) (2004) ...................................................... *passim*

17 C.F.R. § 270.12b-1(e) (2004) ...........................................................................................3

17 C.F.R. § 270.12b-1(b)(3) (2004) ...................................................................................7,8

NASD Conduct Rule 2830, NASD Manual, CCH (¶ 4621)(2000) ............. 2, 8, 16-20, *passim*

## Miscellaneous Authorities

NASD Notice 93-12, 1993 WL 434082 (Feb. 1993) ...........................................................2

SEC Release No. 34-30897, 57 Fed. Reg. 30986 ...........................................................17

"The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns," Lori Walsh, Financial Economist, Office of Economic Analysis, U.S. Securities and Exchange Commission, April 26, 2004 ...................................................2, 6, 19

Memorandum, "Chairman Dingell's Inquiry Concerning Rule 12b-1 Fees," Barbara J. Green, Deputy Director, Sec. Div. of Inv. Mgmt, Aug. 16, 1993 ...................................................19

Plaintiff Milton Pfeiffer respectfully submits this memorandum of law in opposition to defendants' motion to dismiss the second amended complaint (the "complaint").

Defendants' motion should be denied because the complaint pleads sufficient facts, which if proven true, demonstrate that certain expenses charged to the Bjurman, Barry Micro-Cap Growth Fund (the "Fund") after it closed to new investors on May 30, 2003 had no reasonable relationship to the marketing, distribution and administrative services rendered to the Fund. The expenses charged to the Fund in this particular case are not sanctioned by any National Association of Securities Dealers ("NASD") rule or notice, including NASD Rule 2830 or NASD Notice to Members 93-12, because such rules and notices do not, and cannot, insulate defendants from liability where the expenses charged to the Fund are disproportional to the actual needs of, or services rendered to, the Fund. This action alleges that defendants have violated their fiduciary duty under § 36(b) of the Investment Company Act of 1940 [15 U.S.C. § 80a-35(b) (2000)] (the "ICA") by: (i) continuing to charge the Fund for marketing and distribution expenses after the Fund stopped marketing and distributing Fund shares to new investors on May 30, 2003; and (ii) charging the Fund for marketing, distribution, servicing, administrative and other expenses in proportion to the Fund's assets which increased dramatically after the Fund's closure, rather than in proportion to the services rendered to the Fund which do not appear to have increased after the Fund closed to new investors.

## PRELIMINARY STATEMENT

The payments predominantly at issue in this action – ongoing payments by an investment company (i.e. mutual fund) for distribution, sales and servicing – are commonly known as 12b-1 fees. They are made pursuant to a plan of distribution duly adopted and approved by the directors and shareholders of the fund, which is kept under continuing review in accordance with Rule 12b-1 of the ICA ("12b-1 Plan"). Section 12b-1(e) of the ICA requires that directors may only approve and ratify a 12b-1 Plan if they conclude:

> in light of their fiduciary duties under state law and under sections 36(a) and (b) of the Act, that there is a reasonable likelihood that the plan will **benefit the company and its shareholders**...(emphasis added).

Recent studies by the SEC have shown, however, that 12b-1 fees – even for funds open to new investors – do not benefit fund shareholders, especially when the 12b-1 fees are charged indefinitely. *See, e.g.* "*The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns,*" Lori Walsh, Financial Economist, Office of Economic Analysis, U.S. Securities and Exchange Commission, April 26, 2004, at 2 (Exhibit A) ("fund shareholders are paying the costs to grow a fund while the fund advisor is the primary beneficiary of the fund's growth through the collection of higher fees"). While it very well may be, based on these and other studies, that charging 12b-1 fees even to open funds violates § 36(b) and state law as set forth in § 12b-1(e), the ongoing assessment of 12b-1 fees to the Fund under the circumstances described below is most certainly a violation of § 36(b).

3

At the core of this case is plaintiff's claim that it is improper for defendants to charge the shareholders of the Fund expenses related to marketing, distribution and administration that have no reasonable relation to the actual services and needs of a mutual fund that is no longer marketing to, or accepting investments from, new investors. Although NASD rules and notice provide guidance regarding the collection of fees and expenses from mutual funds, they do not abrogate the fiduciary duties imposed by § 36(b) requiring that expenses charged to the Fund be reasonably related to the actual services rendered on behalf of the Fund.

In this case, the 12b-1 fees, administrative expenses, and other expenses charged to the Fund after it closed to new investors on May 30, 2003 increased significantly without any apparent relation to the services actually rendered. For the year ended March 31, 2004, such expenses charged to the Fund were more than double as compared to the prior year period when the Fund was open to new investors. The Fund's shareholders have been assessed these inflated fees because the defendants have continued to charge the Fund fees as a percentage of assets rather than in proportion to the actual marketing and servicing needs of the Fund as required under § 36(b) of the ICA. Because the Fund's assets appreciated significantly, having generated returns of approximately 66% in 2003 and 456% since inception, (*see* Exhibit B), defendants have been overcharging for expenses rendered on behalf of the Fund as the charges had no reasonable relation to the actual services rendered on behalf of the Fund.

Such arbitrary expense accounting is a violation of § 36(b) of the ICA. Accordingly, plaintiff seeks to recover the excessive expenses charged by the defendants

and to enjoin defendants from continuing to overcharge the Fund for such expenses in the future.

## ARGUMENT

It is well settled that a complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint that would entitle the plaintiff to relief. *See King v. Simpson*, 189 F.3d 284, 286 (2d Cir. 1999). In determining whether to dismiss a complaint, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir. 1999). Furthermore, it is not the court's function to weigh evidence that might be presented, but to instead merely determine whether the complaint itself is legally sufficient. *See Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995). As demonstrated below, each of the grounds presented by defendants for dismissing the complaint is without merit.

### A.  THE 12B-1 FEES ARE NOT REASONABLY RELATED TO THE SERVICES RENDERED

At the pleading stage, plaintiff is only required to plead facts which, if proven true, show that the 12b-1 fees charged are disproportional to the services rendered to the Fund. *See e.g. Strougo v. Bea Assoc.*, 2000 WL 45714, *7 (S.D.N.Y.) (plaintiff is not required to plead detail to make a determination with respect to the six *Gartenberg* factors – sufficient to plead facts to support claim that fees bear no reasonable relationship to services rendered). The complaint alleges that after the Fund closed to

new investors on May 30, 2003, the 12b-1 fees charged doubled[1] compared to the prior year (when the Fund was open to new investors) rather than reduced or altogether eliminated. As described below, the 12b-1 fees charged to the Fund constitute a violation of § 36 because these fees were not reasonably related to the services performed for the Fund.

1.  **It Is Unreasonable For Defendants To Charge 12b-1 Fees For Marketing And Distribution After the Fund Closed To New Investors And Stopped Soliciting New Business**

The complaint alleges, with as much detail as defendants' limited disclosures would permit, that 12b-1 fees continue to be charged to the Fund for marketing and distribution even after the Fund ceased soliciting new investors. (*See, e.g.*, Complaint ¶¶ 14-26). As previously noted, the SEC has already questioned the propriety of charging 12b-1 fees altogether. See "*The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns,*" *supra* at 3, (Ex. A). Certainly, in this case where the basis for charging 12b-1 fees – passing the benefits of economies of scale of a larger asset base to shareholders – no longer exists, the ongoing 12b-1 fee charges cannot be reasonable.

Although defendants do not disclose precisely how the 12b-1 fees were spent after the Fund closed to new investors,[2] it appears that defendants continue to charge 12b-

---

[1] Defendants reported the financial results for the Fund for the year ending March 31, 2004 after the complaint was filed. Accordingly, references in this brief are made to defendants' most recent financial disclosure rather than the financial figures for the period ended September 30, 2003 stated in the complaint.

[2] At the initial pre-trial conference held on April 1, 2004, the Court ordered defendants' counsel in this and a related matter involving Dreyfus mutual funds to meet with plaintiffs' counsel to discuss why 12b-1 fees continue to be charged after the funds closed to new investors. On April 16, 2004, all the parties met in accordance with the Court's directive. Counsel for the Dreyfus funds gave a detailed presentation and produced documents on two occasions that demonstrated to our satisfaction that Dreyfus was charging

1 fees for listing the Fund in numerous "fund supermarkets" such as Schwab and E*Trade. (*See* Exhibit C). Typically, a fund uses the percentage of net assets allocated under its 12b-1 Plan in order to pay for an ongoing listing[3] in a fund supermarket in order to gain exposure to the fund supermarket's broad customer base and thereby attract new investors to the fund. Such expenses may be justified where a particular fund seeks exposure to a fund supermarket's customer base in order to attract new investors. However, for a fund that is no longer seeking new investors, such arrangements with the supermarkets are not reasonable and should be terminated. Considering that more than 73% of the Fund shares are held by fund supermarkets,[4] it is unreasonable for the Fund to continue paying the same percentage rate of net assets for the fund supermarkets' marketing and distribution services after the Fund closed to new investors.

Although the Fund's arrangements with the fund supermarkets may have been reasonable at the time the Fund was soliciting new investors, it has become unreasonable after the Fund closed to new investors. Rule 12b-1 requires 12b-1 plans to be reviewed "at least quarterly" to determine if changes in circumstances such as the closure of the Fund cause the 12b-1 Plan to become unreasonable, (*see* Rule 12b-1(b)(3)(ii)). Rule 12b-

---

12b-1 fees for only a limited time to reimburse for commissions advanced to brokers who sold the funds in previous years. The Dreyfus action was therefore voluntarily dismissed. In contrast, counsel for Bjurman did not make any presentation about the Fund, refused to answer our questions at the meeting and would not produce any of the documents pertaining to the Fund that we requested even though the Fund, unlike the Dreyfus funds, is a no-load fund that does not require defendants to have advanced commissions that justifiably may be recovered over time.

[3] Fund supermarkets are typically paid a percentage of the net assets held by the fund supermarket for listing services. For example, to participate in the Charles Schwab & Co. OneSource program, a mutual fund pays fees "based upon the daily balances of client assets invested in the participating funds through Schwab." *See* Form 10-K filed by Charles Schwab & Co. for December 31, 2003.

[4] According to Statement of Additional Information of The Bjurman, Barry Funds ("SAI") at pp 13-14 (Exh. B attached to Def. Mot. to Dis.), more than 73% of the Closed Fund shares were distributed via Charles Schwab & Co. Inc. ("Schwab"), National Financial Services Corp. (a division of Fidelity Investments) and Nation Investor Services Corp. (an affiliate of TD Waterhouse) with Schwab accounting for more that 48% of this amount.

7

1 also requires that any agreement related to a 12b-1 plan must be able to "be terminated at any time, without the payment of any penalty" so that directors can carry out their fiduciary duty under § 36(b). (See Rule 12b-1(b)(3)(iv)). Moreover, when the Fund's shareholders initially voted to approve the 12b-1 Plan, they did so based on the benefits of economies of scale they expected to be achieved as a result of the 12b-1 fees being used by defendants to attract new investors. Now that the Fund has closed to new investors, at the very least, the Fund's shareholders are entitled to vote on whether the Fund should continue to maintain the 12b-1 Plan, including the compensation arrangements with the fund supermarkets that apparently are no longer reasonable.

By continuing to maintain the 12b-1 Plan after the Fund closed to new investors without soliciting shareholder approval after the Fund's material change in circumstances, defendants have breached their fiduciary duties under § 36(b) of the ICA.

### 2.   The 12b-1 Fees Charged Were Not Reasonably Related To Any Past Sales Or Distribution Expenses Advanced By Defendants

The Fund at issue is a "no-load" fund, meaning that it does not impose a sales charge, or load, at the time of sale.[5] As described below, the sale of a no-load fund does not require the payment of a commission to the broker-dealer by either the purchaser or the fund advisor. Consequently, in the case of a no-load fund, 12b-1 fees are not used to pay broker-dealers' commissions for past marketing and sales efforts because the advisor is not required to advance any commissions to the broker-dealer at the time of sale. In contrast, funds that charge a "sales load" generally sell fund shares through registered

---

[5]   A "no-load" fund is defined as a fund that imposes no sales charges or whose total charges against net assets to provide sales related expenses and/or service fees does not exceed 0.25% of average net assets per annum. *See* NASD Rule 2830(d)(4); *see also* Def. Mot. to Dis. at 17.

broker-dealers that charge a commission (i.e., a load) at the time of sale. Load funds therefore employ a variety of schemes to pay for these commissions (that are typically 4% of sales). In certain cases, the fund charges the purchasing shareholder a sales charge at the outset that covers the cost of the selling broker's commission. This arrangement is typical for funds that sell shares designated as "Class A" shares. Alternatively, a fund advisor may advance the commission to the broker-dealer and then "finance" the commission by deducting fees (i.e., 12b-1 fees) directly from the fund's assets. Use of 12b-1 fees to pay for past brokerage commissions (often called "trail commissions") is typical for funds that sell shares designated as "Class B" shares. Generally, load funds offer the option of purchasing fund shares in the form of either Class A shares (where customer pays the sales commission upfront) or Class B shares (where the sales commission is advanced by the advisor and recovered over time using 12b-1 fees). Several other variations of this theme exist where 12b-1 fee arrangements are utilized as a mechanism for customers to pay the sales load.[6]

In contrast, no-load funds are generally sold either directly by the fund advisor itself or through fund supermarkets that typically list thousands of mutual funds for sale. Because fund supermarkets usually do not employ a sales-force of registered representatives, they do not charge the listing fund the traditional 4% sales commission that broker-dealers otherwise expect to receive. Instead, fund supermarkets offer a fund

---

[6] An example of such a load fund is the Dreyfus Premier NexTech fund which was the subject of the related lawsuit filed in this Court and voluntarily dismissed. The NexTech fund has different classes of shares. For example, Class A shares require the purchaser to pay a load up-front but charges no 12b-1 fees. Class B shares, on the other hand, require Dreyfus to advance the commission to the broker-dealer at the time of sale that Dreyfus recovers from the shareholder over time by charging a 1.00% 12b-1 fee. After six years, Class B shares automatically convert to Class A shares and the 12b-1 fees stop.

9