## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MICHELLE YAMEEN,

               Plaintiff,

     v.

EATON VANCE DISTRIBUTORS, INC., *et al.*,

               Defendants, and

EATON VANCE TAX-MANAGED
GROWTH FUND 1.1.,

               Nominal Defendant.

Civil Action No. 03-12437-DPW

## MEMORANDUM IN SUPPORT OF MOTION OF
## DEFENDANT EATON VANCE DISTRIBUTORS, INC.
## TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Wm. Shaw McDermott (BBO #330860)
Aimée E. Bierman (BBO #640385)
Gregory R. Youman (BBO#648721)
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
75 State Street
Boston, MA 02109-1808
(617) 261-3100

Jeffrey B. Maletta, Esq.
Nicholas G. Terris, Esq.
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
1800 Massachusetts Avenue, N.W.
Washington, D.C. 20036
(202) 778-9000

*Attorneys for Defendant*
*Eaton Vance Distributors, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ......................................................................................................... 5

A.    The Regulatory Framework ............................................................................ 5

B.    Closed Funds May Pay Distribution Fees for Past Distribution
      Expenses and Service Fees After a Fund is Closed ....................................... 7

      1.    Closed Funds May Pay Distribution Fees for Past Distribution Expenses ........... 7

      2.    Closed Funds May Continue to Pay Service Fees ................................... 9

C.    The Fund's Distribution and Service Fee Arrangements ................................ 9

      1.    Distribution Fees Assessed on Class B and Class C Shares ............................. 10

      2.    Services Fees Assessed on Class A, B, and C Shares ........................................ 11

DISCUSSION ........................................................................................................... 11

I.     THE EXPRESS RIGHT OF ACTION UNDER § 36(b) DOES NOT
       ENCOMPASS A CLAIM SOLELY INVOLVING DISTRIBUTION FEES ............... 11

II.    THE DISTRIBUTION PAYMENTS IDENTIFIED IN THE COMPLAINT
       ARE EXPRESSLY AUTHORIZED BY ICA § 22(b) AND THE RULES
       THEREUNDER AND CANNOT BE ATTACKED AS EXCESSIVE ......................... 14

III.   THE § 36(a) AND STATE LAW "BREACH OF FIDUCIARY DUTY"
       CLAIMS MUST BE DISMISSED ................................................................. 17

IV.    THERE IS NO IMPLIED PRIVATE RIGHT OF ACTION UNDER § 36(a) .............. 18

V.     DISTRIBUTORS IS ENTITLED TO SUMMARY JUDGMENT ................................. 19

CONCLUSION ........................................................................................................ 20

## TABLE OF AUTHORITIES

*Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) .......................................................... 18

*Benak v. Alliance Capital Mgmt. L.P.*, No. 01-5734,
2004 WL 1459249 (D.N.J. Feb. 9, 2004) ...................................................................... 13

*Blackstone Realty LLC v. Federal Deposit Ins. Corp.,* 244 F.3d 193 (1st Cir. 2001) ................... 10

*Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81 (1st Cir. 2004) ......................................... 18

*Burdett v. Miller*, 957 F.2d 1375 (7th Cir. 1992) ........................................................................ 17

*In re Carl L. Shipley*, 45 SEC 589 (1974) .................................................................................... 19

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ........................................................................................................ 19

*Chamberlain v. Aberdeen Asset Mgt. Limited*, No. 02-CV-5870SJ,
2005 WL 195520 (E.D.N.Y. Jan. 21, 2005) ................................................................... 19

*Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) ...................................................... 18

*DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708 (N.D. Ill. 2005) ............................................. 19

*Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569 (S.D.N.Y. 2001) ......................... 19

*Fogel v. Chestnutt*, 668 F.2d 100 (2nd Cir. 1981) ....................................................................... 13

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982) ........................ 2, 14

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ................................................................... 18, 19

*Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659 (1975) ................................................ 17

*Green v. Fund Asset Management L.P.*, 245 F.3d 214 (3rd Cir. 2001) ........................................ 17

*Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486 (N.D. Ill. 1999) ............................................. 14

*ING Principal Protection Funds Derivative Litig.*, 369 F. Supp. 2d 163,
No. 03-12198JLT, 2005 WL 1107072 (D. Mass. May 9, 2005) ............................... passim

*Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140 (3d Cir. 2002) .................................. 2

*Lefkowitz v. Smith Barney*, 804 F.2d 154 (1st Cir. 1986) ............................................................ 17

*Lessler v. Little*, 857 F.2d 866 (1st Cir. 1988)……………………………………………………12

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................................ 19

*Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76 (2d Cir. 1985).................................. 13

*Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321 (4th Cir. 2001) ................................. 2, 14

*Mutchka v. Harris*, __ F. Supp. 2d __, No. SACV0534JVSANX,
2005 WL 1414304 (C.D. Cal. Jun. 9, 2005) ................................................................. 19

*In re Nuveen Fund Litig.*, No. 94-c-360, 1996 WL 328006 (N.D. Ill. June 11, 1996) ................ 14

*Olmsted v. Pruco Life Insurance Co.*, 283 F.3d 429 (2nd Cir. 2002) ............................................. 19

*Pfeiffer v. Bjurman Barry & Associates*, No. 03-cv-9741DLC,
2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) ................................................ 2, 3, 7, 17

*Rohrbaugh v. Investment Co. Inst.*, Fed. Sec. L. Rep. ¶ 91,961, No. 00-1237, 2002 WL
31100821, (D.D.C. July 2, 2002) ................................................................................... 13

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*,
941 F. Supp. 326 (S.D.N.Y. 1996) ................................................................................. 14

*Texaco, Inc. v. Duhe*, 274 F.3d 911 (5th Cir. 2001)......................................................... 12

*United States v. NASD*, 422 U.S. 694 (1975)................................................................... 16

*United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542 (D.C. Cir. 2002) ..................... 12

*White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982 (E.D. Wis. 2002)........... 19

*Zucker v. AIM Advisors, Inc.*, _____ F. Supp. 2d _____ ................................................. 17

Defendant Eaton Vance Distributors, Inc. ("Distributors") respectfully submits this Memorandum in support of its motion to dismiss the Amended Derivative Complaint pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Rule 56.

## PRELIMINARY STATEMENT

This case was originally filed in December 2003. Plaintiff had ample opportunity for discovery and over a year to refine her pleadings. Yet her Amended Derivative Complaint ("Complaint" or "Compl.") merely rehashes the same utterly meritless legal theory that has now been rejected by at least two federal courts. Indeed, in a recent case in this District involving the same plaintiff's attorney and a substantially similar amended complaint filed against another mutual fund complex, the Court granted a Rule 12(b)(6) motion with respect to the same principal claims at issue in this case. *See ING Principal Protection Funds Derivative Litig.*, 369 F. Supp. 2d 163, No. 03-12198JLT, 2005 WL 1107072 (D. Mass. May 9, 2005) ("*ING*") (reporter page references are currently unavailable).

Plaintiff here challenges the payment by the Eaton Vance Tax-Managed Growth Fund 1.1 (the "Fund") of certain distribution and service fees (at annual rates of .75% and .25% of Fund net assets, respectively) to Distributors, which is the Fund's principal underwriter. Compl. ¶ 6. The Fund was "closed" to new investors on March 1, 2001, in that it stopped selling shares to persons who were not already shareholders. Compl. ¶ 28. It continues to offer and sell its shares to current shareholders. Compl. ¶ 29. The Complaint alleges that Distributors' continued receipt of distribution and service fees after the closing of the Fund is improper because the Fund is not incurring current distribution expenses and the Securities and Exchange Commission ("SEC") rule permitting the payment of distribution fees, Rule 12b-1 under the Investment Company Act of 1940 (the "ICA" or "Investment Company Act"), allows payment only to cover distribution

expenses incurred in current sales of Fund shares.  Compl. ¶¶ 31-36.  Plaintiff contends that the fees paid to Distributors are therefore "excessive" and may be recovered in an action under § 36(b) of the ICA, and are also in violation of supposed fiduciary duties under ICA § 36(a) as well as under Massachusetts law.  *See, e.g.*, Compl. ¶¶ 50-52, 54-58, 165-176.

By enacting § 36(b) in 1970, Congress imposed a limited fiduciary duty on an investment adviser with respect to its receipt of compensation from a mutual fund and authorized a security holder of the fund to sue the adviser and certain other defendants to recover legally excessive fees.  To maintain a § 36(b) claim, a plaintiff must plead and ultimately prove that a defendant has "charge[d] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2nd Cir. 1982).[1]

As the *ING* Court held, the Complaint's allegations concerning distribution fees fail to state a § 36(b) claim against Distributors.  With the approval of the relevant regulatory authorities, the SEC and the National Association of Securities Dealers, Inc. ("NASD"), the mutual fund industry has long used the type of distribution fees at issue, which are limited by NASD Rule 2830 to .75% of a fund's annual net assets, as a means of providing investors an alternative to a traditional front-end sales load, thereby allowing sales charges to be financed over time.  *ING* at *2; *Pfeiffer v. Bjurman Barry & Associates*, No. 03-cv-9741DLC, 2004 WL 1903075 at *5 (S.D.N.Y. Aug. 26, 2004) ("A fund with a Rule 12b-1 fee thus permits shareholders to pay for sales-related and other expenses over time, rather than immediately on

---

[1]     *See also Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3d Cir. 2002) (concluding that "dismissal for failure to state a claim with respect to excessive compensation was appropriate since Plaintiff failed to allege any facts indicating that the fees received were disproportionate to services rendered"); *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321 (4th Cir. 2001) (same pleading standard: "Section 36(b) is limited to cases where there was excessive compensation," *id.* at 329; to violate § 36(b), "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.* at 326 (quoting *Gartenberg*, 694 F.2d at 928)); *ING* at *2 (same).

purchase.").  Accordingly, contrary to the frivolous legal premise on which Plaintiff's case hinges, the regulators and the courts that have considered the issue have recognized that it is entirely proper for a mutual fund distributor to continue to receive distribution fees to recoup past distribution expenses (which, as Plaintiff well knows, is precisely what has occurred in this case) or for other legitimate purposes even after that mutual fund has closed to new investors. *See ING* at *3; *Pfeiffer,* 2004 WL 1903075 at *5 ("[t]he SEC and NASD … permit a fund that is closed to new investors to continue charging an asset-based sales charge" (*i.e.*, a 12b-1 fee)). This compels dismissal of the § 36(b) claim in this case because, as *ING* held:

> Plaintiffs, therefore, cannot entirely confine their claim for excessive distribution fees to the de minimis sales-related services provided when the funds were closed to new investors.  At a minimum, Plaintiffs must also allege that the distribution fees are disproportionate and unrelated to the sales-related services actually provided when shares of the funds were marketed and sold to the general public. Because the amended complaint does not contain this fundamental claim, or any facts that would support such an allegation, Plaintiffs fail to state a claim for breach of fiduciary duty in connection with the payment and receipt of distribution fees.

*ING* at *3.

The SEC and NASD also have permitted mutual fund distributors and other sales persons to receive service fees in an amount up to .25% per year of fund assets that are intended to provide compensation for ongoing personal services to current shareholders.  *See ING* at *2-*3. There is plainly nothing improper about a mutual fund continuing to pay such fees for ongoing services to current shareholders after the fund closes to new shareholders.  *See, e.g., Pfeiffer,* 2004 WL 1903075 at *5 ("the fees charged for ongoing personal shareholder services may be assessed indefinitely").  Accordingly, Plaintiff's claims relating to service fees must be dismissed because:

> In the amended complaint, Plaintiffs do not allege that the service fees exceed the ongoing expenses associated with maintaining shareholder accounts. Plaintiffs

allege no facts that, if true, would indicate that the service fees are unrelated to the
shareholder services provided by broker-dealers….    [Therefore] Plaintiffs also
fail to state a claim with respect to the .25% service fees.

*ING* at *3.

Finally, as Plaintiff acknowledges, *see* Compl. ¶¶ 159-164, her remaining causes of
action are shareholder derivative claims subject to Massachusetts demand requirements and Fed.
R. Civ. P. 23.1.    As *ING* held (at *3-*5), and as discussed in the Independent Trustee
Defendants' separate Memorandum (the arguments of which Distributors adopts), such claims
must be dismissed because Plaintiff has failed to make pre-suit demand on the board of trustees.

For the foregoing reasons, the Complaint should be dismissed, and this Court need not
read further.  For the Court's reference, however, the next section of this Memorandum discusses
the applicable regulatory framework and factual background in greater detail.  The Memorandum
then presents the following additional alternative grounds for dismissal that were not ruled on by
the *ING* Court and that Distributors asks the Court to reach only if it declines to follow *ING*:

1.    The § 36(b) claim must be dismissed because the Complaint does not contain the
requisite allegations of excessive advisory fees but instead focuses solely on supposedly
improper Rule 12b-1 fees, which are outside the scope of the statute.

2.    All of Plaintiff's claims must be dismissed because the amount of service and
distribution fees that Distributors charges is regulated by, and (as Plaintiff has acknowledged)
complies with, a comprehensive regulatory scheme under ICA § 22(b) and NASD Rule 2830 and
therefore, as a matter of law, cannot be deemed excessive under § 36(b) or otherwise.

3.    Plaintiff's § 36(a) and state law "breach of fiduciary duty" claims must be
dismissed because these sources of law do not impose any relevant fiduciary duty that can

possibly be violated by the receipt of distribution and service fees from a "closed" mutual fund given the recognition by courts and regulators that this practice is entirely permissible.

4.      The § 36(a) claim must be dismissed because there is no express or implied private right of action under that provision.

5.      As discussed in the Independent Trustees' Memorandum (a) the § 36(a) and state law "breach of fiduciary duty" derivative claims should be dismissed because Plaintiff has failed to comply with the verification requirement of Fed. R. Civ. P. 23.1, and (b) if the federal claims are dismissed, this Court should not exercise supplemental jurisdiction over the state law claims.

Finally, and alternatively, Distributors is entitled to summary judgment.  As set forth in the Statement of Material Facts Not In Dispute (the "Statement"), the distribution fees are being used for an entirely legitimate purpose: reimbursing "uncovered distribution charges" representing actual expenses incurred by Distributors for past sales of Class B and C shares. Similarly, as also set forth in the Statement, the service fees at issue are being paid for ongoing personal services provided to current Fund shareholders.  Under these circumstances, there is no basis to contend that either the distribution service fees are excessive or otherwise improper.

## BACKGROUND

### A.      The Regulatory Framework

The fees at issue in this case are authorized and regulated by a comprehensive set of rules approved by the SEC and NASD, beginning in 1980 with the SEC's adoption of Rule 12b-1, 17 C.F.R. § 270.12b-1.[2]  Before adoption of these rules, the primary method used by mutual funds to pay sales related expenses (principally commissions to brokers through which investors

---

[2]      *See* Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414, 45 Fed. Reg. 73898 (November 7, 1980) ("12b-1 Adopting Release") (adopting Rule 12b-1 under the ICA, which allows mutual funds to use their assets to finance sales related expenses).

purchase their fund shares) was to deduct a front-end sales load from the offering price of mutual fund shares.[3]    As an alternative to shares on which a front-end sales load is assessed, usually called Class A shares, the mutual fund industry developed shares, usually called Class B and Class C shares, that carry no "up-front" sales charges, but instead are assessed an "asset-based sales charge" or distribution fee that is paid to the distributor of fund shares.  *Id.*[4]  Such a distribution fee is expressly authorized by Rule 12b-1 to cover expenses of distribution, including but not limited to "advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature."  *See* Compl. ¶ 31.  Nothing in Rule 12b-1 states that distribution fees cannot be applied to pay for past expenses.

In  § 22(b) of the ICA, Congress granted the NASD the power to regulate all sales charges, including the distribution fees at issue in this case.[5]  NASD Rule 2830 (previously known as Section 26 of the NASD Rules of Fair Practice), entitled "Investment Company Securities," sets the permissible sales charges for distribution of investment company shares.[6]  Rule 2830 (a copy of which is included in the Appendix of Additional Legal Materials (Ex. A)) submitted in support of this Motion ("Legal Appendix")) defines "sales charge" as "all charges or fees that are paid to finance sales or sales promotion expenses . . . ."  Rule 2830(b)(8).  Rule 2830 defines "asset-based sales charge" as "a sales charge that is deducted from the net assets of

---

[3]     *See* SEC Order Approving Proposed NASD Rule Change Relating to Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, SEC Release No. 34-30897, 57 Fed. Reg. 30985, 30985-86 (July 13, 1992) ("NASD Rule Release").

[4]     Shareholders who do not pay a front-end sales load and who sell, or redeem, these shares within a few years of purchasing generally also must pay a "contingent deferred sales charge" upon redemption.  *See* NASD Rule Release at 30986.

[5]     *See* Proposed Rule Change by NASD Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, SEC Release No. 29070, 56 Fed. Reg. 16137, 16139 (April 19, 1991).

[6]     The SEC approved this Rule.  *See* NASD Rule Release 57 Fed. Reg. at 30989-90.

an investment company and does not include a service fee." Rule 2830(b)(8)(A). Under Rule 2830, an investment company may pay both an "asset-based sales charge" and a "service fee."[7] The asset-based sales charge (or 12b-1 distribution fee) may not exceed .75 of 1 percent per annum of the average annual net assets of the investment company plus interest. Rule 2830(d)(2)(E). Service fees may not exceed .25 of 1% of average net assets per annum. Rule 2830(d)(2)(E) and (5). "Service fees" are defined as "payments by an investment company for personal service and/or the maintenance of shareholder accounts." Rule 2830(b)(9).

SEC Rule 17d-3 completes the regulatory framework governing 12b-1 fees. Promulgated at the same time as Rule 12b-1, Rule 17d-3 allows funds to enter into written agreements with their affiliates who serve as the principal underwriter of fund shares to permit the funds to make payments to the affiliates in connection with the distribution of those shares. 17 C.F.R. § 270.17d-3. S*ee also* SEC 12b-1 Adopting Release, 45 Fed. Reg. at 73898, 73904-06.

**B.    Closed Funds May Pay Distribution Fees for Past Distribution Expenses and Service Fees After a Fund is Closed**

Plaintiff's sole claim is that it was improper for Distributors to receive distribution and service fees while the Fund was closed to new investors because it is impermissible for a mutual fund to pay such fees unless the fund is seeking to attract new shareholders and thereby increase in size. Compl. ¶¶ 31-36. As *ING* and *Pfeiffer* held, this contention is incorrect.

**1.    Closed Funds May Pay Distribution Fees for Past Distribution Expenses**

The SEC, in responding to a Congressional inquiry on the precise issue of whether a closed fund may continue to pay distribution fees, expressly rejected Plaintiff's interpretation of Rule 12b-1:

---

[7]    *See* Questions #23 and #24 of NASD Notice to Members 93-12 (a copy of which is included as Ex. B to the Legal Appendix).

> Rule 12b-1 permits a fund to spread its distribution expenses over several years and allows payment of fees for past distribution services. ***Therefore, even if a fund closes to new investors, it may continue to pay rule 12b-1 fees in order to compensate the distributor for its past distribution efforts***.

*See* Letter dated August 19, 1993 to Congressman John D. Dingell from Acting Chairman Arthur Levitt enclosing Memorandum dated August 16, 1993 of Barbara J. Green, Deputy Director, Division of Investment Management (emphasis added).[8]

In 1993, the NASD also addressed this precise issue, interpreting its own Rule 2830. In Notice to Members 93-12, the NASD posed the following question and gave the following answer:

> Question #6: If a fund generates no sales or discontinues selling its shares, must it stop paying any asset-based sales charges?
> Answer: No….

*See* Notice to Members 93-12.

The reason that the SEC and NASD permit principal underwriters, such as Distributors, and others to continue to receive distribution fees from a mutual fund even after that fund closes is straightforward. Such fees compensate the distributor for *past* distribution expenses. Distribution fees make possible Class B and C shares as alternatives to Class A shares, which carry a front-end sales load. Selecting Class B or C shares essentially allows purchasers to defer payment of sales charges, effectively financing the sales load over time.[9]

---

[8]     A copy of the SEC Letter is included as Ex. C of the Legal Appendix.

[9]     *See* Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 53 Fed. Reg. 23258, 23275 (June 21, 1988). As explained in the Division of Investment Management, SEC, Report on Mutual Fund Fees and Expenses, Dec. 2000, *available at* **http://www.sec.gov/news/studies/feestudy.htm#P1137_160078**:

> [T]oday, many funds adopt a 12b-1 plan as a substitute for or supplement to sales charges or as an ongoing method of paying for marketing and distribution arrangements. The mutual fund industry utilizes a number of marketing and distribution practices that did not exist when rule 12b-1 was adopted. For example, many funds offer their shares in multiple classes – an organizational structure that permits investors to choose whether to pay for fund distribution and marketing costs

### 2.    Closed Funds May Continue to Pay Service Fees

Plaintiff's contention that it is somehow improper for a closed fund to continue to pay service fees is equally frivolous.  Subsection (b)(9) of NASD Rule 2830 defines service fees as "payments by an investment company for personal service and/or the maintenance of shareholder accounts."  As explained in NASD Notice to Members 93-12, service fees are "a payment for personal service provided to the customer.  It is essentially intended to compensate members for shareholder liaison services they provide, such as, responding to customer inquiries and providing information on their investments." NASD Notice to Members 93-12, at 53 (February 1993) (citation omitted).  Moreover, the SEC has stated that a 0.25% service fee "should be adequate … to provide compensation for continued service to mutual fund shareholder accounts."  *See* Order Approving Proposed Rule Changes Relating to the Limitation of Asset-Based Sales Charges, Exchange Act Release No. 34-30897, 57 Fed. Reg. 30985, at 30990 (July 13, 1992).  Thus, there is nothing inappropriate about charging a service fee to a fund after the fund closes to new investors.  The 0.25% service fee is charged to a fund's current shareholders to maintain and service their accounts.  These ongoing services do not terminate once the fund closes to new investors.

### C.    The Fund's Distribution and Service Fee Arrangements

Defendant Distributors acts as the Fund's principal underwriter, Compl. ¶ 6, and distributes the Fund's shares to and through selling brokers under an Amended and Restated Distribution Agreement ("Distribution Agreement").  Statement ¶¶ 2-3.  The Distribution Agreement covers the distribution of all Fund shares, including Class A, Class B and Class C

---

up-front (via front-end sales charge), or in some combination of the above.  Rule 12b-1 plans are integral to these arrangements – they are the means by which the brokers that sell fund shares under these arrangements are paid.

shares. Statement ¶ 3. The Fund also has a Class B Distribution Plan, a Class C Distribution Plan, and a Class A Service Plan all of which were approved by the Fund's Board of Trustees. Statement ¶ 4.[10] These plans are regularly reviewed by the Board, in accordance with Rule 12b-1. *See, e.g.,* Compl. ¶¶ 41-44, 59-152.

### 1. Distribution Fees Assessed on Class B and Class C Shares

Pursuant to the Distribution Agreement, the Fund agrees to pay a commission to Distributors at the time of each sale. Purchasers of Class A shares have a percentage of the purchase price, a "front-end load," deducted and used to pay the brokerage commissions and other distribution expenses. Statement ¶ 5. Purchasers of Class B and C shares, on the other hand, do not pay front-end loads, so that all of their investment is used to buy Fund shares. Statement ¶ 6. The distribution expenses, including commissions to the selling brokers, are paid by defendant Distributors. Statement ¶ 6. In essence, purchasers of Class B and C shares finance the commissions and other distribution expenses relating to their shares, rather than paying for the expenses up front as do the Class A shareholders. The Fund's Distribution Agreement and Distribution Plans provide that a commission will be paid to the Distributors on each sale of Class B and Class C shares and that the amounts due to the Distributors in respect of Class B and Class C share sales are to be accrued as "uncovered distribution charges" and paid as a fee (calculated daily and paid monthly) equal to up to an annual rate of .75% of the net asset value of the Fund's Class B and C shares. Compl. ¶ 29; Statement ¶¶ 7-10. The Fund may make

---

[10]   The Distribution Agreement, the Fund's Class B Distribution Plan and Class C Distribution Plan ("12b-1 Plan"), and the Fund's Class A Service Plan are public documents filed with the SEC and are referenced in the Complaint. *See*, *e.g.*, Compl. ¶¶ 34-39. Although these materials are referred to for purposes of Distributors' motion for summary judgment, they may also be considered by this Court on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See, e.g., Blackstone Realty LLC v. Federal Deposit Ins. Corp.,* 244 F.3d 193, 195 n.2 (1st Cir. 2001). Copies of these documents are attached to the Declaration of James L. O'Connor, filed herewith.

such payments to Distributors only after and as a result of the sale of Fund shares (*i.e.*, as sales commissions imposed on the actual sales of Fund shares).  Statement ¶ 8.

"Uncovered distribution charges" are tracked by share class on a daily basis by the Fund administrator.  Statement ¶ 9.  Uncovered distribution charges are reduced by payments of distribution fees.  When the amount of uncovered distribution charges for a class of shares reaches zero, the Fund ceases to pay the 75 basis point distribution fee.  Statement ¶ 10.

### 2.    Service Fees Assessed on Class A, B, and C Shares

In addition to the distribution fees described above, a service fee at an annual rate of .25% of net assets is paid out of the assets of Class A, B, and C shares.  Statement ¶ 11.  As stated in the Plans for these respective share classes, such payments are limited to service fees as defined in subsections (b) and (d) of Rule 2830.  Statement ¶ 11.  Thus, the payments are made either directly to brokers providing personal services to current Fund shareholders or to Distributors, which in turn pays such brokers for such services.  Statement ¶ 11.

### DISCUSSION

Apart from the rationale expressed in *ING*, there are several grounds for dismissal.

## I.    THE EXPRESS RIGHT OF ACTION UNDER § 36(b) DOES NOT ENCOMPASS A CLAIM SOLELY INVOLVING DISTRIBUTION FEES

The Complaint does not so much as mention the advisory fees paid by or overall services provided to the Fund.  Instead, it focuses exclusively on supposed improprieties relating to the Fund's Rule 12b-1 distribution and service fees.  The Complaint's narrow focus dooms the § 36(b) claim for two independent reasons.

First, the text of § 36(b) specifically excludes from its reach the Rule 12b-1 fees that Plaintiff seeks to attack.  Section 36(b)(4) expressly provides that § 36(b) "shall not apply to compensation or payments made in connection with transactions subject to Section 17 of this

title [the ICA], or the rules, regulations or orders thereunder, or to sales loads for the acquisition of any security issued by a registered investment company." *See Lessler v. Little*, 857 F.2d 866, 874 (1st Cir. 1988) (applying §36(b)(4) to exclude payments subject to § 17 from § 36(b)).

Payments of Rule 12b-1 distribution fees are unquestionably "payments made in connection with transactions subject to § 17 [of the ICA], or the rules … thereunder." The payments under contracts with fund distributors are specifically addressed and (subject to the constraints of Rule 12b-1) authorized by ICA Rule 17d-3.[11] *See* Rule 12b-1 Adopting Release, 45 Fed. Reg. at 73898 ("[t]he Commission also is adopting [Rule 17d-3] to exempt from the requirement of prior Commission approval, to the extent necessary, certain agreements between open-end management investment companies and their affiliated persons whereby investment company assets are used for distribution, if such agreements are entered into in compliance with the rule permitting such companies to bear their distribution expenses"); *id.* at 73901 ("[t]he Commission is exercising its authority under section 17(d) to permit arrangements for use of fund assets for distribution which involve covered joint transactions only if such arrangements comply with rule 12b-1").[12]

---

[11]    Absent Rule 17d-3, a 12b-1 plan would be a "joint transaction" forbidden by § 17(d) and Rule 17d-1 thereunder because:

> If a fund finances distribution, it becomes so actively and intimately involved in the distribution process that, even if it contracts with an underwriter, it cannot fairly be said to be distributing through that underwriter. Such a fund should more properly be viewed as acting as a distributor along with the underwriter.

12b-1 Adopting Release, 45 Fed. Reg. at 73902.

[12]    In this context, "subject to" is synonymous with "governed by." *See, e.g.*, *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 547 (D.C. Cir. 2002) ("an entity is 'subject to' a particular legal regime when it is regulated by, or made answerable under, that regime"); *Texaco, Inc. v. Duhe*, 274 F.3d 911, 918-19 (5th Cir. 2001) (natural gas became "subject to an existing contract" within the meaning of the Natural Gas Policy Act when it was "governed by" the terms of that contract).

Second, Plaintiff fails to allege (as she must to state a § 36(b) claim in this context) that the aggregate fees paid by the Fund are disproportionate to the overall services provided to the Fund. Complaints alleging excessive advisory fees, either standing alone or in combination with so-called "fall-out" benefits (which perhaps may include 12b-1 fees) accruing to the adviser and its affiliates, may state a § 36(b) claim, and any legally excessive fees may be recovered from the adviser or its affiliates.[13] Conversely, complaints that fail to include any allegations about the level of advisory fees or overall services provided to an investment adviser – and that focus instead on 12b-1 fees, service payments, or other supposedly illegal, excessive, or improper payments that relate to only a discrete portion of the services provided by the investment adviser and its affiliates – fail to state a § 36(b) claim. *See, e.g.*, *Fogel v. Chestnutt*, 668 F.2d 100, 112 (2nd Cir. 1981) ("[§] 36(b) was addressed only to cases where the advisory fee was attacked as such"); *Benak v. Alliance Capital Mgmt. L.P.*, No. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) at *8 ("under § 36(b) it is the *overall* nature and quality of the services by the investment adviser that is at issue – not merely some small percentage of those services"); *Rohrbaugh v. Investment Co. Inst.*, Fed. Sec. L. Rep. ¶ 91,961, No. 00-1237, 2002 WL 31100821, at *9 (D.D.C. July 2, 2002) (dismissing complaint alleging that the payment of certain trade group membership dues was wasteful and therefore trade group's receipt of such fees violated § 36(b); "given that Plaintiffs have failed to assert any facts alleging a breach of fiduciary duty related to

---

[13]     Two decisions indicate that Rule 12b-1 fees may be taken into account in determining whether advisory fees are excessive under § 36(b). *See Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76, 83 (2nd Cir. 1985); *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2nd Cir. 1990). Both cases were decided before the NASD promulgated and the SEC approved Rule 2830, which as further discussed below provides a comprehensive set of regulations for determining whether 12b-1 fees are excessive. More fundamentally, neither case involved (let alone approved) the use of § 36(b) to launch a freestanding challenge to Rule 12b-1 fees. Some cases have either allowed a § 36(b) claim to go forward and/or have included language suggesting that a § 36(b) claim may proceed even if it focuses narrowly on certain supposedly illegal or improper payments rather than on the fees charged for the overall services to the fund. In all such cases of which we are aware however, defendants did not raise this issue of the limited scope of § 36(b) or the court's statements on the subject were dicta.

advisory fees, the Court concludes that Plaintiffs do not have a cognizable § 36(b) claim."); *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 343 (S.D.N.Y. 1996) (a complaint alleging that the distributor was paid "at an annual rate of 0.75% of the average daily net assets of the Fund for specific expenses incurred in promoting the sale and distribution of the Fund's shares" but not alleging receipt of compensation for advisory services failed to state § 36(b) claim); *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 491-92 (N.D. Ill. 1999) (service payments received by corporate parent of fund's investment adviser could not be the basis for a § 36(b) violation); *In re Nuveen Fund Litig.*, No. 94-c-360, 1996 WL 328006, at \*15 (N.D. Ill. June 11, 1996) (complaint alleging that adviser devised rights offering to generate fees regardless of consequences to fund does not state a claim under § 36(b) because it "does not challenge the fee arrangement between the Advisor and the Funds"); *see also Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 329 (4th Cir. 2001) ("[g]eneral breach of fiduciary duty claims which involve merely an incidental or speculative effect on advisory fees are not properly within the scope of Section 36(b)").[14]

## II.    THE DISTRIBUTION PAYMENTS IDENTIFIED IN THE COMPLAINT ARE EXPRESSLY AUTHORIZED BY ICA § 22(b) AND THE RULES THEREUNDER AND CANNOT BE ATTACKED AS EXCESSIVE

Plaintiff's effort to attack Distributors' receipt of the 12b-1 fees as legally "excessive" fails for another reason: as already discussed in the Background section, the permissible amount of Rule 12b-1 fees that the principal underwriter of a fund (such as Distributors) is entitled to receive is governed by a comprehensive regulatory scheme. Because the 12b-1 fees at issue

---

[14]      Stated another way, in determining whether the investment adviser has breached its duty under § 36(b) (the statute does not impose a fiduciary duty on any person other than an investment adviser), a plaintiff may not selectively attack a discrete portion of the payments made to or services provided by the adviser or the other potential defendants listed in § 36(b). *See Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928, 931 (2d Cir. 1982); Senate Report 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910. This is why it is inconsistent with the statute to allow a § 36(b) action to go forward absent allegations (which are not made here) that there is no reasonable relationship between the advisory fee charged and the overall services provided to the fund.

unquestionably comply with these regulations, as a matter of law, the fees cannot be deemed excessive under § 36(b) or otherwise.

Section 22(b) was enacted as part of the same 1970 Amendments to the ICA that also added § 36(b).  *See* Investment Company Amendments Act of 1970, Pub. L. No. 91-547, 84 Stat. 1413, 1413-36 (1970).  Whereas § 36(b) created a private right of action as a means of addressing excessive advisory fees, § 22(b) reflects a Congressional intent to prevent excessive sales charges by delegating to the NASD, subject to SEC oversight, responsibility for regulating these charges as they apply to mutual fund shares.  *See* S. Rep. No. 91-184, at 17-18 (1970), reprinted in 1970 U.S.C.C.A.N. 4897, 4904-05, 4912.  In particular, the text of § 22(b) gave the NASD ***exclusive authority*** (subject to SEC oversight) to strike a balance between prohibiting "excessive" sales charges and "allow[ing] for reasonable compensation for sales personnel, broker-dealers, and underwriters."  *See* 15 U.S.C. § 80a-22(b)(1).  Section 22(b) expressly trumps any inconsistent provision of the ICA.  15 U.S.C. § 80a-22(b)(3).

Although Rule 12b-1 (which was adopted in 1980) was silent on what fees would be reasonable, NASD Rule 2830 was adopted in 1992 to implement the Congressional mandate in § 22(b).  The SEC has expressly approved Rule 2830, including the caps on sales charges therein, and has found that sales charges consistent with these caps are reasonable.[15]  The Rule thus represents an administrative determination balancing the protection of investors with the economic health of the securities industry.  It is plain that the balance struck by NASD Rule 2830 could not be maintained were courts exercising jurisdiction under § 36(b) to intrude with

---

[15]    *See* Inv. Co. Release No. 34-30897, 57 Fed. Reg. 30985, 30989 (July 7, 1992) ("The [SEC] is of the opinion that the proposed rule change carries out the NASD's congressional mandate to prevent excessive sales charges on mutual fund shares.  The [SEC] believes that the proposed rule change appropriately balances the need to ensure that the NASD's rules allow broker-dealers, sales personnel, and underwriters to receive reasonable compensation, against the need to ensure that investors are charged reasonable sales loads.").

their own judgments about what constitutes excessive sales charges.[16]

Indeed, Congress in the 1970 Amendments to the ICA unmistakably indicated its intent to exempt sales charges from § 36(b). Section 22(b) authorizes the NASD (subject to SEC supervision) to prohibit "excessive sales load[s]." 15 U.S.C. § 80a-22(b)(1). Section 36(b)(4), in turn, expressly provides that § 36(b) shall "not apply … to sales loads for the acquisition of any security issued by a registered investment company." Although Rule 12b-1 fees did not exist at the time of the 1970 Amendments, the SEC's subsequent recognition that 12b-1 fees are an alternative to a front-end sales load, Inv. Co. Release No. 34-30897, 57 Fed. Reg. 30985, 30988 (July 7, 1992) ("12b-1 fees … generally serve as the functional equivalent of traditional front-end sales charges and should therefore be subject to NASD regulation"), and its decision to approve NASD regulation of these fees under the authority granted by § 22(b) demonstrate that immunity from § 36(b) has at least been impliedly if not explicitly granted. *Cf. Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 693 (1975) (finding private antitrust suits impliedly preempted based on the fixed commission rates that prevailed in 1970; allowing a private antitrust remedy "would conflict with the operation of the regulatory scheme which specifically authorized the SEC to oversee the fixing of commission rates").[17]

---

[16]    *See* SEC Order Approving Proposed NASD Rule Change Relating to Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, SEC Release No. 34-30897, 57 Fed. Reg. 30985, 30988 (July 13, 1992) (SEC notes that NASD possesses the authority to "regulate comprehensively" and "ensure overall reasonableness" of Rule 12b-1 fees and other mutual fund sales charges). *Cf. United States v. NASD*, 422 U.S. 694, 734 (1975) (antitrust laws are impliedly repealed when necessary "to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts").

[17]    Two cases, *Pfeiffer,* 2004 WL 1903075, and *Zucker v. AIM Advisors, Inc.*, ___ F. Supp. 2d __, No. H-03-5653, 2005 WL 1279211 (S.D. Tex. Jan. 20, 2005), appear to contravene the analysis above. In *Pfeiffer*, however, the defendants did not bring to the court's attention the significance of § 22(b) and the decision does not discuss the effect of that section. *Zucker* suggests that Rule 2830 is not designed to preempt § 36(b) because the SEC stated in 1988 that "Rule 12b-1 was not intended to provide a 'safe harbor' from section 36 liability." *Zucker,* 2005 WL 1279211 at *4, *citing* Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 53 Fed. Reg. 23258, 1988 WL 1000015, at *44 (June 13, 1988). The SEC's "no safe harbor" statement in 1988 has no apparent bearing on whether the NASD's

Because the distribution and service charges at issue comply fully with the comprehensive regulations in Rule 2830, they are non-excessive as a matter of law.

## III.    THE § 36(a) AND STATE LAW "BREACH OF FIDUCIARY DUTY" CLAIMS MUST BE DISMISSED

Plaintiff's § 36(a) and state law "breach of fiduciary duty" claims must be dismissed for an additional reason: these sources of law impose no fiduciary duty on Distributors with respect to its receipt of compensation.  Section 36(b) in 1970 imposed a limited fiduciary duty on an investment adviser with respect to the receipt of compensation.  The very reason for the enactment of § 36(b) was that such duties were not imposed by prior law – under which an investment adviser or principal underwriter in negotiating its compensation was generally treated in the same manner as any other adverse party in an arm's-length contractual relationship.[18]  But even assuming *arguendo* that § 36(a) or state law imposed a fiduciary duty with respect to receipt of compensation, the mere receipt of distribution and service fees after a fund is closed cannot possibly constitute a breach of any such duty given the recognition by courts and regulators that this practice is entirely permissible.

---

determination of what constitutes "excessive" and "reasonable" 12b-1 fees under Rule 2830 should displace an overlapping and potentially inconsistent determination by courts applying § 36(b).  If anything, the statement suggests why, **four years later**, the SEC approved NASD regulation of the level of 12b-1 fees under Rule 2830, *see* Inv. Co. Release No. 34-30897, 57 Fed. Reg. 30985, 30989-90 (July 7, 1992): to ensure that 12b-1 fees would not become excessive (as already noted, when Rule 12b-1 was adopted, there was no limitation on the amount of Rule 12b-1 fees).

[18]    *See, e.g., Green v. Fund Asset Management L.P.*, 245 F.3d 214, 225 (3rd Cir. 2001).  It is similarly doubtful under Massachusetts law today that an underwriter owes a mutual fund any fiduciary duties at all, let alone a duty with respect to receipt of compensation.  *Cf. Lefkowitz v. Smith Barney*, 804 F.2d 154, 155 (1st Cir. 1986) ("a simple stockbroker-customer relationship does not constitute a fiduciary relationship in Massachusetts").  *Accord Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) (investment advisers do not generally have fiduciary duties under state law, and such duties will be imputed only in specific and limited circumstances).

## IV.     THERE IS NO IMPLIED PRIVATE RIGHT OF ACTION UNDER § 36(a)

Plaintiff's § 36(a) claim also fails because that provision does not include an express private right of action and none is implied.  Although some courts at one time recognized implied private rights of action under certain provisions of the ICA (including § 36(a)), the Supreme Court has "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one."  *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001). Under current Supreme Court jurisprudence, federal courts must refuse to read a private right of action into a statute where, as here, the statute's plain language does not support such a right. *See Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (past decisions reflecting judicial willingness to make statutory purpose effective in the context of implied rights of action belong to an "*ancien regime*"); *Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81, 86 (1st Cir. 2004) ("because the Supreme Court's decision in *Sandoval* changed the legal landscape, we regard that pre-*Sandoval* decision as lacking continued vitality").  As the Supreme Court made clear in *Gonzaga University v. Doe*, 536 U.S. 273, 283-86 (2002), a statute implies a private right of action only if the text of that particular provision contains "rights creating language" – language that creates an individual right for private persons, as opposed to merely prohibiting conduct or directing governmental action to redress it.  Applying the current Supreme Court analysis, the Second Circuit in *Olmsted v. Pruco Life Insurance Co.*, 283 F.3d 429, 432 (2nd Cir. 2002), refused to recognize an implied private right of action under the ICA.

In the wake of *Sandoval, Gonzaga*, and *Olmsted*, courts have repeatedly ruled against implied private rights of action under § 36(a) and other provisions of the ICA.  *See Chamberlain v. Aberdeen Asset Mgt. Limited*, No. 02-CV-5870SJ, 2005 WL 195520, at *2 (E.D.N.Y. Jan. 21,

2005) (in light of these cases, no implied private right of action under § 36(a));[19] *Mutchka v. Harris*, __ F. Supp. 2d __, No. SACV0534JVSANX, 2005 WL 1414304 (C.D. Cal. Jun. 9, 2005) at *8-*10 (same).[20]

## V.    DISTRIBUTORS IS ENTITLED TO SUMMARY JUDGMENT

For all of the foregoing reasons, the Complaint is defective on its face and should be dismissed for failure to state a claim.    Alternatively, review of a few indisputable facts establishes that defendant is entitled to summary judgment.

It cannot be disputed that the distribution fees are payments made pursuant to the terms of a validly adopted Distribution Agreement to pay down the uncovered distribution charges incurred by defendant Distributors in connection with past sales of the Fund's Class B and Class C shares.  *See* Distribution Agreement (Exhibit A to the Declaration filed herewith) ¶ 5(c), (d). As already discussed, this is entirely proper.  Pursuant to the Fund's Distribution Agreement, once the uncovered distribution charges for a class have been paid, all payments of distribution fees for that class will end.  Statement ¶ 10.  Similarly, as discussed above, all service payments are made for actual, ongoing personal services provided to current shareholders, as contemplated by, and within the limits established by, NASD Rule 2830 (b) and (d).  Statement ¶ 11.

---

[19]    The parties in the *Chamberlain* case moved to vacate the court's order in order to proceed to settlement. *See* 2005 WL 1378757.  The court granted the parties' motion, but expressly ruled that its Order was not a "negation of the substance of the previously issued Order."  *Id.*

[20]    *See also DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708, 714-15 (N.D. Ill. 2005) (no implied private right of action under § 17(j)); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 256 (S.D.N.Y. 2003) (no private right under § 34(b)); *White v. Heartland High-Yield Mun. Bond Fund,* 237 F. Supp. 2d 982, 987 (E.D. Wis. 2002) (same); *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 581 (S.D.N.Y. 2001) (same).  Indeed, it is particularly implausible to suggest that § 36(a) implies a private right of action because, as the SEC has authoritatively held, the statute actually creates no duties or liabilities, it prohibits nothing (and therefore cannot be violated), and it merely authorizes the SEC to bring suit for breach of fiduciary duty.  *See In re Carl L. Shipley*, 45 SEC 589, 590-93, 1974 WL 11442 at *2-4 (1974) (A copy of *Shipley* is attached as Ex. D to the Legal Appendix.).  It is illogical to suggest that an enforcement provision that cannot itself be violated can serve as the basis for an implied private right of action.  *See Centr. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176-77 (1994) (federal courts lack authority to "extend liability beyond the scope of conduct prohibited by the statutory text"); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

There is no allegation that the uncovered distribution charges result from anything other than actual past sales of Class B and Class C shares at a contractually agreed rate, and there is no allegation that this rate was excessive. The distribution fees are within the legal limits set by NASD rules and are not, and cannot by contract become, "excessive" or improper in any respect. Likewise, there is no allegation that the service fees are paid for anything other than actual, ongoing personal services provided by brokers of current Fund shareholders within the contemplation of NASD Rule 2830. Accordingly, Distributors is entitled to summary judgment.

## CONCLUSION

Distributors requests dismissal of the Complaint with prejudice or summary judgment.

Respectfully submitted,

/s/ Gregory R. Youman
Wm. Shaw McDermott (BBO #330860)
Aimée E. Bierman (BBO #640385)
Gregory R. Youman (BBO #648721)
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
75 State Street
Boston, MA  02109-1808
(617) 261-3100

Jeffrey B. Maletta, Esq.
Nicholas G. Terris, Esq.
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
1800 Massachusetts Avenue, N.W.
Washington, D.C.  20036
(202) 778-9000

*Attorneys for Defendant*
*Eaton Vance Distributors, Inc.*

Date:  June 30, 2005