# EXHIBIT B

# NASD NOTICE TO MEMBERS 93-12

Questions and Answers About New NASD® Rules Governing Investment Company Sales Charges — Article III, Sections 26(b) and (d) of the Rules of Fair Practice

### Suggested Routing

- ■ Senior Management
- ☐ Corporate Finance
- ☐ Government Securities
- ☐ Institutional
- ☐ Internal Audit
- ■ Legal & Compliance
- ☐ Municipal
- ■ Mutual Fund
- ☐ Operations
- ☐ Options
- ☐ Registration
- ☐ Research
- ☐ Syndicate
- ☐ Systems
- ☐ Trading
- ☐ Training

### Executive Summary

Since the Securities and Exchange Commission (SEC) approved new NASD* rules governing investment company sales charges on July 7. 1992. the NASD has fielded numerous questions from member firms and mutual funds concerning the interpretation and application of these rules. In anticipation of the July 7, 1993. effective date of the new rules. the NASD has compiled in this Notice frequently asked questions and answers to help members understand and apply these rules. The categories addressed are calculation of sales charges and interest. retroactive calculation of remaining amounts, service fees. and exchanges.

### Background

On July 7, 1992. the SEC approved amendments to Article III. Sections 26(b) and (d) of the Rules of Fair Practice (Rules) relating to investment company sales charges as announced in *Notice to Members 92-41* (August 1992). The new Rules take effect on July 7, 1993. The text of the new Rules follows this Notice. The following questions and answers have been developed to assist members in interpreting and implementing the new Rules.

The statements contained in this *Notice to Members* supersede and replace any and all prior statements of the NASD on the subject of investment company sales charges to the extent such prior statements are inconsistent with this Notice. The NASD may publish other question and answer Notices as needed to answer member questions.

Members are also reminded that, while Article III. Section 26 of the Rules of Fair Practice addresses investment company issues. the Rules apply to members. not investment companies. Members are obligated under the Rule to ensure that the sales charges paid by the investment companies for the shares that they sell to the general public comply with the requirements of the Rules. A member that sells shares of an investment company in violation of the Rule is subject to disciplinary action. not the investment company. Nevertheless. members may rely on the statements in a fund's prospectus. or on statements from the fund about the amount of sales charges paid in the distribution of fund shares. unless the member knows, or should have known on the exercise of reasonable diligence. that the statements are not true.

Questions regarding this Notice may be directed to R. Clark Hooper. Vice President. Investment Companies at (202) 728-8329 and Elliott R. Curzon. Senior Attorney, Office of General Counsel at (202) 728-8451.

### Questions and Answers

As an aid to understanding the questions and answers contained in this Notice. the NASD has developed a comprehensive example using a hypothetical investment company to show the calculations for remaining amount, balance for interest, and interest.[1] Readers are referred to this example on page 56

---

[1] Readers should note that for purposes of the calculations discussed in this Notice each class of shares and each series may be treated as a separate investment company. In *Notice to Members 90-56* (September 1990) requesting member vote on the new Rule the NASD stated that "[t]he Board considers each class of shares to be a separate investment company for purposes of the sales charge Rule."

## I. Calculation of Sales Charges and Interest

**Question #1:** How often should a fund' with an asset-based sales charge calculate the remaining amount under its appropriate aggregate cap' to which its total sales charges are subject for purposes of ensuring that it is in compliance with the limits under the Rules?

**Answer:** The remaining amount should be calculated at least as frequently as the fund makes payments of an asset-based sales charge, but in no event less frequently than once each calendar quarter. Thus, for example, a fund that pays an asset-based sales charge quarterly should calculate its remaining amount at least quarterly, and a fund that pays daily should calculate its remaining amount daily.

**Question #2:** How would a fund that pays asset-based sales charges quarterly make monthly calculations of its remaining amount (i.e., what happens when the fund's payment period is different from the period for which it calculates its remaining amount)? How should such a fund calculate interest?

**Answer:** The remaining amount would be calculated by multiplying the appropriate aggregate cap times new gross sales for the month, subtracting any front-end or deferred sales charges collected and any asset-based sales charges accrued during the month. The remaining amount for the month is then added to any pre-existing remaining amount and interest on the entire remaining amount is then calculated in the manner described in Questions 3 and 4.

A fund may also track a separate "balance for interest," which would be the appropriate aggregate cap times new gross sales for the period, minus any front-end, deferred, or asset-based sales charges collected during the period, and then added to any pre-existing "balance for interest." This new "balance for interest" (to which the prime rate, or an average of the prime rates for the period, plus one percent, would be applied) differs from the fund's remaining amount before interest as described above in that asset-based sales charges accrued but not paid would not be deducted. Thus, interest can be assessed on the amount represented by the accrued, but unpaid, asset-based sales charges. This difference in the balance used to calculate interest takes into account the fact that a fund underwriter that advances money to pay up front for distribution costs will not be reimbursed until the asset-based sales charge is actually paid to the underwriter.

**Question #3:** The Rules permit funds to increase their remaining amount by adding interest at the prime rate plus one percent. How and when should a fund determine the appropriate interest rate?

**Answer:** NASD *Notice to Members 90-56* (September 1990) describes the prime rate as "the most preferential rate of interest charged by the largest commercial banks on loans to their corporate clients" and refers to the rate published daily in *The Wall Street Journal*. Thus, the prime rate used for this purpose should be the rate appearing in *The Wall Street Journal*, which represents "the base rate on corporate loans posted by at least 75 percent of the nation's 30 largest banks." The prime rate in effect on the date when the fund calculates its remaining amount plus one percent (see Question 1) if the fund calculates daily or, alternatively, if a fund calculates its remaining amount less frequently, an average of the prime rates over the period plus one percent should be used to calculate the amount by which a fund may increase its remaining amount. Funds generally should select and consistently use one of the above two alternatives.

**Question #4:** To calculate the increase in a fund's remaining amount based on the interest allowed (referred to in Question 3), to what amount should the prime rate plus one percent be applied?

**Answer:** Subparagraphs (d)(2)(A), (B), and (C) of Article III, Section 26 of the NASD Rules of Fair Practice refer to "interest charges

---

[2] The term "fund" as used in this Notice refers to open-end investment companies or single payment investment plans issued by a unit investment trust registered under the Investment Company Act of 1940.

[3] The term "remaining amount" as used in this Notice refers to the appropriate aggregate caps minus the amount of sales charges paid or accrued, including asset-based sales charges, front-end and deferred sales charges, plus the permitted interest. On the effective date of the new Rule, July 7, 1993, each fund will begin with either a zero remaining amount or a remaining amount calculated pursuant to new Sub-section 26(d)(2)(C) on the basis of its historical sales and charges (see Question 11).

[4] The term "appropriate aggregate cap" refers to the appropriate maximum aggregate sales charge for the fund in question as specified in Subsection 26(d) of the new Rule. For a fund with an asset-based sales charge and a service fee (see Questions 18-26 with respect to service fees) the appropriate aggregate cap will be 6.25 percent of total new gross sales. For a fund with an asset-based sales charge and no service fee the appropriate aggregate cap will be 7.25 percent of total new gross sales.

on such amount." and "such amount" is the appropriate aggregate cap on sales charges. As indicated in *Notice to Members 92-41* (August 1992), however, the NASD intended that interest be calculated not on the appropriate aggregate cap but rather on the fund's remaining amount before the current interest calculation (i.e., the portion of the amount permitted to be charged that has not yet been paid). In calculating the permitted interest allowance, the fund should apply the appropriate interest rate (prime plus one percent) (see answer to Question 3) to its remaining amount or "balance for interest" (see discussion in answer to Question 2). For example, if a fund calculates its remaining amount daily, but pays asset-based sales charges monthly, it should apply the prime rate plus one percent to the current day's "balance for interest." If a fund calculates its remaining amount monthly and pays asset-based sales charges monthly, it should apply an average of the month's prime rates plus one percent to its average remaining amount for the month. The NASD believes that if a fund adopts a particular method of accruing or paying charges and calculating its remaining amount and interest, it must consistently apply and adhere to the chosen practices. Funds may not change practices for short-term advantage to the distributor or underwriter.

**Question #5:** If a fund's remaining amount reaches zero, what do the Rules require?

**Answer:** If a fund's remaining amount reaches zero it must stop accruing asset-based sales charges and retain any deferred sales charges collected, until it has new sales that increase the remaining amount. In the NASD's view, the prudent fund whose remaining amount is approaching zero should calculate its remaining amount on a more frequent (even daily) basis so that it stops accruing asset-based sales charges when its remaining amount reaches zero.

The NASD is aware that in many cases front-end sales charges are paid directly to the selling member through deduction of the sales charge from the proceeds of sale; however, front-end sales charges deducted by the member will not exceed the remaining amount because each purchase will raise the remaining amount and the increase will not be consumed by the front-end sales charge.

**Question #6:** If a fund generates no sales or discontinues selling its shares, must it stop paying any asset-based sales charges?

**Answer:** No. The Rule provides only that the fund stop paying sales charges (either asset-based or deferred) when its remaining amount is depleted. A fund may fail to generate sales or stop selling its shares before its remaining amount is exhausted.

**Question #7:** For purposes of determining when a fund must begin to retain deferred sales charges because the remaining amount has been exhausted, must the fund determine on which day it exhausted the remaining amount?

**Answer:** The requirement that the fund retain deferred sales charges upon exhausting its remaining amount will be deemed to be met if the fund begins to retain those charges no later than the first day of the month following the month during which the remaining amount was depleted. As stated above, a fund should calculate its remaining amount more frequently as it approaches zero. In addition, a fund which has depleted its remaining amount must also continue to retain deferred sales charges in subsequent months until its remaining amount becomes positive as a result of new sales. If an underwriter/distributor is collecting the deferred sales charges in such cases, it has an obligation to turn such amounts over to the fund immediately.

**Question #8:** If a fund's remaining amount is depleted, so that it must stop accruing asset-based sales charges, and subsequently it has new sales which result in a positive remaining amount, can it resume accruing asset-based sales charges at a rate that, if annualized, would exceed .75 percent of its assets so long as the fund pays no more than .75 percent for the year?

**Answer:** No. It is contrary to the intent of the Rule for a member to sell the shares of a fund that on any given day has an asset-based sales charge in excess of .75 percent calculated on an annualized basis.

**Question #9:** If a fund has depleted its remaining amount and is retaining deferred sales charges, but subsequently has new sales that result in a positive remaining amount, can the underwriter recoup the deferred sales charges that were previously paid to the fund if the remaining amount increase occurs within the same fiscal period as exhaustion of the remaining amount?

**Answer:** No. Allowing the underwriter to recoup deferred sales charges paid to the fund in these circumstances is not consistent with the intent of the Rules.

**Question #10:** Can assets acquired through a statutory merger or a purchase of assets for shares be treated as new sales under the Rules?

**Answer:** No. But if a fund acquires a fund with an asset-based sales

charge and a remaining amount, the acquiring fund is permitted (not required) to add the acquired fund's remaining amount to its own remaining amount. Further, this remaining amount carry-over is not limited to funds with the same underwriter.

## II. Retroactive Calculation of Remaining Amounts

Subparagraph 26(d)(2)(C) permits a fund to "look back" to sales which occurred before the effective date of the Rules to calculate its remaining amount as of the effective date of the Rules. The following questions and answers address issues related to the determination of a fund's starting balance.[1]

**Question #11:** Subparagraph (d)(2)(C) of Article III, Section 26 permits a fund to increase its remaining amount to take into account sales made between the time the fund first adopted an asset-based sales charge and July 7, 1993 (the effective date of the new provisions). How should a fund calculate the appropriate remaining amount as of that date?

**Answer:** To calculate its starting balance, a fund looks back to the date when it began paying an asset-based sales charge. It calculates the appropriate aggregate cap based on new gross sales from that date, subtracts actual sales charges paid or accrued from that date (including asset-based, front-end, and deferred) and adds interest as permitted under the Rules (see answer to Question 16). This amount is the fund's starting balance as of July 7, 1993. For purposes of this provision the NASD will deem a fund to have begun paying an asset-based sales charge only if it was actually paying the charge. A fund with an approved asset-based sales charge which was never implemented (sometimes referred to as a "defensive 12b-1 Plan") may not rely on this provision.

**Question #12:** Must a fund calculate its starting balance on the same basis as it will calculate its remaining amount after July 7, 1993?

**Answer:** No. A fund is not required to calculate its starting balance on the same basis as it will calculate its remaining amount after the new provisions take effect. This flexibility is intended to accommodate funds that, for example, may wish to do daily calculations going forward but might not have the ability to make daily calculations based on prior sales. Thus, notwithstanding the answer to Question 1, a fund need not make its retroactive calculations on the same or greater frequency as the fund paid asset-based sales charges.

**Question #13:** In determining the starting balance, may a fund with an asset-based sales charge exclude fees paid pursuant to a 12b-1 plan that meet the definition of "service fees" under the new NASD provisions from the required reduction representing actual sales charges paid?

**Answer:** Yes. As noted in Question 11, a fund is permitted to make these calculations as though the new provisions (including all definitions thereunder) had been in effect from the time an asset-based sales charge was adopted. Therefore, to the extent "service fees" (as defined in subparagraph (b)(9) of the amended Rules and discussed in Questions 17-25), whether or not separately described as service fees at the time, were actually paid by the fund, the amount of such fees not exceeding .25 percent may be excluded from the reduction representing asset-based sales charges paid. The fund's records must be sufficiently detailed to identify payments of fees which meet the definition of service fees under the Rule. A fund is not permitted a "freebie" exclusion of .25 percent in the absence of documentary evidence that a service fee was actually paid. A fund that can establish that it paid a service fee should use the 6.25 percent aggregate cap in calculating its starting balance.

**Question #14:** In determining a fund's starting balance, which aggregate limit should be applied by a fund with an asset-based sales charge that did not pay a service fee before the effective date of the Rule but that will pay a service fee after the effective date of the Rule?

**Answer:** A fund that did not pay a service fee before the effective date may use the 7.25 percent limit to calculate its starting balance. As with the circumstances described in Question 13, a fund that paid a service fee as defined in the Rule may not opt to use the 7.25 percent limit by declining to declare that it paid such a service fee if its records show that it did. By the same reasoning, a fund that paid a service fee for only a portion of the prior period can apply the 7.25 percent limit for the portion of the period during which it did not pay a service fee.

**Question #15:** May a fund that, before the effective date of the new provisions, has had a 12b-1 plan limiting payments under the plan to a level lower than the new NASD aggregate limits, nonetheless, use the appropriate aggregate

---

[1] The term "starting balance" as used in this Notice means the remaining amount of the fund as of the effective date of the Rule calculated pursuant to new Subsection 26(d)(2)(C).

NASD Notice to Members 93-12                                                                                       February 1993

caps to calculate its starting balance?

Answer: Yes. The new Rules, however, do not amend a fund's 12b-1 plan and permit it to pay more than specified in the plan if such a plan has limits that are lower than the limits in the new Rules.

Question #16: If a fund calculates its starting balance without making interim (e.g., monthly, quarterly, etc.) calculations, how should the appropriate interest allowance be calculated?

Answer: A fund that calculates its starting balance based on new sales from the date of adopting an asset-based sales charge until the effective date of the amended Rules without making interim calculations should apply the average of the prime rates for the period, plus one percent, to an estimate of the average remaining amount over that period.

## III. Service Fees

Question #17: What does the term "service fees" include or exclude?

Answer: The term "service fees" is defined in subparagraph (b)(9) of the amended Rules to mean "payments by an investment company for personal service and/or the maintenance of shareholder accounts." As noted in the explanatory section of NASD *Notice to Members 90-56* (September 1990), the term "service fees" is not intended to include transfer agent, custodian, or similar fees paid by funds. In addition, the phrase is not intended to include charges for the maintenance of records, recordkeeping, and related costs. *Notice to Members 92-41* (August 1992) states that "service fees are intended to be distinguished from other fees as a payment for personal service provided to the customer. It is essentially intended to compensate members for shareholder liaison services they provide, such as, responding to customer inquiries and providing information on their investments. It is not intended to apply to fees paid to a transfer agent for performing shareholder services pursuant to its transfer agent agreement. This fee does not include recordkeeping charges, accounting expenses, transfer costs, or custodian fees." Finally, the fact that a fund pays a fee pursuant to a "shareholder servicing" or similarly described plan does not conclusively determine whether the fee or any portion thereof constitutes a "service fee" for purposes of the Rules.

In broad categories the term does not include subtransfer agency services, subaccounting services, or administrative services. Specific services not covered by the term "service fee" include:

• Transfer agent and subtransfer agent services for beneficial owners of the fund shares.

• Aggregating and processing purchase and redemption orders.

• Providing beneficial owners with statements showing their positions in the investment companies.

• Processing dividend payments.

• Providing subaccounting services for fund shares held beneficially.

• Forwarding shareholder communications, such as proxies, shareholder reports, dividend and tax notices, and updating prospectuses to beneficial owners.

• Receiving, tabulating, and transmitting proxies executed by beneficial owners.

Question #18: How does a fund that pays a member a single fee for investment advisory, administrative, shareholder liaison, and other services comply with the limitation on service fees in the new Rule?

Answer: To comply with the Rule a member receiving such a fee pursuant to an omnibus servicing plan must identify those portions of the fee which are covered by the limitations of the Rule and ensure that the fees comply. There is no restriction on such fees in general, provided the member can demonstrate compliance with the Rule.

Question #19: Are service fee payments limited to .25 percent?

Answer: Yes. A fund may not pay more than .25 percent and treat such payments as service fees for purposes of the Rules. This applies whether payments are made directly by the fund or through the underwriter/adviser as a conduit. The new Rule does not apply to additional amounts paid by the underwriter or adviser out of its own resources. However, such additional amounts should not be called service fees.

Question #20: Can an underwriter/adviser take the .25 percent from the fund and reallocate it so that some dealers receive more and some less than .25 percent?

---

[6] The term "service fees," intended to describe payments that compensate members for providing personal service and maintenance of shareholder accounts, is being substituted for the previously used term "trail commission." The NASD believes the term "service fees" more accurately describes the intent of the payments and intends that the term "trail commission" not be used in the future to describe such payments.

Answer: No. This violates the intent of the Rule.

Question #21: Subparagraph (d)(5) imposes a limit on service fees paid to any member of .25 percent of the average annual net asset value of shares sold. Does this include shares acquired through reinvestments of distributions paid on shares sold by that member?

Answer: Yes. The NASD intended to have the limit apply to shares acquired through distribution reinvestments as well as shares actually sold.

Question #22: May a fund determine that it is in compliance with the limits on service fees by referring to the level of its net assets on the dates on which it calculates payments of service fees?

Answer: Yes. The fund should determine that it is in compliance with the limits on service fees that can be paid consistent with its method for calculating such fees. That is, a fund that uses a specific record date to calculate service fees should use its net assets on such date, while a fund that calculates fees based on average assets during a specific period should use the average net assets during such period (e.g., monthly or quarterly).

Question #23: Is there a clear distinction between asset-based sales charges and service fees?

Answer: Yes.

Question #24: If an item is a service fee, is it outside the scope of the Rule's limits on sales charges?

Answer: Yes.

Question #25: Is a fund's service fee counted as part of the 12b-1 fees?

Answer: Whether SEC Rule 12b-1 requires service fees to be included in a 12b-1 plan is not addressed by the NASD's Rule.[*]

IV. Exchanges

The following questions address exchanges or transfers between funds in the same family, and the transfer of a portion of a remaining amount corresponding to the amount exchanged. Notwithstanding the extensive discussion of exchanges, there is no obligation in the Rule to transfer any remaining amount.

Question #26: If Fund A chooses to increase its remaining amount based on exchanges from Fund B (a fund within the same complex), thus requiring the deduction of a corresponding amount from the remaining amount of Fund B, must Fund B treat exchanges from Fund A in the same manner?

Answer: Yes, except as provided in Question 30. This requirement will help ensure that inequities do not result as between the two funds.

Question #27: By what amount should Fund A increase its remaining amount based on exchanges from Fund B?

Answer: As indicated in NASD *Notice to Members 90-56* (September 1990), a fund may increase its remaining amount by treating the shares received through an exchange as new gross sales (if the amount of such increase is deducted from the remaining amount of the fund out of which shares are exchanged). However, funds may choose to transfer less than this maximum amount allowed pursuant to a fund policy that is consistently applied in accordance with Question 26. Funds may determine to transfer some portion of the remaining amount rather than the maximum amount allowed, for a variety of reasons. For example, applying the applicable maximum sales charge to the exchanged shares to determine the amount of the increase in Fund A's remaining amount — as will be the case if exchanges are treated as new gross sales — does not take into account that asset-based sales charges already have been assessed on those shares or that they may have been in the original fund for some period of time, during which that fund's remaining amount was depleted.

Examples of policies that funds might adopt under which less than the maximum amount allowed of the remaining amount would be transferred include, but are not limited to: (1) a policy pursuant to which a percentage of Fund B's remaining amount that is the same as the percentage of net assets of Fund B being exchanged into Fund A is added to Fund A's remaining amount; (2) a policy under which a percentage less than the maximum appropriate aggregate cap, that takes into consideration the aging of the exchanged shares (e.g., 2 percent rather than 6.25 percent), is applied to the amount being transferred from Fund B to Fund A; or (3) a policy under which the applicable sales charge is multiplied by the value of the exchanged shares at the time of their original purchase (as opposed to their value at the time of the exchange) for purposes of determining the increase in Fund A's remaining amount.

---

[*] The SEC has stated that "[w]hether particular shareholder or other services are starting balance" as used in this Notice means the remaining amount of the fund as of the effective date of the Rule calculated pursuant to new Subsection 26(d)(2)(C).

Question #28: If Fund A. which has an asset-based sales charge. receives an exchange from Fund B. which does not have an asset-based sales charge (and. therefore. no "remaining amount" from which to deduct an increase in Fund A's remaining amount) may it increase its remaining amount? This could occur. for example. where a fund complex uses a money market fund (Fund B) as the initial repository for investments which will thereafter be transferred periodically into an equity fund (Fund A) pursuant to a "dollar-cost averaging" program.

Answer: In this case Fund A could treat the amount exchanged as new gross sales for purposes of the Rule even though there is no "remaining amount" in Fund B from which to deduct Fund A's increase. If Fund A does so. however, it should decrease its remaining amount on any exchange from Fund A to Fund B. This treatment would be the same whether the investor originally invested in Fund A directly or exchanged Fund B shares for Fund A shares.

Question #29: By what amount may a fund increase its remaining amount based on exchanges from a fund that has a front-end sales charge?

Answer: The fund into which shares are exchanged may increase its remaining amount by an amount that is no more than the appropriate aggregate cap. minus the other fund's maximum front-end sales charge (but not in any event less than zero). times the amount being exchanged. in order to reflect appropriately the assessment of the initial sales charge. This requirement applies whether or not the front-end sales charge fund has an asset-based sales charge.

Question #30: What happens if the fund from which shares are being exchanged has already exhausted its remaining amount?

Answer: No remaining amount adjustments should be made in this instance as the underwriter/adviser has already received all monies due from the prior sale.

Question #31: What happens if an exchange is made from a fund that has not exhausted its remaining balance to one that has?

Answer: If the fund's general policy on exchanges calls for the transfer of remaining amounts. then an appropriate amount may be transferred between the two funds.

Question #32: How are exchanges before the effective date of the Rule amendments treated?

Answer: A fund may treat these exchanges in any manner that would be permitted for exchanges occurring after the amendments become effective (including choosing not to make any adjustments based on exchanges). as long as any method chosen is applied consistently for the entire period.

Question #33: Can different funds within the same fund complex have different policies regarding exchanges?

Answer: Yes. as long as each fund treats exchanges into it from any other fund the same as that other fund treats exchanges from the first fund. as set forth in Question 26 (subject to the exception described in Question 30 concerning funds that have exhausted their remaining amounts). Thus. a fund's policy regarding treatment of exchanges may differ depending on the fund from which the exchange comes or to which it goes.

V. Miscellaneous

Question #34: May a particular class of securities within a given portfolio of a fund be referred to as a "no load" class. provided that the particular class has no front-end or deferred sales charges. and has no asset-based sales charges and/or service fees aggregating more than .25 percent. but where other classes of securities within the same portfolio do have front-end or deferred sales charges or asset-based fees in excess of .25 percent?

Answer: Yes. *Notice to Members 90-56* (September 1990) requesting member vote on the new Rule stated "[t]he Board considers each class of shares and each series to be a separate investment company for purposes of the sales charge Rule."

Question #35: The NASD's Rule separately defines asset-based sales charges and service fees. How should a fund that pays both asset-based sales charges and service fees pursuant to a Rule 12b-1 plan make disclosure that complies with the SEC's Form N-1A. and at the same time make clear that the fund is complying with the NASD's Rule?

Answer: Form N-1A requires adequate disclosure of fees paid and charges imposed by a mutual fund. While the NASD does not take a position on the adequacy of disclosures in Forms N-1A. either in general or in specific cases. in many cases the principal source of information for a member firm for such fees will be the prospectus. Funds would be well advised to include prospectus disclosure regarding the fees paid and charges imposed in a manner sufficient for member firms to prove that they can sell the fund's shares in compliance with the NASD's Rules.

Comprehensive Example Showing Remaining Amount, Balance for Interest, and Interest Calculations

|  |  | Remaining Amount | Balance for Interest |
|---|---:|---:|---:|
|  |  | 0 | 0 |
| *Balance forward from prior calculation* |  |  |  |
| New gross sales for month | 10,000,000 |  |  |
| Appropriate aggregate cap | 6.25% | 625,000 | 625,000 |
| Deferred sales charges collected for month |  | (10,000) | (10,000) |
| Asset-based sales charges accrued for month |  | (3,000) |  |
| Asset-based sales charges paid during month |  |  | 0 |
| *Balance before interest* |  | 612,000 | 615,000 |
| Interest calculation: |  |  |  |
|    Average balance for interest |  |  |  |
|      {(Beginning + ending)/2} | 307,500 |  |  |
|    Interest rate (average prime + 1%)/12 | 0.5833% | 1,794 | 1,794 |
| *Balance at end of month 1* |  | 613,794 | 616,794 |
| New gross sales for month | 20,000,000 |  |  |
| Appropriate aggregate cap | 6.25% | 1,250,000 | 1,250,000 |
| Deferred sales charges collected for month |  | (45,000) | (45,000) |
| Asset-based sales charges accrued for month |  | (12,000) |  |
| Asset-based sales charges paid during month |  |  | 0 |
| *Balance before interest* |  | 1,806,794 | 1,821,794 |
| Interest calculation: |  |  |  |
|    Average balance for interest |  |  |  |
|      {(Beginning + ending)/2} | 1,219,294 |  |  |
|    Interest rate (average prime + 1%)/12 | 0.5833% | 7,113 | 7,113 |
| *Balance at end of month 2* |  | 1,813,906 | 1,828,906 |
| New gross sales for month | 20,000,000 |  |  |
| Appropriate aggregate cap | 6.25% | 1,250,000 | 1,250,000 |
| Deferred sales charges collected for month |  | (60,000) | (60,000) |
| Asset-based sales charges accrued for month |  | (24,000) |  |
| Asset-based sales charges paid during month |  |  |  |
|    (Equals 3 months accrued) |  |  | (39,000) |
| *Balance before interest* |  | 2,979,906 | 2,979,906 |
| Interest calculation: |  |  |  |
|    Average balance for interest |  |  |  |
|      {(Beginning + ending)/2} | 2,404,406 |  |  |
|    Interest rate (average prime + 1%)/12 | 0.5833% | 14,026 | 14,026 |
| *Balance at end of month 3* |  | 2,993,932 | 2,993,932 |

**Assumptions used:**
* Fund has a service fee, therefore appropriate aggregate cap = 6.25 percent.
* Fund calculates remaining balance monthly, based on aggregate data for month.
* Fund pays asset-based sales charges at end of quarter.
* Prime rate was 6 percent for entire period.

NASD Notice to Members 93-12                                                                    February···

**Text of Section 26 of the Rules of Fair Practice Reflecting Amendments Approved By the SEC in SR-NASD-91-61**

Investment Companies

Sec. 26

* * * * *

Definitions

(b)

* * * * *

(4) Person shall mean "person" as defined in the Investment Company Act of 1940.

* * * * *

(8) "Sales charge" and "sales charges" as used in subsection (d) of this section shall mean all charges or fees that are paid to finance sales or sales promotion expenses, including front-end, deferred and asset-based sales charges, excluding charges and fees for ministerial, recordkeeping or administrative activities and investment management fees. For purposes of this section, members may rely on the sales-related fees and charges disclosed in the prospectus of an investment company.

(A) A "front-end sales charge" is a sales charge that is included in the public offering price of the shares of an investment company.

(B) A "deferred sales charge" is a sales charge that is deducted from the proceeds of the redemption of shares by an investor, excluding any such charges that are (i) nominal and are for services in connection with a redemption or (ii) to discourage short-term trading, that are not used to finance sales-related expenses, and that are credited to the net assets of the investment company.

(C) An "asset-based sales charge" is a sales charge that is deducted from the net assets of an investment company and does not include a service fee.

(9) "Service fees" as used in subsection (d) of this section shall mean payments by an investment company for personal service and/or the maintenance of shareholder accounts.

(10) "Prime rate" as used in subsection (d) of this section shall mean the most preferential interest rate on corporate loans at large U.S. money center commercial banks.

* * * * *

Sales Charges

(d) No member shall offer or sell the shares of any open-end investment company or any "single payment" investment plan issued by a unit investment trust (collectively "investment companies") registered under the Investment Company Act of 1940 if the sales charges described in the prospectus are excessive. Aggregate sales charges shall be deemed excessive if they do not conform to the following provisions:

(1) Investment Companies Without an Asset-Based Sales Charge

(A) Front-end and/or deferred sales charges described in the prospectus which may be imposed by an investment company without an asset-based sales charge shall not exceed 8.5% of the offering price.

(B)(i) Dividend reinvestment may be made available at net asset value per share to any person who requests such reinvestment

(ii) If dividend reinvestment is not made available as specified in subparagraph (B)(i), the maximum aggregate sales charge shall not exceed 7.25% of the offering price.

(C)(i) Rights of accumulation (cumulative quantity discounts) may be made available to any person in accordance with one of the alternative quantity discount schedules provided in subparagraph (D)(i) below, as in effect on the date the right is exercised.

(ii) If rights of accumulation are not made available on terms at least as favorable as those specified in subparagraph (C)(i) the maximum aggregate sales charge shall not exceed:

(a) 8% of offering price if the provisions of subparagraph (B)(i) are met; or

(b) 6.75% of offering price if the provisions of subparagraph (B)(i) are not met.

(D)(i) Quantity discounts, if offered, shall be made available on single purchases by any person in accordance with one of the following two alternatives:

(a) A maximum aggregate sales charge of 7.75% on purchases of $10,000 or more and a maximum aggregate sales charge of 6.25% on purchases of $25,000 or more, or

(b) A maximum aggregate sales charge of 7.50% on purchases of $15,000 or more and a maximum aggregate sales charge of 6.25% on purchases of $25,000 or more.

(ii) If quantity discounts are not made available on terms at least as favorable as those specified in subparagraph (D)(i) the maximum aggregate sales charge shall not exceed:

(a) 7.75% of the offering price if the provisions of subparagraphs (B)(i) and (C)(i) are met.

(b) 7.25% of the offering price if the provisions of subparagraph (B)(i) are met but the provisions of subparagraph (C)(i) are not met.

(c) 6.50% of the offering price if the provisions of subparagraph (C)(i) are met but the provisions of subparagraph (B)(i) are not met.

(d) 6.25% of the offering price if the provisions of subparagraphs (B)(i) and (C)(i) are not met.

(E) If an investment company without an asset-based sales charge pays a service fee, the maximum aggregate sales charge shall not exceed 7.25% of the offering price.

(F) If an investment company without an asset-based sales charge reinvests dividends at offering price, it shall not offer or pay a service fee unless it offers quantity discounts and rights of accumulation and the maximum aggregate sales charge does not exceed 6.25% of the offering price.

(2) Investment Companies With an Asset-Based Sales Charge

(A) Except as provided in subparagraphs (2)(C) and (2)(D), the aggregate asset-based, front-end and deferred sales charges described in the prospectus which may be imposed by an investment company with an asset-based sales charge, if the investment company has adopted a plan under which service fees are paid, shall not exceed 6.25% of total new gross sales (excluding sales from the reinvestment of distributions and exchanges of shares between investment companies in a single complex, between classes of shares of an investment company with multiple classes of shares or between series shares of a series investment company) plus interest charges on such amount equal to the prime rate plus one percent per annum. The maximum front-end or deferred sales charge resulting from any transaction shall be 6.25% of the amount invested.

(B) Except as provided in subparagraphs (2)(C) and (2)(D), if an investment company with an asset-based sales charge does not pay a service fee, the aggregate asset-based, front-end and deferred sales charges described in the prospectus shall not exceed 7.25% of total new gross sales (excluding sales from the reinvestment of distributions and exchanges of shares between investment companies in a single complex, between classes of shares of an investment company with multiple classes of shares or between series shares of a series investment company) plus interest charges on such amount equal to the prime rate plus one percent per annum. The maximum front-end or deferred sales charge resulting from any transaction shall be 7.25% of the amount invested.

(C) The maximum aggregate sales charge on total new gross sales set forth in subparagraphs (2)(A) and (B) may be increased by an amount calculated by applying the appropriate percentages of 6.25% or 7.25% to total new gross sales which occurred after an investment company first adopted an asset-based sales charge until July 7, 1993, plus interest charges on such amount equal to the prime rate plus one percent per annum less any front-end, asset-based or deferred sales charges on such sales or net assets resulting from such sales.

(D) The maximum aggregate sales charges of an investment company in a single complex, a class of shares issued by an investment company with multiple classes of shares or a separate series of a series investment company, may be increased to include sales of exchanges shares provided that such increase is deducted from the maximum aggregate sales charges of the investment company, class or series which redeemed the shares for the purpose of such exchanges.

(E) No member shall offer or sell the shares of an investment company with an asset-based sales charge if:

(i) The amount of the asset-based sales charge exceeds .75 of 1% per annum of the average annual net assets of the investment company, or

(ii) Any deferred sales charges deducted from the proceeds of a redemption after the maximum cap described in subparagraphs (2)(A), (B), (C), and (D) has been attained are not credited to the investment company.

(3) No member or person associated with a member shall, either orally or in writing, describe an investment company as being "no load" or as having "no sales charge" if the investment company has a front-end or deferred sales charge or whose total charges against net assets to provide for sales related expenses and/or service fees exceed .25 of 1% of average net assets per annum.

(4) No member or person associated with a member shall offer or sell the securities of an investment company with an asset-based sales charge unless its prospectus discloses that long-term shareholders may pay more than the economic equivalent of the maximum front-end sales charges permitted by this section. Such disclosure shall be adja-

cent to the fee table in the front section of a prospectus.

(5) No member or person associated with a member shall offer or sell the securities of an investment company if the service fees paid by the investment company, as disclosed in the prospectus, exceed .25 of 1% of its average annual net assets or if a service fee paid by the investment company, as disclosed in the prospectus, to any person who sells its shares exceeds .25 of 1% of the average annual net asset value of such shares.

National Association of Securities Dealers, Inc.

February, 1993