### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

**MICHELLE YAMEEN,**

          **Plaintiff,**

**vs.**

**Civil Action No. 03-12437- DPW**

**EATON VANCE DISTRIBUTORS, INC.,**
*et al.*,

          **Defendants, and**

**EATON VANCE TAX-MANAGED
GROWTH FUND 1.1,**

          **Nominal Defendant.**

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
### MOTION OF EATON VANCE DISTRIBUTORS, INC.
### TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Edward F. Haber (BBO No. 215620)
Michelle Blauner (BBO No. 549049)
Theodore M. Hess-Mahan (BBO No. 557109)
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02109
(617) 439-3939

Attorneys for the Plaintiffs

Dated: August 15, 2005

## INTRODUCTION

This is an action brought by the Plaintiff, Michelle Yameen, pursuant to Section 36(b) of the Investment Company Act of 1940 (the "ICA"), on behalf of the Eaton Vance Tax Growth Fund 1.1 (the "Fund"), in which the Plaintiff is a shareholder. The Fund is a mutual fund which is an open-end management company, registered under the ICA. The action is brought against the defendant, Eaton Vance Distributors, Inc. ("Distributors"), the Principal Underwriter of the Fund's shares, for breach of fiduciary duty in violation of §36(b) to recover excessive distribution fees collected by the Distributors from the Fund during a period of time that the Fund was closed to new investors.

Distributors has moved, pursuant to Fed R. Civ. P. 12(b)(6), for dismissal of the Plaintiff's complaint, or alternatively, for summary judgment, pursuant to Fed. R. Civ. P. 56 (the "Motion"). Plaintiff submits this memorandum of law in opposition to the Motion.[1] Plaintiff's opposition to the Motion is also supported by Plaintiff's Response to the Distributors' Statement of Material Facts Not in Dispute in Support of the Motion.

Distributors seeks dismissal or summary judgment based upon several erroneous, technical, legal arguments that ignore the express terms of Securities Exchange Commission ("SEC") Rule 12b-1, promulgated under the ICA, which governs the Fund's payment of the distribution fees to Distributors that are at issue in this case.[2]

---

[1]Without conceding the merits of any of Distributors' arguments, Plaintiff has elected not to oppose Distributors' motion to dismiss Plaintiff's other claims for breach of fiduciary duty under §36(a) of the ICA (Count II) and for breach of fiduciary duty under Massachusetts law (Count III).

[2]The Independent Trustee Defendants, Donald R. Dwight, Samuel L. Hayes, William H. Park, Ronald A. Pearlman, Norton H. Reamer, Lynn A. Stout, and Jack L. Treynor, and Defendant Jessica M. Bibliowicz ("Bibliowicz"), collectively referred to herein as the "Trustee Defendants" or the "Trustees", have moved to dismiss the claims against them in the Amended Derivative Complaint (the "Complaint") for breach of fiduciary duty under §36(a) of the ICA (Count II), and under Massachusetts law (Count III), *inter alia*, for failure to make demand. The nominal defendant also seeks dismissal of Counts II and III of the Complaint solely for failure to make demand and does not otherwise take any position with respect to the merits of the claims asserted in the Complaint. Distributors, on the other hand, does not, as it cannot, argue that demand on the Trustees should have been made with respect to the §36(b) claim set forth in Counts I of the Complaint. *See, Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984) and Complaint, ¶¶ 157-158.

Without conceding the merits of any of the Trustee Defendants' arguments in support of their motion to dismiss the Complaint, Plaintiff has elected not to oppose the dismissal of the claims against the Trustee Defendants in this action.

## ARGUMENT

**A.    LEGAL OVERVIEW.**

### 1.    THE INVESTMENT COMPANY ACT OF 1940.

The ICA was enacted by Congress to regulate investment companies that operate mutual funds. *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 93 (1991). Unlike other corporations, investment companies are typically created and managed by pre-existing entities known as investment advisers. *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 536 (1984). Because the adviser generally supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the relationship between investment advisers and mutual funds is "'fraught with potential conflicts of interest.'" *Id.*, quoting *Burks v. Lasker*, 441 U.S. 471, 481 (1979). Mindful of those potential conflicts, Congress crafted a regulatory scheme in the ICA that placed quantitative and qualitative limits on the relations between advisers and investment companies. *See Lessler v. Little*, 857 F.2d 866, 870 (1st Cir. 1988); *United States v. Smolar*, 557 F.2d 13, 20 (1st Cir. 1971).

In 1970, Congress passed the Investment Company Amendments Act of 1970 (the "1970 Amendments"), Pub. L. No. 91-547, 84 Stat. 1413 (1970), which, *inter alia*, amended Section 36 of the ICA. 15 U.S.C. §80a-35. The 1970 Amendments added Section 36(b) to the ICA which was expressly intended to address the "potential conflicts of interest" where investment advisors and their affiliates set the fees that they charge mutual funds, because the "forces of arm's-length bargaining do not work in the mutual fund industry. . . ." Investment Company Amendments Act of 1970, S. Rep. No. 91-184 , reprinted in 1970 U.S.C.C.A.N. 4897, 4898, 4901-2, 4912, 1969 WL 4981 (Leg. Hist. May 21, 1969) ("the "Senate Report"). The Senate Report explains that, in light of that conflict of interest, Section 36(b) was enacted to provide an effective means "for the courts to act where mutual fund shareholders . . . believe there has been a breach of fiduciary duty." *Id.* at 4898. Thus, Section 36(b) generally provides that:

- a mutual fund's investment advisor and its affiliates have a fiduciary duty with respect to compensation received by them from the mutual fund; and

- a mutual fund's shareholders may bring an action against the fund's investment advisors and/or affiliates to recover, on behalf of the fund, the compensation that was collected in breach of the advisor's and/or the affiliate's fiduciary duty.

15 U.S.C. § 80a-35(b).

A claim brought under §36(b) is not subject to any heightened pleading requirement. Rather, a plaintiff must only plead facts sufficient to place defendants on notice of the claims against them. *Wicks v. Putnam Investment Mgmt, LLC*, No. Civ. 04-10988, 2005 WL 705360, at *4 (D. Mass. Mar. 28, 2005) (O'Toole, J.) (there is no "heightened pleading requirement for § 36(b) excessive fee claims"); *Strigliabotti v. Franklin Resources, Inc. et al.*, No. C 04-00883 SI, 2005 WL 645529, at *4 (N.D. Cal. March 7, 2005) (refusing to dismiss § 36(b) claims under Rule 8's liberal standard); *Pfeiffer v. Bjurman Barry & Associates*, 2004 WL 1903075, at *3 (S.D.N.Y. August 24, 2004) (§ 36(b) "complaint is governed by the pleading standards set forth in Rule 8a"); *Richard Krantz v. Fidelity Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 159 (D. Mass. 2000) (Saris, J.) (proceeding under "notice pleading standard" as to § 36(b) claim and refusing to dismiss). Therefore, the Court's focus in reviewing the defendants' motion to dismiss "is on whether the allegations in the complaint set forth "a short and plain statement of the claim showing that the pleader[s][are] entitled to relief." *Wicks*, 2005 WL 705360, at *4.

## 2.    SEC RULE 12b-1.

Prior to 1980, it was unlawful for a mutual fund to use its assets, directly or indirectly, to pay for or finance costs of selling or distributing shares in that investment company. See John P. Freeman, USE OF MUTUAL FUND ASSETS TO PAY MARKETING COST, 9 Loyola U.L.J. (Chi.) 533 (1978). However, in 1980, the SEC promulgated Rule 12b-1, 17 C.F.R. 240.12b-1, that permitted mutual funds, like the Fund, to use their assets to pay for activities which are:

**primarily intended to result in the sale of shares issued by such company,** including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature.

Rule 12b-1(a)(2), 17 C.F.R. 240.12b-1(a)(2) (emphasis added).

In its release adopting Rule 12b-1, the SEC expressed its concerns regarding: (1) the conflicts that may exist between the interests of a fund and those of its investment adviser in deciding whether the fund should pay its distribution costs; (2) the likelihood that the fund will benefit from paying distribution costs; and (3) the fairness of a distribution financing arrangement to then existing fund shareholders. *In re Bearing of Distribution Expenses By Mutual Funds*, Release No. 6254, Release No. 33-6254, Release No. IC -11414, 21 S.E.C. Docket 324, 1980 WL 20761, at *1 (Oct. 28, 1980). To address those concerns, the SEC set forth in Rule 12b-1 substantive standards and strict procedural guidelines, including:

- Rule 12b-1(b)(3)(iii) provides that the distribution plan required by Rule 12b-1(b) must provide that "...it may be terminated at any time..." by the fund's trustees, 17 C.F.R. §270.12b-1(b)(3)(iii) (emphasis added); and

- Rule 12b-1(b)(3)(iv)(A) provides that the written distribution agreement (between a mutual fund and an underwriter) required by Rule 12b-1(b) must provide that:

    it may be terminated at any time, without the payment of any penalty, by a vote of a majority of the members of the board of directors [who are "disinterested"] ... on not more than sixty days' written notice to any other party to the agreement..., 17 C.F.R. §270.12b-1(b)(3)(iv)(A) (emphasis added).

Rule 12b-1 also requires constant review by the mutual fund's trustees to determine whether the mutual fund's assets should continue to be used to pay for the costs of distributing the fund's shares to the public. Specifically:

- Rule 12b-1(b)(3)(i) prohibits a plan or agreement to continue in effect for more than one year unless "...such continuance is specifically approved at least annually in the manner described in paragraph (b)(2), 17 C.F.R. §270.12b-1(b)(3)(i)[3];

- Rule 12b-1(d) provides that:

  In considering whether a [mutual fund] should ... continue a plan in reliance on paragraph (b) of this rule, the directors of such company shall have a duty to request and evaluate ... such information as may reasonably be necessary to an informed determination of whether such plan should be ... continued; in fulfilling their duties under this paragraph the directors should consider and give appropriate weight to all pertinent factors considered.... 17 C.F.R. §270.12b-1(d).

- Rule 12b-1(e) provides that a plan or agreement may not be continued unless:

  ...the directors who vote to approve such ... continuation conclude, in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and under sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that [the continuation of] the plan will benefit the company and its shareholders....17 C.F.R. §270.12b-1(e) (emphasis added).

"An action alleging that Rule 12b-1 expenses resulted in excessive compensation to a mutual fund's investment adviser is properly brought under Section 36(b) of the ICA." *Pfeiffer*, 2004 WL 1903075, at *4.

**B.    IN LIGHT OF THE TRUSTEES' DECISION TO CEASE SELLING SHARES OF THE FUND, THERE IS NO "...REASONABLE LIKELIHOOD THAT [THE CONTINUATION OF] THE PLAN WILL BENEFIT THE COMPANY AND ITS SHAREHOLDERS..."**

It is undisputed that the Trustee Defendants caused the Fund, as of March 1, 2001, to cease offering and selling of shares of the Fund to the public. *See* Complaint, ¶28 and Declaration of James L. O'Connor ("O'Connor Decl."), ¶ 2.  While further discovery will provide the Plaintiff and the Court with the specifics of the Trustees' reasons for closing the Fund to new investors, it is apparent that in

---

[3]Rule 12b-1(b)(2) requires approval by a vote of the board of directors "...cast in person at a meeting called for the purpose of voting on such plan or agreements..."  17 C.F.R. 240.12b-1(b)(2).

making that decision the Trustees determined that the continued sales of shares of the Fund, and the resulting growth in the Fund's assets, would not benefit the Fund and its shareholders.[4]

The crux of the claim in this case is that, in light of the fact that the Trustees determined, as of March 1, 2001, that it was no longer in the best interests of the Fund and its shareholders for the Fund to sell additional shares of the Fund to the public, there cannot be " a reasonable likelihood that [the continuation of] the plan will benefit the [Fund] and its shareholders…" Rule 12b-1(e). Furthermore, the continuation of the Plan could not have been "… primarily intended to result in the sale of shares issued by [the Fund]." Rule 12b-1(a)(2).

Paradoxically, the Trustees of the Fund, in explaining their decision to continue the Plan after the Fund had been closed to new investors, in a filing by the Fund with the SEC, said: "**The Trustees of the Fund believe that each Plan will be a significant factor in the expected growth of the Fund's assets…"**[5] That explanation of the Trustees' decision to continue the Plans is nonsensical because, having ceased selling shares of the Fund to new investors, there would be no "expected growth of the Fund's assets" from sales of the Fund's shares.

By voting to continue the Fund's Plans and Agreements after the Fund ceased selling shares to the public, the Trustees of the Fund breached their fiduciary duties to the Fund and the Fund's shareholders, under Section 36(b) of the ICA. Likewise, by continuing to collect the distribution fees under the Plans and Agreements, after the Fund ceased selling shares to the public, Distributors breached its fiduciary duties to the Fund and the Fund's shareholders, under state law and under Section

---

[4]No claim is asserted in this action with respect to the decision of the Trustees to close the fund to new investors.

[5] *See* May 1, 2003 Statement of Additional Information ("SAI"), at page 17, excerpts of which are attached as Exhibit 1 to Declaration of Theodore M. Hess-Mahan Pursuant to Fed. R. Civ. P 56(f), in Opposition To Motion of Eaton Vance Distributors, Inc. to Dismiss Or, in the Alternative, for Summary Judgment ("Hess-Mahan Decl.") (emphasis added).

36(b) of the ICA.[6]

## C.    DISTRIBUTORS' RELIANCE ON THE *ING* DECISION IS MISPLACED.

In arguing that Plaintiff failed to state a claim for excessive distribution fees under §36(b), Distributors relies heavily on Judge Tauro's decision in *In re ING Principal Protection Funds Derivative Litigation*, 369 F. Supp. 2d. 163 (D. Mass. 2005) ("*ING*").  DM at 2-3.[7]  Distributors' reliance on *ING* is misplaced because, as discussed below, that decision is fundamentally flawed.

In his decision in *ING*, Judge Tauro held that the plaintiffs had failed to adequately plead a violation of §36(b) due to the defendant's collection of Rule 12b-1 distribution fees, during the period (the "Guarantee Period") that the ING Funds were closed to new investors.  Judge Tauro held that "Plaintiffs...cannot entirely confine their claim for excessive distribution fees to the *de minimis* sales-related services provided when the Funds were closed to new investors..." *Id.* at 169.

Judge Tauro reached that conclusion by applying the criteria for proving, at trial, an excessive **advisory fee** claim under §36(b) as set forth in *Gartenberg v. Merrill Lynch Asset Mgmt. Inc.,* 694 F. 2d 923, 928 (2d Cir. 1982) - i.e. "To be guilty of a violation of Section 36(b)...the advisor - manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered..." *ING,* 369 F.Supp. 2d at 168, n. 24, quoting *Gartenberg* at 928.

Judge Tauro reasoned that in applying the *Gartenberg* criteria, one could not only look at the services rendered **during the period in which the allegedly excessive fees were paid** but one also had to consider the services that had been rendered during earlier periods of time.  Judge Tauro held that the Plaintiffs' allegation "...that the distribution fees exceed the *de minimis* sales-related expenses incurred during the Guarantee Period when the Funds were closed to new investors...are impermissably

---

[6]    Section 36(b)(3) provides that the cause of action for breach of fiduciary duty under §36(b) can only be brought against the recipient of the compensation or payments at issue, in this case, Distributors.

[7] Distributors' memorandum of law submitted in support of its motion to dismiss or in the alternative for summary judgment is cited to herein as "DM at ___."

selective." 369 F. Supp. 2d at 168 - 169.

That analysis and conclusion is fundamentally flawed. It fails to recognize that the focus on the "*de minimis* sales-related expenses incurred during the Guarantee Period when the Funds were closed to new investors," *Id.* at 168, was not chosen by Plaintiff "selectively," but rather is a **requirement** of Rule 12b-1.

As detailed in the Complaint, Rule 12b-1 expressly provides that the **annual continuation** of Rule 12b-1 payments must benefit the Fund and its shareholders. Specifically, Rule 12b-1 provides that 12b-1 fees cannot be continued unless: "directors of an investment company...conclude...that there is a reasonable likelihood that the plan **will** benefit the investment company and its shareholders," Rule 12b-1(e), Complaint, ¶ 32.(d), emphasis added.

In other words, Rule 12b-1 requires there to be a likely **future** benefit that flows from continuing the Rule 12b-1 fee payments in the future. The *ING* decision ignores the express provisions of Rule 12b-1, which affirmatively contradict the *ING* Court's conclusion. The error in applying the *Gartenberg* criteria to this action, without modifying it to reflect the express provisions of Rule 12b-1, is further compounded by the fact that *Gartenberg* was a case that did not involve Rule 12b-1 or Rule 12b-1 Distribution Fees in any way.

It follows from that express provision in Rule 12b-1, that the reasonableness or excessiveness of Rule 12b-1 fees must be judged in light of the benefits received by the shareholders or the Fund **during the period of time that those fees are being paid**. To conclude otherwise is to ignore and eviscerate that express regulatory scheme pursuant to which Rule 12b-1 fees are governed. It certainly cannot be said, as defendants argue, that Rule 12b-1 fees charged during a period when virtually no distribution expenses are being incurred, are reasonable, as a matter of law. The motion to dismiss the §36(b) claim must therefore be denied.

## D.    THE EXPRESS RIGHT OF ACTION UNDER §36(b) ENCOMPASSES DISTRIBUTION FEES

Distributors advances two arguments in support of its contention that distribution fees do not fall within the scope of the express private right of action under §36(b).  First, Distributors argues that §36(b)(4), by its own terms, renders distribution fees outside the reach of § 36(b)'s express right of action, because they are "subject to" Rule 17d-3, promulgated pursuant to §17 of the ICA.  Distributors' second argument fails because the distribution fees are specifically **exempted** from §17 of the ICA; they are not "subject to" it.  *See* Rule 17d-3.  Second, Distributors argues that the case law uniformly rejects any §36(b) action challenging excessive distribution fees – as opposed to advisory fees.  In doing so, Distributors ignores or mischaracterizes authorities that unequivocally reject its position.

### 1.    Rule 12b-1 Distribution Fees Are Not "Subject To" Section 17 of the ICA; They Are "Exempt From" Section 17

Distributors argues that distribution fees paid to principal underwriters are "subject to §17 of this Act, or rules, regulations, or orders thereunder," and hence are exempt from §36(b) pursuant to §36(b)(4).(*see* DM at 10, quoting §36(b)(4))  This argument is frivolous.  Distribution fees paid in accordance with a 12b-1 plan are not "subject to Section 17 of this Act, or rules, regulations, or orders thereunder," because they are explicitly exempted from §17 of the ICA by SEC Rule 17d-3, which provides that:

> An affiliated person of, or principal underwriter for, a registered open-end management investment company and an affiliated person of such a person or principal underwriter shall be **exempt** from section 17(d) of the Act. . .

17 C.F.R. §270.17d-3 (emphasis added).

It is axiomatic that Rule 12b-1 distribution fees cannot be both "subject to" and "exempt" from §17 of the ICA (and its accompanying regulatory framework).[8]  Accordingly, §36(b) claims challenging

---

[8] *See United States Postal Service v. Flamingo Industries (USA) Ltd.*, 124 S.Ct. 1321, 1329 (2004)(noting that the Postal Reorganization Act "refers in explicit terms to various federal statutes and specifies that the Postal Service is **exempt from some and subject to others**.")(emphasis added); *Northeast Federal Credit Union v. Neves*, 837 F.2d 531, 532, n.1 (1st Cir. 1988)(quoting Federal Credit Union Act which renders all property and income of federal credit

excessive distribution fees are not precluded by §36(b)(4).[9]

### 2. The Unambiguous Language of §36(b) Demonstrates that Actions Can Be Brought Under §36(b) Against Principal Underwriters for Excessive Distribution Fees

Distributors also argues that Plaintiff's claim under section 36(b) must be rejected because §36(b) only provides a cause of action to challenge payments that are made for excessive advisory fees as opposed to a claim for excessive distribution fees. DM at 13-14. Distributor's argument should be rejected because it conflicts with the unambiguous language of §36(b) and ignores or mischaracterizes authorities that unequivocally reject its position.

### a. The Unambiguous Language of Section 36(b) Demonstrates that Actions Can Be Brought Under Section 36(b) Against Principal Underwriters for Excessive Distribution Fees.

In interpreting a statute, the court must "...turn first to the language of the statute itself. If a statute is unambiguous, we use neither legislative history, . . . , nor administrative agency interpretation. *Bryson v. Shumway*, 308 F.3d 79, 85 (1st Cir.2002)(citations omitted). Section 36 unambiguously provides that an action can be brought pursuant to §36(b) against a principal underwriter of a mutual fund's shares, such as the Defendant at bar. Section 36(a)(2) specifically identifies the "principal underwriter" of a "registered...open-end" investment company, as an entity which can be subject to suit under §36(a). Section 36(b) first codifies that: "An action may be brought under this subsection...against ... any ...person enumerated in subsection (a) [i.e., a "principal underwriter"] of this

---

unions "exempt from all taxation" except for any real property or tangible personal property which is "subject to Federal, State, Territorial, and local taxation to the same extent as other similar property is taxed."); *Maine Central Railroad Co. v. Brotherhood of Maintenance of Way Employees*, 813 F.2d 484, 491 (1st Cir. 1987)(explaining the rationale of the Supreme Court in finding a specific statute unconstitutional because of the "possibility that the American Express Company would continue to be exempt if its characteristics were to change, but competitors would continue to be subject to the statute even if their characteristics became identical to the American Express Company's."); *Massachusetts Furniture & Piano Movers Association, Inc. v. FTC*, 773 F.2d 391 (1st Cir. 1985)("Absent a statutory exemption, or state created immunity, . . ., the collective preparation or filing of intrastate motor carrier rates which affect interstate commerce is subject to federal regulation.").

[9]Distributors' argument that the fees are "subject to" §17 of the ICA because Rule 17d-3 states that they must comply with Rule 12b-1 to qualify for the exemption is nothing more than a nonsensical word game. Simply because Rule 17d-3 mentions Rule 12b-1 in defining the scope of the exemption does not mean that the fees are "subject to" 12b-1, and, thus, "subject to" §17 of the ICA. The reference to Rule 12b-1in Rule 17d-3 is to establish the scope of precisely what fees are not "subject to" §17 of the ICA.

section ... for breach of fiduciary duty in respect of ... payments paid by such registered investment

company ... to such person...."

Section 36(b)(3) then provides that an action under §36(b) can only be "...brought or maintained

against...the recipient of such compensation or payments...." The statute unambiguously provides that

a principal underwriter can be sued under §36(b) for its improper receipt of any "compensation or

payments" from the mutual fund. This obviously includes distribution fees, which are the primary

payments which a principal underwriter would receive from a mutual fund. The Defendant's argument

that a principal underwriter could only be sued under §36(b) in connection with its receipt of advisory

fees is belied by the unambiguous terms of the statute.

> **b.** **The Only Two Circuits to Address the Issue Have Held that Distribution Fees are Encompassed by the Express Right of Action Under 36(b).**

The two circuit courts of appeals that have addressed the issue have determined that a principal

underwriter can be sued under §36(b) for the receipt of excessive distribution fees. In *Meyer v.*

*Oppenheimer Management Corp.*, 764 F.2d 76, 82 (2nd Cir. 1985) the Second Circuit expressly rejected

the precise argument advanced by Distributors here. As the Court said:

> Section 36(b), the [defendant's] argument runs, deals only with compensation for *advisory* services. But section 36(b) expressly applies to payments made to "any affiliated person" of the investment advisor, and the brokerage defendants are concededly affiliated persons. Moreover, in proposing what ultimately became section 36(b) the SEC made clear the broad scope of that provision:
>
> The statutory requirement . . . would apply to *all* forms of compensation paid by all investment companies to their affiliated persons, **principal underwriters**, and affiliates of such persons. **This would include all forms of compensation paid to** officers, directors, advisory board members, trustees, sponsors, investment advisers, **principal underwriters**, and controlling persons of both externally and internally managed companies as well as persons or organizations with which such persons are affiliated. Although advisory fees are the principal form of managerial compensation in investment company industry, **externally managed companies frequently pay fees for various nonadvisory services to principal underwriters**, trustees, business managers, and sponsors *who*, like investment advisers, **are likely to have close and dominant relationships with such companies that preclude arm's-length bargaining.**

*Meyer*, 764 F.2d at 82 (quoting H.R.Rep. No. 2337) (italics in original; bold italics emphasis added).

*See also Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866-867 (2nd Cir. 1990) (reaffirming and clarifying earlier decision, *Meyer*, 764 F.2d at 82); *Krantz v. Prudential Investments Fund Management LLC*, 305 F.3d 140, 142 (3rd Cir. 2002) ("Section 36(b) also provides for a private cause of action by a shareholder against the . . . principal underwriter 'for breach of fiduciary duty in respect of ... compensation' paid by a fund.'"); *Pfeiffer*, 2004 WL 1903075, at *4 ("An action alleging that Rule 12b-1 expenses resulted in excessive compensation to a mutual fund's investment adviser is properly brought under Section 36(b) of the ICA.").[10]

Distributors incorrectly argues that the Second Circuit decisions in the *Meyer* cases stand only for the limited proposition that distribution fees can be taken into account in considering a challenge to excessive advisory fees.  In fact, the Second Circuit explicitly stated that the two types of payments are unrelated and either one can be challenged as excessive under the terms of Section 36(b): "The two kinds of payments are for entirely different services, namely advice on the one hand and sales and distribution on the other.  If the fee for each service viewed separately is not excessive in relation the service rendered, then the sum of the two is also permissible."  *Meyer*, 895 F.2d at 866.  Because the lower court had found – as a matter of fact – that "neither payment was excessive[,]" it affirmed the verdict at trial.  *Id.  Meyer* establishes both that excessive distribution fees can be challenged under

---

[10]These decisions are consistent with the views of the SEC.  Indeed, it is clear from Rule 12b-1 itself that §36(b) applies to a claim for excessive 12b-1 fees because the Rule provides that a 12b-1 plan may not be continued unless:

> ...the directors who vote to approve such ... continuation conclude, in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and **under sections 36(a) and (b) of the Act**, that there is a reasonable likelihood that [the continuation of] the plan will benefit the company and its shareholders**...** (emphasis added).

*See also In Re: Merrill Lynch California Municipal Bond Trust*, 41 S.E.C. Docket 699, 1988 WL 902856 (Jul. 28, 1988) ("the directors/trustees must analyze the reasonableness of the advisory fee and **the distribution fee** under the standards defined by section 36(b) of the 1940 Act"); *In Re: Prudential-Bache California Municipal Fund*, 45 S.E.C. Docket 196, 1989 WL 993295 (Dec. 20, 1989) ("The Directors/Trustees of each Fund must analyze the reasonableness of the advisory fee and the **distribution** fee under the standards defined by section 36(b) of the 1940 Act."); *In re: American Capital Comstock Fund, Inc.,* 49 S.E.C. Docket 1278, 1991 WL 296356 (September 18, 1991) ("the directors must analyze the reasonableness of the advisory fee and the **distribution fee** under the standards defined by section 36(b) of the Act."); *In Re: the Alliance Fund, Inc.*, *53 S.E.C.* Docket 396, 1992 WL 400699 (Dec. 31, 1992) ("Further, the Directors/Trustees must analyze the reasonableness of the advisory fee, **the distribution fee** and the service fee under the standards defined by section 36(b) of the Act.").

§36(b), and that resolution of the excessiveness question is a factual issue that should not be decided on a motion to dismiss.

      **c.**      **The Decisions Cited By Distributors Are Inapplicable to the Issue For Which They Are Cited, or They Were Erroneously Decided.**

In addition to mischaracterizing the Second Circuit precedent discussed above (and ignoring entirely the Third Circuit's decision in *Krantz*), Distributors cites five cases (some of which are unpublished) which it argues support its assertion that only advisory fees can be the subject of a §36(b) action.[11] Two of these decisions simply did not concern excessive fees at all (let alone distribution fees); they challenged conduct outside the scope of §36(b). In *Migdal*, the plaintiffs challenged the independence of the directors who had negotiated the fee arrangements. However, they did not claim that the resulting fees were excessive. *Migdal,* 248 F.3d at 329. Similarly, in *In re Nuveen*, plaintiffs alleged that the investment adviser engaged in certain transactions which were designed solely to generate more fees for the adviser. But, they did not challenge any fees or compensation as excessive.

The three other decisions cited by Distributors were erroneously decided. First, none of those courts appear to have been aware of the *Meyer* decisions, or the legislative history of §36(b) discussed therein. Indeed, in *Rohrbaugh* (which had nothing to do with distribution fees – it was a challenge to certain membership dues), the court explicitly stated that the plaintiffs had failed to cite to any cases under §36(b) which challenged anything other than excessive advisory fees, and "[n]or ha[d] the Court uncovered any such case." *Rohrbaugh*, 2002 WL 31100821 at *9. Likewise, the *In re TCW/DW* decision from the Southern District of New York does not acknowledge, and cannot be reconciled with, the Second Circuit's *Meyer* decisions, which were binding precedent on that court. Finally, each of those decisions relies on an incorrect interpretation of the legislative history.

---

[11] *See* DM at 13-14 (citing *Rohrbaugh v. Investment Co. Inst.*, Civ. A. 00-1237, 2002 WL 3110821 (D.D.C. July 2, 2002); *In re TCW/DW North American Gov't Income Trust Securities Litig.*, 941 F.Supp. 326 (S.D.N.Y. 1996); *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486 (N.D.Ill. 1999); *In re Nuveen Fund Litigation*, No. 94 C 360, 1996 WL 328006 (N.D. Ill. June 11, 1996); *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321 (4th Cir. 2001)).

Each of these decisions rely upon a single sentence cropped from the legislative history of §36(b) by the court in *Halligan v. Standard & Poor's/Intercapital, Inc.*, 434 F.Supp. 1082, 1084 (E.D.N.Y. 1977). The *Halligan* decision focuses on the following sentence from Senate Report No. 91-184, which discusses the provision in §36(b) that renders affiliated persons of the investment adviser susceptible to suit under that section:

> This provision affords a remedy if the investment adviser should try to evade liability by arranging for payments to be made not to the adviser itself but to an affiliated person of the adviser.

*Halligan*, 434 F.Supp. at 1082 (citing Sen.Rep. No. 91-184, 91st Cong., 1st Sess. 16 (1969)); *see also Rohrbaugh* 2002 WL 31100821 at *9 (citing same Senate Report); *In re TCW/DW*, 941 F.Supp. at 343 (citing *Halligan* analysis of legislative intent); *Green*, 186 F.R.D. at 492 (citing *Halligan* analysis and Senate Report). Based on that single sentence in the Senate Report, each of those three decisions relied on by Distributors conclude that only excessive advisory fees can be challenged under §36(b). However, that sentence, when read in context, does not support that proposition.

The paragraph of the Senate Report from which that sentence comes reads in full as follows:

> An action for breach of fiduciary duty may be brought not only against the investment adviser but also against any officer, director, member of any advisory committee, depositor, or principal underwriter of the investment company who, under the circumstances, may also have a fiduciary duty in respect to the payments received. The fiduciary duty of the investment adviser is extended not only to compensation paid to the investment adviser but also to payments made by the investment company or its shareholders to an affiliated person of the investment adviser. This provision affords a [remedy] if the investment adviser should try to evade liability by arranging for payments to be made not to the adviser itself but to an affiliated person of the adviser.

Sen.Rep. 91-184, section entitled "Explanation and Analysis of the Bill, Part A: Costs of Mutual Fund Investment, Section 20, Adding New Section 36(b) to the Act – Breach of Fiduciary Duty Involving Management Compensation and Other Payments." The paragraph, read as a whole, is saying that all of the persons and entities identified in the first sentence have a fiduciary duty with respect to payments they receive from a mutual fund, and they can be sued under §36(b) for recovery of those payments.

The second sentence advises that, in addition to the investment advisor, all affiliates of the investment advisor have a fiduciary duty with respect to any payments they receive from a mutual fund, and they can be sued under §36(b) for recovery of those payments. The third sentence explains how chicanery by the investment advisor could be remedied by the section; it does not in any way suggest that the payments identified in the first sentence are limited to advisory fees.

The Congressional intent to provide the broad scope to §36(b) discussed by the Second Circuit in *Meyer* is also evidenced by other portions of the Senate Report relied upon in *Halligan*. The Senate Report, in the section entitled "Purpose of the Bill" describes §36(b) as providing an "effective method whereby the courts can determine whether there has been a breach of this duty by the adviser **or by certain other persons with respect to their compensation from the fund.**"  Senate Report, 91-184 (emphasis added). Moreover, the section of the Senate Report which discusses the lack of arm's-length negotiating in the mutual fund industry is entitled "Advisory Fees **and Other Compensation**." *Id.*  In that section, the Senate Report unambiguously states, as does the statute itself, that not only does 36(b) provide an express right of action against the adviser and its affiliates for its "handling of the fund's assets and investments," but that "[o]ther persons enumerated in §36(a) [which includes principal underwriters] who may have a similar fiduciary duty with respect to compensation or payments received by them from the fund or its shareholders may also be sued for a breach of such duty."  *Id.*

In sum, the unambiguous statutory language; the equally unambiguous legislative history; and the decisions of the Second and Third Circuits fully support the conclusion that §36(b) provides a remedy to shareholders suing on behalf of their mutual fund against the fiduciary recipient of excessive fees – without regard to whether such fees are for advisory or distribution services.

**E.    COMPLIANCE WITH NASD RULE 2830 DOES NOT  INSULATE DISTRIBUTORS FROM LIABILITY UNDER §36(b).**

The Fund is charged an annual asset based 12b-1 distribution fees which the Fund pays Distributors of .75% of the assets of the Fund and an annual asset based 12b-1 trail commission or

service fee of .25% of the Fund's assets. Distributors argues that Plaintiff's complaint should be dismissed because those percentages are equal to, and not greater than, the maximum annual percentages which an underwriter can collect from a mutual fund for those Rule 12b-1 fees, pursuant to NASD Rule 2830.

That argument is a "red herring." No claim is made in this case that Distributors is violating NASD Rule 2830. That rule sets a ceiling (of .75% and .25% of the assets, per year) on the amount that can be charged for Rule 12b-1 distribution fees and service fees, **only if** all of the requirements and restrictions of Rule 12b-1 have been met. Compliance with NASD Rule 2830 does not, in any way, mean that a fund, its trustees or its underwriter, have complied with Rule 12b-1. The fact that the Rule 12b-1 distribution fee paid to Distributors here does not exceed the maximum allowed by NASD Rule 2830 does not speak at all to the question of whether – in light of the trustees' determination that as of March 1, 2001, it was no longer in the best interests of the Fund and its shareholders for the Fund to sell additional shares of the Fund to the public – "...there is a reasonable likelihood that [the continuation of] the plan will benefit the [Fund] and its shareholders…" Rule 12b-1(e).

If, as Plaintiff fully expects, this Court concluded "...under all the circumstances" (§36(b)(2)), based upon a full factual record, "…that there is [no] reasonable likelihood that [the **continuation** of] the plan will benefit the [Fund] and its shareholders…" (Rule 12b-1(e)), this Court could grant relief to Plaintiff pursuant to §36(b) – notwithstanding that the Rule 12b-1 fees complied with NASD Rule 2830's requirement not to exceed a certain percentage of the Fund's assets.

Indeed, as Distributors itself concedes (DM at 16, n. 17), in *Pfeiffer,* 2004 WL 1903075, at *5, the District Court in the Southern District of New York rejected the precise argument advanced by Distributors here. As here, at issue in *Pfeiffer* were Rule 12b-1 fees being paid by a mutual fund that had closed to new investors. The plaintiff claimed the fees were excessive, in violation of §36(b). The defendants in *Pfeiffer* moved to dismiss the complaint, arguing, as the Defendants do here, that, as a

16

matter of law, the fees could not be excessive because they were not greater than the maximum percentage of assets permitted by NASD Rule 2830. The Court in *Pfeiffer* rejected that argument and denied the motion to dismiss, holding as follows:

> ...The defendants heavily rely on the argument that, because the Plan caps its Rule 12b-1 fees at 0.25% of the Fund's average daily assets – or one-fourth less than the maximum asset – based charge allowed by the SEC [and the NASD] – the fees are *per se* reasonable. The defendants cite no case law for this proposition. Should the plaintiff succeed in showing that the fees were excessive...the defendant will not be able to defeat that showing by arguing that they could have charged even more....

*Id.* at *5.

NASD Rule 2830 does not and cannot preempt the mandate of SEC Rule 12b-1. To the contrary, §22 of the ICA provides that the rules and regulations of the SEC prevail over any rules of the NASD. *See* 15 U.S.C. §80a-22(a) and (c). Section 22(a) authorizes registered securities associations, in this case the NASD, to prescribe rules for the practices of its members. 15 U.S.C. §80a-22(a). In this situation the NASD has done so by establishing, in Rule 2830, the maximum percentage of assets that a member of the NASD can charge for fees under SEC Rule 12b-1. If, however, industry self-regulation proves insufficient, §22(c) authorizes the Commission to make rules and regulations "covering the same subject matter, and for the accomplishment of the same ends as are prescribed in subsection (a)," and proclaims that the SEC rules and regulations supersede any inconsistent rules of the registered securities association." 15 U.S.C. §80a-22(c).

The provisions of §22(b), upon which Distributors relies, are not to the contrary. Section 22(b)(2) expressly provides that SEC "may alter or supplement the rules of any securities association as may be necessary to effectuate the purposes of this section ...." Indeed, Distributors concedes, as it must, the authority of the NASD to adopt rules prohibiting excessive distribution fees under §22(b) is "subject to SEC supervision ...." DM at 16.

Distributors' reliance on NASD Notice to Members 93-12 is also misplaced. As Distributors also concedes, "In NASD Notice to Members 93 -12 [the NASD was] interpreting its own Rule

2830...", DM at 8, which is not at issue in this litigation. No claim is made in this case that Distributors has violated NASD Rule 2830. NASD Notice to Members 93 -12 is not an interpretation of SEC Rule 12b-1.[12] As the Court in *Pfeiffer* held, compliance with NASD Rule 2830 does not, in any way, mean that a mutual fund, its trustees or its underwriter, have met their fiduciary and other obligations under Rule 12b-1 and §36(b) of the ICA. Neither NASD Rule 2830 nor Notice 93-12 speak to the question of whether it is a breach of Distributors' fiduciary duties under §36(b) to continue to collect Rule 12b-1 distribution fees because they are not for activities which are "**primarily intended to result in the sale of shares issued by [the Funds]**" and they will not "**benefit the [Funds] and [the Funds'] shareholders.**" Rule 12b-1(a)(2) and (e) (emphasis added).

Recent decisions by the court in the Southern District of Texas in both *Zucker v. Aim Advisors*, Inc., 371 F.Supp.2d 845 (S.D.Tex. 2005) ("*AIM*"), and *Lieber v. Invesco Funds Group, Inc.*, 371 F.Supp.2d 852 (S.D.Tex 2005) ("*Invesco*") are also direct, on point authority in support of Plaintiff's position that NASD Rule 2830 in no way undermines her claims regarding the Rule 12b-1 fees at issue in this case, and that NASD Rule 2830 provides no support for Distributors' Motion.

The Court in both *Aim* and *Invesco* held as follows:

> Rule 2830 essentially places a cap on Rule 12b-1 sales charges: "[t]he rule deems a sales charge excessive if it exceeds the rule's caps." See 69 Fed. Reg. 9726, 9727 (Mar.1, 2004). It does not follow, however, that if charges conform to Rule 2830, they are ***not*** excessive for purposes of §36. Although compliance with Rule 2830 is necessary, it is not necessarily sufficient to insulate one from §36 liability. *See Pfeiffer v. Bjurman, Barry & Assocs.*, CIV.A. No. 03 Civ. 9741 DLC, 2004 WL1903075, at*5 (S.D.N.Y. Aug 26, 2004) (rejecting argument that 12b-1 fees less than the maximum permitted by the SEC are *per se* reasonable).

(*AIM*, 371 F. Supp. 2d at 850; *Invesco*, 371 F. Supp. 2d at 857) (emphasis in originals).

The plaintiffs in *Aim* and *Invesco* make the same claims pursuant to §36(b) of the ICA as does

---

[12]Even if the NASD offered an advisory opinion regarding an SEC rule (though the NASD has no place giving advisory opinions regarding SEC rules), such an advisory opinion would command "no particular deference" from the courts. *Association of Int'l Automobile Manufacturers, Inc. v. Commissioner*, 208 F.3d 1, 6 (1st Cir. 2000).

the plaintiff at bar – i.e. that the defendant "breached its fiduciary duty under the Act by collecting excessive marketing, distribution, and other advisory fees from the Funds after the Funds were closed to new investors." *Aim* at 846; *Invesco* at 853.[13]

Moreover, in a recent ruling from the bench, Judge Wolf in *Bahe v. Franklin/Templeton Distributors, Inc., et al.*, Civil Action No. 04-11195 (D. Mass.), rejected an argument based on NASD Notice to Members 93-12, asserted here by Distributors (see DM at 8). In denying a motion to dismiss a §36(b) claim for excessive Rule 12b-1 distribution fees, in *Bahe*, Judge Wolf stated:

> Defendants argued that because the plaintiff has not alleged that the payments made exceeded the limits set by Rule 2830, there is no legal basis for challenging the payments. The defendants particularly cite the response to question 6 of the notice to members in which the NASD stated that: If the fund generates no sales or discontinues selling its shares, must it stop payment any Asset-based sales charges, i.e., 12B-1B [*sic*]? And the answer is no.

Transcript of March 17, 2005 Motion Hearing, at 41. Relying upon the Second Circuit's decision in *Meyer*, and the district courts' decisions in *Pfeiffer*, *AIM* and *Invesco*, Judge Wolf held "that there is no inconsistency between Rule 2830 and Section 36(b)." *Id.* at 43.

> Section 22b-1 only permits the NASD to prescribe rules for reasonable compensation. What is reasonable still depends on all the relevant circumstances, which include the circumstances described in *Gartenberg* and *Krinsk* and may include other circumstances now, including the action of the NASD in connection or in implementing Rule 2830.
>
> .... [W]hat the NASD has done may be evidence of what is reasonable, ... but it is not dispositive and, particularly, does not eliminate the jurisdiction of the federal courts to litigate cases like this one.

---

[13]While Distributors concedes, as it must, that the *Pfeiffer* and *AIM* decisions "appear to contravene" Distributors' argument that the SEC's approval of NASD Rule 2830 insulates it from liability from claims for excessive Rule 12b-1 distribution fees under §36(b), it argues that the court should disregard those decisions based on a fundamentally flawed analysis. DM at 16, n. 17. First, Distributors dismisses the significance of the *Pfeiffer* decision because the *Pfeiffer* court did not address §22(b) of the ICA. As noted above, however, neither §22(b) of the ICA nor NASD Rule 2830 preempts the mandate of SEC Rule 12b-1. Second, Distributors argues that the *AIM* court erred in holding that NASD Rule 2830 cannot trump liability under §36(b) based on the SEC's 1988 statement that "Rule 12b-1 was not intended to provide a 'safe harbor' from section 36 liability" by claiming that the SEC's statement had no bearing on whether distribution fees are excessive under Rule 2830. *Id.* Distributors' argument is misplaced because, as in the case at bar, there was no claim in the *AIM* case that the distribution fees violated NASD Rule 2830. In addition, as the *AIM* court correctly points out, "Rule 2830 is designed not to preempt §36(b), but merely to limit sales charges imposed by NASD members under Rule 12b-1. 371 F. Supp. 2d at 850. Moreover, as the *AIM* court also found, consistent with the SEC's "no safe harbor" statement, Rule 2830 does not purport to exclude liability under §36(b). *Id.*

*Id.* at 44.

### F.    WHETHER IT COULD EVER BE FOUND THAT A CLOSED FUND AND ITS SHAREHOLDERS COULD BENEFIT FROM THE CONTINUED PAYMENT OF RULE 12b-1 DISTRIBUTION FEES IS NOT RELEVANT TO THE SUFFICIENCY OF THE COMPLAINT AT BAR

Distributors' final argument seeking dismissal of Plaintiff's §36(b) claim is that two unauthenticated, unofficial statements by staff of the SEC and the NASD express the "opinion" that there is no *per se* rule against a closed fund continuing to pay Rule 12b-1 fees. From that, Distributors erroneously jumps to the conclusion that no legal claim could ever be made that the continued payment of Rule 12b-1 fees by a closed fund violates the fiduciary duty of the underwriter receiving those fees. As demonstrated below, the unauthenticated, unofficial statements upon which Distributors relies cannot properly be considered on a motion to dismiss; are entitled to no deference by this Court; and by their own terms, do not foreclose the claim set forth in the complaint at bar.

Distributors points to a letter, dated August 19, 1993, from Arthur Levitt of the SEC to a member of Congress and a five page document entitled "Memorandum," dated August 16, 1993. Distributors submits these documents as part of an unsworn submission entitled "Appendix Of Additional Legal Materials In Support of Motion of Eaton Vance Distributors, Inc. To Dismiss Or, in the Alternative, for Summary Judgment." Nothing regarding the source of the documents, nor their authenticity is disclosed. These are not the kind of documents with respect to which a court could take judicial notice and consider on a motion to dismiss. *See Locicero v. Leslie*, 948 F.Supp. 10, 12 (1996)(court can only take judicial notice of "public records or indisputably authentic documents" at 12(b)(6) stage of proceedings). Distributors' failure to properly authenticate the documents and identify their source unfairly precludes Plaintiff from exploring the facts surrounding the creation and use of the documents, and thereby denies Plaintiff the opportunity to advance any and all appropriate rebuttal evidence and argument – an outcome not permitted by the evidentiary rules delineating the scope of judicial notice. *See* Fed.R.Evid.201, Note to Subdivision (b).

20

Even if this Court were to consider the documents, they would not be entitled to any deference by this Court. These documents are not rules or regulations promulgated by the SEC. On their face, they represent the view, or, at best, an advisory opinion of one member of the SEC's staff in 1993. It is settled law that advisory opinions of an administrative agency do not "command any particular deference under *Chevron* or comparable doctrines" *Association of Int'l Automobile Manufacturers, Inc. v. Commissioner, Massachusetts Dept. of Env. Protection*, 208 F.3d 1, 6 (1st Cir. 2000) citing *Mid-America Care Foundation v. NLRB*, 148 F.3d 638, 642 (6th Cir. 1998).[14]

Finally, on their face, they not only do not support Distributors' effort to dismiss the Plaintiff's §36(b) claim. Rather, they support Plaintiff's claim that the continuation of a Rule 12b-1 plan must be made pursuant to the requirements and commands of Rule 12b-1. Specifically, the August 16, 1993 Memorandum states:

### B. Requirements of Rule 12b-1

Fee practices such as those described in the *Forbes* article generally are governed by rule 12b-1 under the Investment Company Act, which permits the use of fund assets to promote distribution. Rule 12b-1 requires fund directors, including a majority of the independent directors, to determine that the use of fund assets to promote distribution is reasonably likely to benefit fund shareholders. The rule also contains provisions intended to ensure that the directors are not dominated or unduly influenced by management and that they are fully informed and exercise reasonable business judgment. Rule 12b-1, however, does not provide the board with a checklist of information it must review. Instead, rule 12b-1(d) requires the board to request such information as may be reasonably necessary to make an informed determination. Thus, the board's review under rule 12b-1 will depend on the specific facts and circumstances relating to each fund's 12b-1 plan.

In sum, this Memorandum simply expresses one staff member's view that there is no *per se* bar to the continuation of a Rule 12b-1 plan by a closed fund. However, even that staff member recognizes that before that could be done, the Trustees would have "...to determine that the use of fund assets...is

---

[14]The memorandum and letter also make clear that they do not represent the type of "final agency action" that is afforded any deference by the courts, because they contemplate further investigation and monitoring of the practices at issue "to determine whether changes are necessary to prevent possible abuses arising from these practices." Levitt Letter of Aug. 19. When the opinions expressed contemplate such future action, they do not constitute "final agency action" and are afforded no deference. *Automobile Manufacturers*, 208 F.3d at 5-6.

reasonably likely to benefit fund shareholders" and that "...the board's review under rule 12b-1 will depend on the specific facts and circumstances relating to each fund's 12b-1 plan." The claim at bar is that under the "specific facts and circumstances" here, it was a breach of fiduciary duty for Distributors to continue to receive payments from the Fund pursuant to those plans. That claim is fully consistent with the "Memorandum" contained in the Levitt letter, even if (which Plaintiff does not concede) there is no *per se* bar to the continuation of a Rule 12b-1 plan by a closed fund. Thus, the Complaint states a claim upon which relief can be granted.

### G.    DISTRIBUTORS IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE IT CREDITS THE RULE 12b-1 DISTRIBUTION FEES AGAINST WHAT IT CALLS "UNCOVERED DISTRIBUTION CHARGES"

Distributors argues it is entitled to summary judgment because the Rule 12b-1 Distribution Fees it receives relate to sales charges associated with sales of shares before the Fund "closed" itself to new investors and stopped selling its shares to the public on March 1, 2001. Distributors calls those unpaid charges "uncovered distribution charges." O'Connor Decl., ¶¶ 10-11.[15]

It is important to note that there are two different Rule 12b-1 distribution fees which are paid by the Fund to Distributors, and which are at issue in this action:

- the Rule 12b-1 fees sometimes described as a "Sales Charge," which the Class B and Class C shares of the Fund pay at the rate of .75% per year of the assets of the Class B and Class C shares of the Funds (the ".75% Distribution Fee"); and

- the Rule 12b-1 fees sometimes described as "Trail Commissions" or "Service Fees," which all of the classes of the Fund – Class A, Class B and Class C – pay at a rate of .25% per year of the assets of all classes of the Fund (the ".25% Distribution Fee").

---

[15]Distributors can profit from the Fund's payment of the "uncovered distribution charges" pursuant to the 12b-1 Plans and Distribution Agreements. In a public filing with the SEC, the Fund states that "The Eaton Vance organization will profit by reason of the operation of the Class B and Class C Plans ... if at any point in time the aggregate amounts received by the principal underwriter [Distributors] pursuant to the Plans ... have exceeded the total expenses incurred in distributing Class B and Class C shares." *See* Excerpts from May 1, 2003 Statement of Additional Information at 17, attached as Exhibit 1 to the Hess-Mahan Decl.

Complaint ¶¶34-37.[16]

The .75% Distribution Fee is credited against funds previously advanced by Distributors. The .25% Distribution Fee, however, does **not** pay for or reimburse Distributors for any commissions or other expenses that it previously advanced. Rather, those payments are **additional** payments made each year after the Fund's was closed to new investors.[17] Distributors' argument regarding "uncovered distribution charges" relates solely to the .75% Distribution Fee.

Implicit in Distributors' argument is the erroneous assumption that the Fund is contractually or legally obligated to continue to pay those charges to Distributors. In that regard, Distributors' statement in its Memorandum in support of the Motion, that "It cannot be disputed that the distribution fees are contractually due payments made pursuant to the terms of a validly adopted Distribution Agreement," DM at 19, is not correct. Plaintiff expressly claims, for the reasons detailed herein and in the Complaint, that the Fund Trustees' approval of the continuation of the Distribution Agreements, after March 1, 2001, violated Rule 12b-1 because the Trustees entirely failed to consider the fact that the Fund was closed to new investors. Complaint, ¶¶ 79-84, 105-110 and 129-134.

As demonstrated below, Distributors' argument fails because: (1) As a matter of law – based upon the express provisions of Rule 12b-1 discussed above – any financial commitment which the Fund made to pay distribution fees would have to be terminable "...at any time, **without the payment of any penalty** ... on not more than sixty days' written notice to any other party to the agreement..." Rule 12b-1(b)(3)(iv)(A) (emphasis added). (2) As a matter of fact – based upon the Fund's Plans and Distribution Agreements – the Fund can terminate those Plans and Distribution Agreements, with no continuing obligation to pay the distribution fees. *See* O'Connor Decl. ¶ 5; and ¶ 10 of Exhibits B and C thereto.

---

[16]The Complaint sometimes refers to the .75% Distribution Fee and the .25% Distribution Fee collectively as "Rule 12b-1 Distribution Fees." *Id.* ¶36.

[17]Plaintiff also alleges that the services rendered in exchange for the annual .25% Distribution Fee were *de minimis*, and decreasing as a result of the closing of the Fund, and that the service fee was excessive. Complaint ¶54.

The Distribution Agreements between the Fund and Distributors provide:

...this Agreement may be terminated with respect to a Class with a 12b-1 plan at any time by vote of a majority of the Rule 12b-1 [disinterested] Trustees ... on not more than sixty (60) days notice to the Principal Underwriter [Distributors]....

O'Connor Decl. Exhibit A ¶ 9(b); Hess-Mahan Decl. Exhibit 2 ¶ 9(b).[18]

The fact that the Distribution Agreements do not obligate the Fund to continue to repay the "uncovered distribution charges" upon termination is also apparent from the terms of the Distribution Agreements. Paragraph 5(d) of the Distribution Agreements provides that the only manner in which the uncovered distribution charges will be paid is through the payments by the Fund, to Distributors, of the annual, asset-based .75% Distribution Fee.[19] Furthermore, paragraph 9 of the Distribution Agreements, which addresses the termination of the Distribution Agreements, provides that, in the event of their termination, the **only** continuing financial obligation of the Fund is to pay over to Distributors any "..contingent deferred sales charges[20] paid or payable ... with respect to any day subsequent to such termination." ¶9(b).[21]

Indeed, the Fund's financial statements reflect that the Fund and its auditor, Deloitte & Touche LLP, fully understood that the Fund is under no legal obligation to pay Distributors the "uncovered distribution charges." As indicated in the Fund's Annual Report for 2002, the amount of the "uncovered distribution charges" for the Fund's Class B and Class C shares, as of December 31, 2002,

---

[18]Exhibit A attached to the O'Connor Decl. is the Amended and Restated Distribution Agreement effective as of June 16, 2003. The Distribution Agreement effective as of March 1, 2001 is attached as Exhibit 2 to the Hess-Mahan Decl.

[19]That provision conforms with Rule 12b-1. Payment of those charges by the Fund could not lawfully be made from any other source except the .75% Distribution Fee.

[20]Contingent deferred sales charges are paid by an individual investor who sells his shares of the Fund within a specified period of time after their purchase. Those charges are not paid by the Fund; are not governed by Rule 12b-1; and are not at issue in this action.

[21]Obviously, when Distributors entered into the Distribution Agreements, and expended funds which became the "uncovered distribution charges," it did so with full knowledge that it was assuming the risk that it would not be repaid the "uncovered distribution charges" if the Fund exercised its right to terminate the Distribution Agreements, without cause and without penalty, on 60 days notice.

was $86,884,581 and $86,489,100 respectively. Hess-Mahan Decl., Exhibit 4, at pages 26-27. If the

Fund was obligated to pay that $173,373,681 of "uncovered distribution charges," that sum would have

appeared on the Fund's financial statements as a liability. In fact, no such liability appears of the

Fund's Statement of Assets and Liabilities in the Fund's Annual Report for 2002. *See* Hess-Mahan

Decl., Exhibit 4, at page 13.[22] Indeed, such a liability would have dwarfed the Fund's liabilities, which

as of December 31, 2002 totaled only just over $16 million.[23] *Id.*

Hence we see that the fact that the Distribution Fees relate to what Distributors calls "uncovered

distribution charges" that accrued before the Fund closed, does not support Distributors' motion for

summary judgment. The Fund has not, and legally could not, have unconditionally committed itself

to repay all of those "uncovered distribution charges," because Rule 12b-1(3)(iv)(A) mandates that the

distribution agreements be terminable by the fund on sixty days notice without penalty. Accordingly,

the core issue in this action remains: in light of the fact that the trustees determined, as of March 1,

2001, that it was no longer in the best interests of the Fund and the shareholders of the Fund, for

additional shares of the Fund to be sold to the public could there be "a reasonable likelihood that [the

continuation of] the plan will benefit the [Fund] and its shareholders…" Rule 12b-1(e). That issue

must be decided by this Court based upon "... all of the circumstances" (§36(b)(2) of the ICA), which

cannot be done prior to the development and presentation of a full factual record after discovery.

Accordingly, Distributors' motion for summary judgment must be denied.

---

[22]There is a line item under Liabilities for "Payable to affiliate for distribution and services fees" in the amount of only $103,931. Hess-Mahan Decl., Exhibit 4, at page 13. Presumably that represents .75% Distribution Fee that had accrued but had not been paid as of December 31, 2002.

[23]The same analysis, with somewhat different numbers, applies to the Fund's 2003 and 2004 Annual Reports. *See* relevant excerpts from the Fund's Annual Report for 2003, attached as Exhibit 5 to the Hess-Mahan Decl., at pages 19 and 34-35 (total uncovered distribution charges nearly $28.5 million; total liabilities approximately $11.2 million) and the Fund's Annual Report for 2004, attached as Exhibit 6 to the Hess-Mahan Decl., at pages 7 and 16 (total uncovered distribution charges nearly $21.6 million; total liabilities approximately $6.5 million).

## CONCLUSION

For the reasons set forth above, Distributors' motion to dismiss or, in the alternative, for summary judgment as to Plaintiff's §36(b) claim against Distributors should be denied. However, if the Court should conclude that the Defendant might be entitled to summary judgment on the record currently before the Court, then, for the reasons set forth in the Hess-Mahan Decl., submitted herewith, Plaintiff requests that the Court, pursuant to Fed. R. Civ. P. 56(f) deny Distributors' motion for summary judgment, in order to afford the plaintiff the opportunity to obtain the necessary discovery, in order to obtain facts with which to oppose the Distributors' motion for summary judgment.

Dated: August 15, 2005                              Respectfully submitted by the attorneys for the plaintiff,

**/s/Theodore M. Hess-Mahan**
Edward F. Haber (BBO No. 215620)
Michelle Blauner (BBO No. 549049)
Theodore M. Hess-Mahan (BBO No. 557109)
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02109
(617) 439-3939

OF COUNSEL:
Richard J. Vita (BBO No. 510260)
77 Franklin Street, 3rd Fl.
Boston, MA 02110
(617) 426-6566