```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


MICHELLE YAMEEN, derivatively  )
on behalf of the Eaton Vance   )
Tax-Managed Growth Fund 1.1,   )
                               )
     Plaintiff,                )
                               )       CIVIL ACTION NO.
     v.                        )       03-12437-DPW
                               )
EATON VANCE DISTRIBUTORS, INC.,)
JAMES B. HAWKES, SAMUEL L.     )
HAYES,NORTON H. REAMER,        )
LYNN A. STOUT, WILLIAM H. PARK,)
RONALD A. PERALMAN, JESSICA M. )
BIBLIOWICZ, JACK L. TREYNOR,   )
and DONALD R. DWIGHT,          )
                               )
     Defendants, and           )
                               )
EATON VANCE TAX-MANAGED GROWTH )
FUND 1.1,                      )
                               )
     Nominal Defendant.        )
```

MEMORANDUM AND ORDER
October 14, 2005

Plaintiff Michelle Yameen, a shareholder of the Eaton Vance Tax-Managed Growth Fund 1.1, brings this derivative action on the Fund's behalf. She alleges that the Defendants breached their fiduciary duties under Sections 36(b) and (a) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. §80a-1 *et seq.*, (Counts I and II), and Massachusetts law (Count III) by authorizing and receiving excessive distribution fees during the period of time that the Fund was closed to new investors.

-1-

Eaton Vance Distributors, Inc. ("Distributors"), nine Independent Trustees ("Trustees"), and nominal defendant Eaton Vance Tax-Managed Growth Fund 1.1 have moved to dismiss or alternatively, for summary judgment, as to the Amended Derivative Complaint ("Complaint") pursuant to Fed. R. Civ. P. 12(b)(6). The Plaintiff has elected not to oppose the motion to dismiss Counts II and III.[1] After full consideration of the remaining

---

[1] The Plaintiff states that although she does not oppose the Defendants' motions to dismiss Claims II and III, she does not concede the merits of the Defendants' arguments. I note that even had she actively opposed the motions, the Plaintiff's claims presented in Counts II and III would not have survived.

The claim for breach of fiduciary duty based on Section 36(a) alleged in Count II fails because there is no private right of action under that provision. Alexander v. Sandoval, 532 U.S. 275, 288 (2001), requires that any implied right of action must be found in the "text and structure" of a statutory provision. Section 36(a) contains no express private right of action. 15 U.S.C. §80a-35(a). The ICA provides that the SEC can enforce both 36(a) and 36(b), but private investors can enforce only 36(b). 15 U.S.C. §80a-35(a), (b). Thus, as the court held in In re Eaton Vance Mutual Fund Fee Litig., 380 F. Supp. 2d 222, 232 (S.D.N.Y. 2005),

> [t]he absence of rights-creating language, the existence of an alternative method of enforcement, and the existence of an explicit private right of action for another provision of the statute creates the strong presumption that Congress did not intend to create private rights of action under ... §36(a).

The claim alleged in Count III under Massachusetts law also fails. In order to bring a derivative action in Massachusetts, a plaintiff must first make a demand upon the board of directors or trustees. Mass. Gen. Laws ch. 156D, §7.42(1). This requirement applies universally to all suits brought after July 1, 2004. See ING Principal Protection Funds Derivative Litigation, 369 F.Supp.2d, 163, 170 (D. Mass. 2005). The Plaintiff filed the amended derivative complaint on March 30, 2005, but failed to make a demand upon the trustees.

In a Memorandum and Order issued today in another case raising similar claims but where the plaintiff did not effectively abandon them, I treat these issues in a more extended

claim presented in Count I, I will grant the motions to dismiss all three counts.

## I. BACKGROUND

Established on March 28, 1996, the Eaton Vance Tax-Managed Growth Fund 1.1 ("Fund")is an open-end management investment company, or mutual fund, and a series of the Eaton Vance Mutual Funds Trust ("Trust"). The Trust is governed by a six-member Board of Trustees ("Board").

Pursuant to a distribution agreement approved by the Board ("Distribution Agreement"), Distributors serves as the principal underwriter for the Fund. The Distribution Agreement governs the distribution of the Fund's shares, which are sold primarily through broker-dealers or other financial institutions.

The Fund offers several classes of shares with varying fee structures. Class A shareholders pay a sales charge, or "front-end load," at the time of purchase. The front-end load is calculated as a percentage of the purchase price. The Fund pays the front-end load to Distributors as compensation for distribution expenses, including commissions to the selling broker-dealer.

Purchasers of Class B and C shares pay no front-end load. Instead, Distributors pays the sales commissions and other up-

---

fashion. See generally Stegall v. Ladner, et al., Civil Action No. 05-100062-DPW (D. Mass. October 14, 2005). For present purposes, it is sufficient to observe that I am satisfied the claims set forth in Counts II and III are without merit.

front, sales-related expenses.  According to the Distribution Agreement, the Fund must pay Distributors a commission of 5% and 6.25% for Class B and C shares, respectively, plus interest on outstanding amounts.  To that end, the Fund collects a distribution charge equal to 0.75% per year of daily net assets, which it pays to Distributors on a monthly basis.  Class B and C shares make these monthly payments to Distributors until the distribution charges are fully paid.  At that point, the fund ceases to collect the 0.75% fee.

   The Fund also imposes an annual service fee on Class A, B, and C shares equal to 0.25% of the net asset value of the funds. This fee covers expenses for ongoing personal services, such as providing shareholders with assistance and information, and maintenance of shareholder accounts.  See generally, NASD Rule 2830(b)(9).

   On March 1, 2001, the Fund "closed", or stopped selling shares, to persons who were not already shareholders.  It continued, however, to sell shares to existing shareholders.  It also continued to charge the 0.75% fee payable to Distributors and the 0.25% service fee.  The Plaintiff estimates that the Fund has paid a total of $155.3 million in distribution and service charges since March 1, 2001.

   The Plaintiff contends that once the Fund closed to new investors, the distribution and service fees greatly exceeded the minimal distribution costs then actually being incurred.  The

single claim Plaintiff now presses in Count I is that Distributors breached its fiduciary duties under Section 36(b) of the ICA by receiving distribution and service fees after the Fund had closed to new investors.

## II. DISCUSSION

### A. Standard of review

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting Hishon v. King & Spalding, 467 U.S. 69(1984)). In considering a motion to dismiss, a court "must accept as true the factual allegations of the complaint and draw all reasonable inferences in favor of [the Plaintiff]." Blackstone Realty LLC v. Federal Deposit Insurance Corporation, 244 F.3d 193, 197 (1st Cir. 2001).

In cases, such as this one, where a plaintiff alleges that a mutual fund charged excessive fees, "a complaint must state more than a legal conclusion that a fee is excessive in order to survive a motion to dismiss." Krantz v. Fidelity Mgmt & Research, Co., 98 F. Supp. 2d 150, 158 (D. Mass. 2000). "Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." DM Research v. College of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999).

**B. Legal framework**

Three inter-related regulatory directives are relevant here: Section 36(b) of the ICA, SEC Rule 12b-1, and NASD Rule 2830.

The ICA is a comprehensive regulatory scheme enacted to protect shareholders from the "potential abuse inherent in the structure of investment companies." Daily Income Fund v. Fox, 464 U.S. 523, 536 (1984)(quoting Burks v. Lasker, 441 U.S. 471, 480 (1979)); see also Investment Company Amendments Act of 1970, S. Rep. No. 91-184, reprinted in 1970 U.S.C.C.A.N. 4897, 4901(Leg. Hist. May 21, 1969).  Unlike most corporations, investment companies are generally created and managed by a separate, pre-existing organization known as an investment advisor.  Daily Income Fund, 464 U.S. at 536.  The advisor supervises the daily operation of the fund and selects the company's board of directors.  Id.  As a result, the "relationship between investment advisers and mutual funds is fraught with potential conflicts of interest."  Id. (internal citations omitted).

With respect to fees, Congress apparently believed that mutual fund shareholders needed special protection because the "forces of arms-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."  Id.  To that end, Section 36(b) of the 1970 Amendments to the ICA imposes a fiduciary duty upon mutual fund

investment advisors and managers:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. §80a-35(b).

This fiduciary duty with respect to fees applies not just to investment advisors, but to others, such as officers, directors, board members, and principal underwriters, who owe general fiduciary duties to mutual fund shareholders.[2]  See 1970 U.S.C.C.A.N. at 4902 ("Other persons enumerated in Section 36(a) who may have a similar fiduciary duty with respect to compensation or payments received by them from the fund or its shareholders may also be sued for a breach of that duty.")

Intending to grant managers greater freedom to use fund assets for distribution costs, the Securities and Exchange Commission ("SEC") in 1980 adopted Rule 12b-1 under the ICA. See Bearing of Distribution Expenses by Mutual Funds, 45 Fed. Reg. 73898-01, 73898 (November 7, 1980). Rule 12b-1 allows mutual funds to use a percentage of their assets to compensate underwriters, dealers and sales personnel for services "in

---

[2] Section 36(a) establishes general fiduciary duties on the part of any person who serves or acts "(1) as officer, director, member of any advisory board, investment adviser, or depositor; or (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company." 15 U.S.C. §80a-35(a).

connection with" the distribution and marketing of the fund's shares. 17 C.F.R. §270.12b-1(b); <u>ING Principal Protection Funds Derivative Litigation,</u> 369 F. Supp. 2d 163, 167 (D. Mass. 2005). As will become evident below, I concur with the view that it also allows mutual funds to choose between paying distribution and service charges up front and spreading them out over a period of several years. <u>ING</u>, 369 F. Supp. 2d at 167.

The board of directors of a mutual fund may implement a fee structure in accordance with Rule 12b-1 only if "there is a reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. §270.12b-1(e). The adoption of a fee plan under Rule 12b-1 gives rise to the fiduciary duties imposed by Section 36(b). <u>Id.</u> Allegations, such as this one, that Rule 12b-1 fees are excessive have been brought under Section 36(b). <u>Pfeiffer v. Bjurman, Barry & Associates</u>, 2004 WL 1903075, *4 (S.D.N.Y)(relying upon <u>Krinsk v. Fund Asset Management, Inc.</u>, 875 F.2d 404, 406 (2d Cir. 1989)).

Section 22(b) of the ICA grants the National Association of Securities Dealers ("NASD") the authority to limit the service fees that mutual funds may charge shareholders under Rule 12b-1. 15 U.S.C. §80a-22(b). NASD Rule 2830 limits asset-based sales charges to 0.75% per year of the average annual net assets of the fund plus interest. NASD Rule 2830(d)(2)(E).[3] Service fees may

---

[3] "Sales charges" are "all charges or fees that are paid to finance sales or sales promotion expenses, including front-end,

not exceed 0.25% of the average annual net asset value of the fund.  NASD Rule 2830(d)(5).[4]

With this regulatory scheme in mind, I address the Plaintiff's claim that Distributors breached its fiduciary duties under §36(b) by receiving excessive distribution and service fees.

**C. Breach of fiduciary duty under Section 36(b)**

It is undisputed that the Fund's distribution and service fees are within the limits set by NASD Rule 2830.  However, this does not necessarily mean that the fees are _per se_ reasonable.  See ING, 369 F. Supp. 2d at 168; Bahe v. Franklin/Templeton Distributors, Inc., et al., Civil Action No. 04-11195-MLW (D. Mass), Transcript of Motion to Dismiss Hearing, 44 (March 17, 2005) ("Section 22b-1 only permits the NASD to prescribe rules for reasonable compensation. What is reasonable still depends on all the relevant circumstances.").

The test for breach of fiduciary duty under Rule 36(b) is whether the fee "is so disproportionately large that it bears no

---

deferred and asset-based sales charges, excluding charges and fees for ministerial, recordkeeping or administrative activities and investment management fees."  NASD Rule 2830(b)(8).

[4] "Service fees" are "payments by an investment company for personal service and/or the maintenance of shareholder accounts."  NASD Rule 2830(b)(9).  Service fees pay for "shareholder liaison services... such as responding to customer inquiries and providing information on their investments."  NASD Notice to Members 93-12, 53 (February 1993).  I find that such fees support the sales efforts of the company by assuring that there will be follow-up account maintenance for purchasing shareholders.

reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2nd Cir. 1982).

Gartenberg identified six factors to consider when evaluating the excessiveness of a fee:

> (a) the nature and quality of services provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; and (f) the independence and conscientiousness of the trustees.

Krinsk v. Fund Asset Management, Inc., 875 F.2d 404, 409 (2d Cir. 1989)(quoting Gartenberg, 694 F.2d at 929-30).

The Plaintiff's allegations put in issue only the last of the Gartenberg factors: the independence and conscientiousness of the Trustees. She claims that the Trustees failed to consider the fact that the Fund was closed to new investors when they approved the fees at annual meetings in 2001, 2002, 2003, and 2004. The closure of the Fund, she alleges, was "highly pertinent" to the decision to continue the fees because the sales-related expenses of the closed Fund are "minimal." From this, she draws two conclusions. First, there was no "reasonable likelihood" that the payment of fees would benefit the shareholders as required by Rule 12b-1, and second, the fees could not have been the product of arm's length negotiations.[5]

---

[5] The Plaintiff alleges that both the 0.75% distribution fee and the 0.25% service fee are excessive because in a closed fund,

-10-

These allegations alone are insufficient to survive a motion to dismiss.  Although a claimant need not set out in detail the facts upon which she bases her claim, it bears restating that "[a]t the pleading stage, a complaint must state more than a legal conclusion that a fee is excessive."  Krantz, 98 F. Supp. 2d at 158.  The plaintiff must allege some relationship between fees charged and the services rendered that, if true, would support a claim that the fees are excessive.  Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 327 (4th Cir. 2001).

In her 46-page complaint, the Plaintiff alleges 30 separate times that the Trustees failed to consider the fact that the Fund was closed when it made its decision to continue the fee plan. She repeats 11 times that there was no reasonable likelihood that the Fund's payment of the fees would benefit its shareholders, and repeats four times that the Trustees' decision to continue the fees could not have been the product of arm's length bargaining.  However, she fails to demonstrate any substantive connection between the Trustees' fiduciary duties and the allegedly excessive fees.  Cf. Krantz, 98 F. Supp. 2d at 158-59

---

those expenses are *de minimis*.  The Plaintiff does not dispute that the Fund charged 0.25% service fee to provide ongoing personal services, such as shareholder assistance, in accordance with NASD Rule 2830.  She provides no facts to support her allegation that the closing of the fund resulted in a decrease of those personal services.  It follows that the portion of her claim relating to the 0.25% service fee must be dismissed. The remainder of the instant memorandum focuses on the 0.75% distribution fee.

(denying the defendant's motion to dismiss where the plaintiff alleged that the Fund lacked independent watchdog trustees, performed poorly, and significantly increased its revenue without passing along the savings to investors).

As evidence of the Trustees' disregard for the benefit of the shareholders, the Plaintiff points to memoranda that the Trustees requested from Distributors each year regarding the distribution fees ("Memoranda").  In the Plaintiff's view, the Memoranda did not distinguish between open and closed funds and recommended that the Trustees continue the fees as incentives for brokers to continue selling the shares, despite the fact that the Fund had closed.[6]  They also justified the fees based on the number of sales of shares which, the Plaintiff points out, declined once the fund closed.

Even assuming the Plaintiff's interpretation of the Memoranda is correct,[7] she does not explain how the Trustees'

---

[6] The parties have not submitted the Memoranda to the court. Consequently, the discussion in the instant Memorandum and Order is based only upon the excerpts included in the Complaint.

[7] The Plaintiff's interpretation itself is subject to question. The Memoranda ask the Trustees to evaluate the success of the service fee by examining the number of the sales and redemptions of shares since the Fund's inception.  In order to suggest that the sales fee was unwarranted, the Plaintiff notes that the actual number of sales decreased while redemptions increased each year since the Fund was closed. By focusing only on the annual, post-closure data, the Plaintiff not only misreads the Memoranda, she also fails to consider the performance of Distributors during the time that the fund was open. It is apparent that it is in large part for sales and marketing services provided during this time period that the Fund continues

reliance upon them would be improper. She contends only that the minutes of the meetings do not show that the Trustees considered the closed nature of the Fund. She makes no mention of the role the Memoranda played in their decisions.

The Memoranda actually weigh against the Plaintiff's claims. That the Trustees requested the Memoranda from Distributors at all shows that they attempted to make an informed decision in furtherance of their fiduciary duties. Moreover, as the Plaintiff points out, the Trustees engaged attorneys at the firm of Goodwin Procter, LLC to advise them, correctly, that they should record in the minutes the basis for their decisions on fees and should consider whether the fees benefitted the shareholders. The Plaintiff does not allege or provide any facts to suggest that the Trustees failed to follow this advice or were less than procedurally conscientious in making their decision to continue the fees.[8]

The only fault that the Plaintiff finds with the Trustees is that they allegedly failed to consider the closed nature of the Fund in setting the level of fees. She does not contend that the fees were excessive when the funds were open. Consequently, the

---

to charge the distribution fees at issue.

[8] To the contrary, the Plaintiff reports that the Trustees requested the Memoranda from Distributors upon Goodwin Procter's advice so that they could have "such information as may be reasonably necessary for them to make an informed determination of whether each Fund's [fee] plan should be continued."

-13-

crux of the Plaintiff's claim is that the fees are <u>per se</u> excessive because they exceed the *de minimis* ongoing sales expenses of a closed Fund.

Upon nearly identical facts, Judge Tauro in <u>ING</u> held that such a claim could not stand. In <u>ING</u>, shareholders challenged the continued charge of a Rule 12b-1 0.75% distribution fee and 0.25% service fee on net assets during the period when a mutual fund was closed to new investors. <u>ING</u>, 369 F. Supp. 2d 163, 166 (D. Mass. 2005). As in this case, the plaintiffs claimed that the distribution and service fees were excessive because they exceeded the *de minimis* sales-related expenses incurred while the fund was closed. <u>Id.</u> at 169. Noting that SEC Rule 12b-1 has for some time been authoritatively interpreted by officials of the SEC, the promulgating agency, to allow mutual funds to compensate companies for past distribution services, Judge Tauro granted the defendants' motion to dismiss. <u>Id.</u> He found that the plaintiffs failed to allege the "fundamental claim" that "the distribution fees are disproportionate and unrelated to the sales-related services actually provided when shares of the funds were marketed and sold to the general public." <u>Id.</u>

The Plaintiff argues that <u>ING</u> was wrongly decided. She claims that Judge Tauro should have modified the <u>Gartenberg</u> test to accommodate the requirement of Rule 12b-1(e) that there be a "reasonable likelihood that the [fee] plan will benefit the

-14-

company and its shareholders."  Rule 12b-1, she contends, requires the fees to benefit the shareholders in the future and their legality should be judged based on the benefits shareholders receive during the period of time the fees are being paid.

The Plaintiff provides a wooden reading of Rule 12b-1.  She reads it to bar deferred payment for services rendered.  But, as Judge Tauro noted, Rule 12b-1 and NASD Rule 2830 are specifically designed to allow mutual funds to continue paying sales charges after a fund has closed to new investors.  NASD Rule 2830 requires, of course, that mutual funds stop making payments for sales-related expenses once the charges have been paid in full.  But the Plaintiff does not allege that the Fund did not intend to or failed to cease payments after it had fully compensated Distributors according to the Distribution Agreement.

Nor is the Plaintiff persuasive in arguing that the Gartenberg test fails to come to grips with Rule 12b-1's requirement that distribution and service fees ultimately benefit the shareholders.  Gartenberg, to be sure, arose in the context of a challenge to a fund's advisory fees under Section 36(b).  But the Second Circuit crafted its test after careful consideration of the meaning of "fiduciary duty" as used in Section 36(b), the issue presented in this case.  Gartenberg, 694 F.2d at 928.  By the time Gartenberg was decided, Congress had already incorporated Rule 12b-1 into the ICA regulatory scheme.

The SEC crafted the rule to balance two competing interests: the need for Fund directors "to make business judgments to use fund assets for distribution" and the need to ensure that directors are "free of undue management influence and have carefully considered all relevant factors." Bearing of Distribution Expenses by Mutual Funds, 1980 WL 20761, *1 (SEC Release No. 6254, October 28, 1980). The Gartenberg test accommodates evaluation of both of these interests as presented in the context of Section 36(b).

Although the First Circuit has not set a standard for excessive fees, at least four lower courts outside the Second Circuit, including two judges of this District, have followed the Gartenberg test in reported decisions. See ING, 369 F. Supp. 2d at 168 (Judge Tauro); Krantz, 98 F. Supp. 2d at 158 (Judge Saris); Migdal v. Rowe-Price Fleming, 1999 WL 104795, at *1 (D.Md.), aff'd, 248 F.3d 321 (4th Cir. 2001); King v. Douglass, 973 F. Supp. 707, 722 (S.D.Tex. 1996). As Judge Saris noted, Gartenberg "provides a comprehensive framework to analyze a claim of excessive fees." Krantz, 98 F. Supp. 2d at 158. I decline the invitation to refine that framework here.

The Plaintiff in this case, like the plaintiffs in ING, fails to allege that "the distribution fees are disproportionate and unrelated to the sales-related services actually provided when shares of the funds were marketed and sold to the general

-16-

public." ING, 369 F. Supp. 2d at 169. She also provides no factual assertions that would support such an allegation, with respect to either the 0.75% distribution fee or the 0.25% service fee. Rather, she relies upon the categorical contention, rejected by the regulatory bodies charged with supervising this activity, that such fees are per se disproportionately large and hence unreasonable when paid out while the fund is closed. The Plaintiff must allege more than an erroneous construction of an SEC rule to state a claim under Section 36(b). She has not.[9] The Complaint fails to state a claim for breach of fiduciary duty in connection with the fees at issue here.

### III. CONCLUSION

For the reasons set forth more fully above, the Defendants' motions to dismiss are GRANTED.

/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[9] The Defendants advance three alternative grounds for dismissal: (1) Section 36(b)(4) excludes 12b-1 payments from Section 36(b); (2) even setting aside §36(b)(4), §36(b) does not support an attack focused solely on distribution fees; and (3) the distribution payments identified in the complaint are expressly authorized by ICA §22(b) and the rules thereunder and, consequently, cannot be attacked as excessive. Because the complaint is being dismissed on other grounds, there is no need to consider and resolve those grounds at this time.